1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GERALD F. STANLEY,

11             Petitioner,                 No. CIV S-95-1500 FCD GGH P

12       vs.

13   JILL L. BROWN, Acting              **DEATH PENALTY CASE**
     Warden of the California State Prison
14   at San Quentin,

15             Respondent.                 ORDER RE: EVIDENTIARY HEARING ISSUES

16   _____/

17   *Introduction*

18             Pursuant to the order of the court filed September 10, 2004, and modified several

19   times thereafter with respect to dates, petitioner[1] was directed to file a motion for evidentiary

20   hearing, and:

21             Within that motion, petitioner shall attach such evidence as
               necessary to demonstrate that materially disputed facts exist to
22             warrant an evidentiary hearing.  Petitioner shall support in
               evidentiary fashion the allegations of the petition.  The court will

23

24       [1] For ease of reference, "petitioner" is used to reference both the actual petitioner himself
     and/or his counsel.  Generally, it is obvious where petitioner actually refers to Gerald Stanley and
25   where petitioner is simply a shorthand for "petitioner's counsel." When it becomes necessary in
     the course of this order to differentiate petitioner from his counsel, the court will refer to
26   petitioner as "Stanley," and counsel as "petitioner's counsel."

                                            1

accept references to the state record, admissible exhibits and
declarations of witnesses, including expert witnesses, for the
establishment of such facts.  Petitioner need not prove his case on
each claim, but much like summary judgment, must submit
sufficient factual material to warrant the conclusion that an
evidentiary hearing is warranted.

Petitioner has filed his motion, but the satisfaction of the above requirements shall

be the subject of discussion below.  Respondent filed an opposition, in part, and petitioner filed

his reply thereafter.

The claims in the operative amended petition filed September 30, 2002, upon

which petitioner seeks an evidentiary hearing are: 1, 2, 4, 21, 22, 23, 24, 25, 26, and 27.   With

qualification (discussed below), respondent agreed that a hearing should be held on claims 21

and 24.

_Standards for an Evidentiary Hearing_

The standards for an evidentiary hearing are those set forth in AEDPA, 28 U.S.C.

2254 (e)(2) and relevant case law.[2]  However, nothing in that statute or the case law precludes the

undersigned from tasking the parties, pursuant to Fed. R. Civ. P. 16 and 56, _especially after a ten_

_year pendency of this case in federal and state court on post-conviction review_, with

demonstrating up-front specificity and offers of proof constituting at least a prima facie case.

Nothing in AEDPA or the case law directives requires a court to subject itself to numerous

hearings on claims where the petitioner cannot even make a minimal offer of proof that the claim

is colorable after he has been given essentially _carte blanche_ in federal court to develop the facts

of his case.

\\\\\

---

[2]  Although this case was commenced prior to the effective date of AEDPA, no petition
was filed until well after that date.  The first document which could be considered a petition
was filed September 27, 1997.  The court does not consider any of Stanley's various filings, including
a "petition not to file a petition" as a petition under the habeas rules.  See, Woodford v. Garceau,
538 U.S. 202, 207, 123 S. Ct. 1398 (2003) (for purposes of § 2254(d), an application for habeas
corpus relief is a filing that seeks "an adjudication on the merits of the petitioner's claims").

1        In general, prior to even arriving at the AEDPA standards for evidentiary hearing,

2  a petitioner must allege facts with specificity, demonstrating the real possibility of constitutional

3  error.  Blackledge v. Allison, 431 U.S. 63, 75 (n.7), 97 S. Ct. 1621 (1977); Calderon v. USDC,

4  98 F.3d 1102, 1109 (9th Cir. 1996) (Schroeder, J., concurring).

5        Assuming the initial specificity of non-conclusory facts, in the absence of any

6  scheduling requirements imposing an accelerated duty for a petitioner to demonstrate the

7  existence of material facts, a petitioner may have an evidentiary hearing if he was not at fault for

8  the non-development of the facts he would desire to present on collateral review, and one of the

9  reasons set forth in Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745 (1963) is applicable.

10  Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005).  Here, the only ground with

11  potential applicability is the non-holding of a state court hearing on the claims alleged.  The state

12  court did not hold any hearing on any claim in this case.  And, respondent does not urge that

13  petitioner is "at fault" for not previously presenting facts which would have precluded a hearing

14  on any of petitioner's requested claims.

15        However, in a holding that has never been limited by the Supreme Court, and

16  which may not be limited or ignored by the circuit courts (no matter how many cases are cited by

17  petitioner in which further procedures were not at issue), the Supreme Court gave district courts

18  the authority to utilize civil case procedures to weed out insubstantial claims before substantial

19  resources are expended on evidentiary hearings.

20           This is not to say that every set of allegations not on its face
             without merit entitles a habeas corpus petitioner to an evidentiary

21           hearing.  As in civil cases generally, there exists a procedure whose
             purpose is to test whether facially adequate allegations have

22           sufficient basis in fact to warrant plenary presentation of evidence.
             That procedure is, of course, the motion for summary judgment.

23

24  Blackledge v. Allison, 431 U.S. at 80, 97 S. Ct. at 1632.

25  That is the very procedure, in a somewhat different and accelerated form, that the undersigned

26  ordered in this case:  in light of the answer which, on the contested claims herein, has in essence

1   asserted that no material issue of fact exists which would preclude judgment in its favor,

2   petitioner was tasked with offering sufficient evidentiary materials to establish a material issue of

3   fact.  "Petitioner need not prove his case on each claim, but much like summary judgment, must

4   submit sufficient factual material to warrant the conclusion that an evidentiary hearing is

5   warranted."  Order of September 10, 2004.  The procedures developed by the undersigned were

6   expressly sanctioned by the Ninth Circuit in Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir.

7   1999).[3]  In other words, the district court may employ procedures authorized by the Federal Rules

8   of Civil Procedure to determine whether a claim is "colorable."  See also Williams v. Woodford,

9   384 F.3d 567, 588 (9th Cir. 2004):  "However, conclusory allegations by counsel that are

10  unsworn and unsupported by any proof or offer of proof do not provide an adequate basis to

11  obtain a federal evidentiary hearing."  The undersigned's procedures were designed to elicit that

12  proof and/or offer of proof.[4]

13  *Discussion*

14          The undersigned will not repeat the background of this case as he has set this forth

15  in various orders and findings and recommendations already; in any event, for purposes of this

16  order, the background is well set forth in the state supreme court opinion, People v. Stanley, 10

17  Cal. 4th 764, 42 Cal. Rptr. 2d 543 (1995).

18  

19      [3]  Respondent cited to the earlier version of the Ninth Circuit's opinion which was
    withdrawn and re-issued.  In its re-issued opinion, the Ninth Circuit provided: "In fact, the
    Magistrate Judge established an entirely reasonable process to deal with the claims for which
20  Rich sought discovery and a hearing. The process required Rich to identify which of his claims
    remained unexhausted, which actually presented federal questions, and those as to which habeas
21  relief might be available if favorable evidence were developed.  Despite being given more than
    five months to investigate and prepare as well as a full day of argument to identify claims that
22  might colorably entitle him to relief, Rich was unable to do so."  The Magistrate Judge in Rich
    was the undersigned, and the "entirely reasonable process" was a summary judgment type
23  procedure.

24      [4]  The undersigned need not go into all the procedural context of the verification of the
    petition by counsel, and Stanley's subsequent attempted repudiation of the petition.  However,
25  the petition is based, in part, and unknowable part, on "information and belief."  See Verification
    page.  Such a verification does not take the place of "sworn facts" which presume that the facts
26  are based on personal knowledge.

Claim 1

Claim 1, with its seven sub-claims is a pot pourri of asserted legal error and error based upon factual allegations.  It also overlaps somewhat with Claims 22, 23, and 24.  The undersigned will visit each of the sub-claims here, and will address later, to the extent not already addressed with respect to Claim 1, the other related claims.

To the extent not based upon ineffective assistance of counsel, Claim 1 has been procedurally barred for failing to have raised the issues on direct review.  See Order of August 3, 2005, adopting the March 3, 2004 Findings and Recommendations.  This applies to both procedural and substantive incompetence theories.  (However, as seen below, whether petitioner was in fact incompetent (substantive due process) is part of the ineffective assistance of counsel equation.)

The court pauses to discuss the procedural bar ruling based on In re Dixon, 41 Cal. 2d 756, 759 (1953).  Respondent raised this defense in its answer filed July 29, 2003.  As pointed out by petitioner *now*, but not in its opposition to application of the Dixon bar, respondent's assertion of the defense was ambiguous.  On page 3 of the answer, respondent did limit the defense to Claim 1(a).  However, on page 100 of the answer, respondent indicated that the Dixon bar was being presented here just as the California Supreme Court had so stated.  The opposition to the procedural bar made no mention of this conundrum, nor petitioner's present Waltreus position; indeed, the Dixon part of the discussion in petitioner's opposition matched the brevity of respondents:  less than one page.  If petitioner thought respondent's assertion of the bar was ambiguous, or limited, or that Waltreus somehow limited the court's ability to impose the Dixon bar, petitioner should have informed the court of his position in the proceedings related to the procedural bar motion.  Nevertheless, the court will review on their merits claims which were actually raised before the California Supreme Court, and will not consider them procedurally

\\\\\
\\\\\

5

1  barred.  Further discussion of the effect of <u>Waltreus</u> on Claim 1 is discussed in footnote 5 below.[5]

2        Sub-claim 1(a) of the operative petition asserts that "information known to the

3  court" revealed that petitioner may have been incompetent at various stages of his capital case

4  proceedings.  Since this allegation proceeds on "known," of record, information, the California

5  Supreme Court barred this claim for not having raised it on direct appeal.

6        Petitioner alleges, in sub-claims 1(b) and 1(e) that his counsel were ineffective in

7  several regards in not asserting petitioner's lack of competency earlier in the proceedings and

8  during the competency proceedings, i.e., failure to object to certain proceedings or evidence,

9  testifying in the competency proceeding.  As is well known, a claim of ineffective assistance of

10  counsel proceeds on two prongs:  (1) were counsel's actions unreasonable; (2) did petitioner

11  suffer prejudice as a result of the unreasonable actions of counsel, prejudice being defined as an

12  undermining of the court's confidence in the outcome of the proceeding.  <u>Strickland v.</u>

13  <u>Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984).

14        Petitioner does not set forth evidence, only allegations in the petition, that his

15  counsel acted unreasonably.  That is, petitioner presents no factual explanations from counsel for

16  the criticized actions.  However, the court accepts for purposes of ordering an evidentiary hearing

17  the allegations that counsel's actions were deficient on their face.  The court now turns to

18  prejudice.

19        [5] Petitioner raised the fact that Claim I had also been barred by <u>In re Waltreus</u>, 62 Cal. 2d

20  218, 225 (1965) insofar as Claim I asked for re-adjudication on claims already presented on
direct review.  <u>Waltreus</u> is not a bar to federal review since by definition the federal court will be

21  reviewing the claims which were decided on the merits on direct review, i.e., the habeas petition
re-alleging the claim is superfluous.  <u>See</u> <u>Nunnemaker v. Ylst</u>, 501 U.S. 797, 111 S. Ct. 2590

22  (1991).  Although petitioner never mentioned <u>Waltreus</u> at the time of the procedural bar motion
in its briefing as a reason why claims should not be procedurally defaulted, the court agrees that

23  two sub-claims were reviewed on direct appeal in the state supreme court and will be reviewed
here on their merits (sub claim 1(c) (appointment of counsel to advocate Stanley's competency)

24  and 1(d) (whether Stanley was competent to waive any rights at his competency hearing).
However, as seen in the text of this order, such claims are legal issues not requiring an

25  evidentiary hearing.  They will be decided on final Findings and Recommendations.  Claims 1(a)
and 1(g) are procedurally barred because they were not raised on direct appeal, but could have

26  been.  The court disagrees with petitioner that Claim 1(g) was raised on direct review.

Prejudice mirrors the substantive due process "retrospective competency hearing" that has been procedurally barred.  In other words, petitioner would have to show that counsel's unreasonable actions fostered a situation where petitioner was demonstrably unable to assist his counsel or comprehend the proceedings at whatever stage of his state court proceedings.  See Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788 (1960).  Obviously, if petitioner were not competent to proceed in state court, the court's confidence in the outcome of the proceedings are undermined as a matter of law.  In a sense, what has been procedurally barred as a "straight" claim under 1(a) may be adjudicated in the prejudice inquiry of ineffective assistance.[6]

In the factual prelude to all the sub-claims, petitioner sets forth a detailed, of record, factual chronology which he believes posits examples of his incompetency at various stages of the criminal proceedings.  If this were the only factual presentation, the undersigned would simply decide the matter as of record.  However, petitioner allies this chronology with two outside sources, the declaration of Dr. George Woods (Exhibit 10 to the state court exhaustion petition) and the declaration of Marcia Morrissey, Esq. (Exhibit 1 to the state court exhaustion petition).

The Dr. Woods declaration, an extensive rendition of expertise and opinion, qualifies as the presentation of facts sufficient to warrant an evidentiary hearing.  The purpose of this order is not to express an opinion on the substance of the Woods testimony, and indeed, the undersigned expresses no such opinion directly or by intimation.  However, it does present material issues of fact with respect to the issues of sub-claims (b) and (e).  Respondent is incorrect insofar as she believes that expert mental health testimony would be irrelevant to Stanley's actions or inactions at trial.  A trained observer can assist the court in translating actions or speech which might mean nothing to the untrained observer.  Or, a trained observer

---

[6]  As stated at hearing, petitioner is especially not prejudiced by the court not hearing sub-claim 1(a) on its merits (the "straight" Dusky claim) because petitioner repeated this sub-claim in Claim 22.

1  from respondent's camp may debunk petitioner's expert's strained analysis (as respondent would

2  argue), and show that the actions or speech are nothing more than amateur manipulation.  The

3  court cannot say that such testimony may not be presented by the advocates for each side at

4  evidentiary hearing.  Nor can the court definitively assess all the bases for Dr. Woods' opinions.

5  They may be based, as is proper for retrospective competency hearings, at least in part, on

6  contemporaneous medical records and contemporaneous actions of Stanley in court.[7]

7          Nevertheless, in order that petitioner not misunderstand his burden at this hearing,

8  petitioner cannot forget that the trial court held a *jury trial* on petitioner's competence in which

9  the verdict rendered was—competent.  This finding is entitled to a presumption of correctness,

10 and may not be disregarded in the absence of clear and convincing evidence, 28 U.S.C. §

11 2254(e)(1), or proof of other error, e.g., ineffective assistance of counsel *during the competency*

12 *proceedings*, which prejudicially tainted the proceedings.  Nor does it matter that the competency

13 hearing was held after the guilt phase and prior to completion of the penalty phase.  Petitioner's

14 counsel do not allege that Stanley was *ever* competent during his state trial court proceedings;

15 rather, petitioner alleges that the circumstances which made him incompetent existed at all times.

16 Therefore, as far as the presumption of correctness is concerned, it does not matter when the

17 competency trial was held, or when counsel should have recognized it.  Petitioner's counsel

18 cannot point, and have not pointed, to anything different, in terms of the temporal nature of their

19 mental acuity allegations, which would not have been at issue during the competency trial had

20 such trial been held at the beginning of the guilt phase, during the guilt phase, at the beginning of

21 the penalty phase, when it was actually held, or later in the penalty phase.  If the court were to

22 retrospectively find Stanley incompetent, it would necessarily have to apply to the entire

23 trial—all three phases.  Finding counsel ineffective for not having recognized this fact would

24

---

25      [7] The trial judge will not be held, however, to the standard of a Board certified
   psychiatrist.  Petitioner will have to show that laypersons should have been aware of what Dr.
26 Woods points out.

8

appear to be of no consequence once the finding of incompetence has been made.  The fact alone of incompetence is all that Stanley needs to prevail on the prejudice prong—difficult as it may be to prove.

In addition, the presumption of correctness is buttressed by the great reluctance of courts to hold retrospective competency adjudications.  Petitioner has a difficult burden indeed.  See Boyde v. Brown, 404 F.3d 1159, 1167 (9th Cir. 2005) (rejecting the retrospective competency opinion of Dr. Woods—petitioner's expert in this case—, *without evidentiary hearing* because it was not based on contemporaneous medical records, and the record indicated that petitioner was competent).[8]

The declaration of Ms. Morrissey is another matter.  There is no doubt that the declaration of Ms. Morrissey presents herself as a well qualified counsel.  However, appointed counsel in this case are qualified as well.  Ms. Morrissey's declaration is a legal brief, which any of petitioner's counsel would be competent to present and argue.  The primary purpose of the declaration, and hence Ms. Morrissey's testimony before the undersigned, is to argue the legal significance of what she perceives to be facts demonstrating petitioner's incompetence at trial.  Appointed counsel will perform this task.  Partially for the reasons set forth by respondent, and pursuant to the discretion that the undersigned maintains to take legal argument in the form of expert testimony, see Williams v. Woodford, 384 F.3d at 612 (n.17), the undersigned exercises that discretion to decline to hear this testimony, nor will the record be expanded to include the declaration/argument.  The declaration does not present material issues of fact.[9]

\\\\\

---

[8]  The state of the record, outside of the competency trial itself, in this case is less clear with respect to competency, and the court is desirous to hear from trial counsel in this regard.

[9]  The undersigned is not so presumptuous as to say that he does not need assistance in the endeavor of retrospective competency determinations; he is saying that he has the legal assistance he needs with counsel in this case.  At hearing, counsel stated that Ms. Morrissey would testify to the legal standards facing California lawyers at the time of Stanley's trial.  However, those standards will be set forth for the most part in applicable statutes, cases, treatises and the like.

1            Sub-claim 1(c) alleges that the trial court erred in determining to appoint an

2 counsel to advocate Stanley's position that he was in fact competent.  This issue is clearly a legal

3 issue inappropriate for evidentiary hearing.

4            Sub-claim 1(d) also posits a legal issue—the ability of a defendant whose

5 competence is questioned to make any decisions in his [competency] trial.  Although petitioner's

6 counsel's present position that Stanley was unable to assert that he was indeed competent at his

7 competency trial raises a rather Catch-22 situation, this issue is one of law.[10]

8            Sub-claim 1(f) is simply a catch-all claim that if any of the claims within Claim

9 one are successful, the court can find that they would have been successful if made at other

10 portions of the trial.  This sub-claim is wholly dependent on sub-claim 1(e) for which an

11 evidentiary hearing has been ordered.  None of the other sub-claims make sense as part of 1(f).

12            Sub-claim 1(g) has to do with a jury instruction(s) at the competency phase which

13 was not given.  Of course, the propriety of jury instructions, whether given or not, are legal issues

14 for which no evidentiary hearing is appropriate.  In addition, because this "lack of giving an

15 instruction" as phrased was not raised on direct review (only instructions given were addressed,

16 see People v. Stanley, 10 Cal. 4th at 815-818, 42 Cal. Rptr. 2d at 574-75), this issue could have

17 been raised on direct appeal and has been been procedurally barred.

18 \\\\\

19 \\\\\

20 \\\\\

21

22     [10]  The contention is also probably flawed.  Adjudications of incompetency have their
adverse effects on a defendant.  Some defendants do not want their trials forever delayed while

23 they lay in a legal limbo of incompetency status.  Favorable evidence may also be lost in the
meantime.  An indefinite incarcerated status before trial may have a tendency to "wear out" a

24 defendant.  Therefore, the fact that a defendant may want to advocate for a finding of competence
does not mean that he is incompetent.  Moreover, if petitioner's counsel were correct, a

25 defendant would not be entitled to testify on his own behalf or decide to represent himself.  The
court sees great difficulty in petitioner's counsel's position, but makes no final ruling on this

26 issue.

Claim 2

Petitioner asserts in Claim 2:

"The extended hiatus in the penalty phase and the publicity of the competency trial created a significant risk that members of the jury may have been exposed to prejudicial extraneous information about the case...

Amended Petition para. 273

***

Had the court permitted voir dire [at the recommencement of the penalty phase], the parties would have discovered prejudice stemming from the hiatus....

Amended Petition, para. 278

After a decade plus of the pendency of this case, years after the exhaustion process, and years after the filing of the operative petition, we know as much factually about the conclusions of Claim 2 as we know now. Petitioner did not even mention Claim 2 in his initial briefing for evidentiary hearing, and conceded, more or less, at hearing that this claim was not properly subject to evidentiary hearing. No proffer of any facts have been made outside the bare allegations of hiatus. Nor can petitioner claim that he has not been given sufficient time or resources to investigate this claim. Petitioner has had a figurative blank check for investigation because the Federal Defender has been co-counsel in this case. The Federal Defender does not have to ask the court for investigative funds; those funds are available as the Federal Defender sees fit. The court's procedure for ferreting out claims that need an evidentiary hearing is confirmed by this claim. The court will not hold an evidentiary hearing on the speculative premise that something will fall out of the sky which might be of benefit to petitioner.

Finally, petitioner asserts that Claim 2 is allied with Claim 21 alleging specific instances of juror misconduct. Therefore, according to the argument, an evidentiary hearing should be held on Claim 2. The undersigned disagrees. The prima facie facts set forth in Claim 21, which in part raise material issues of fact for that claim, rise or fall on their own merits.

11

1  Argument that those alleged instances of misconduct were caused by the hiatus in the penalty

2  phase case, a hiatus which petitioner concedes was necessary under California law, is sheer

3  speculation.  No facts have been proffered which would establish such a connection.

4     The undersigned makes no ruling here whether, as a matter of law, there is a time

5  period in which a penalty phase must be held after the end of the guilt phase.  Petitioner is still

6  free to make that argument should he so desire.  However, there will be no evidentiary hearing on

7  Claim 2.[11]

8    Claim 4

9     In this claim, petitioner asserts that his motions to suppress on Fourth

10  Amendments grounds were not adequately reviewed by the state supreme court, and that in any

11  event, the judge hearing the motions was biased.  To the extent that petitioner claims that this

12  "state process" of review violates due process, this claim has been procedurally barred.  To the

13  extent that petitioner is alleging that Stone v. Powell should not apply to the Fourth Amendment

14  claims he did raise, because he did not receive a fair hearing, petitioner is wrong as a matter of

15  law.  In any event, neither assertion warrants an evidentiary hearing.

16     Petitioner first claims that the preclusion of review of Fourth Amendment issues

17  as set forth in Stone v. Powell, 428 U.S. 465, 96 S. Ct. 3037 (1976), does not apply to capital

18  cases.  Case law holds differently.

19     There is nothing within the language of Stone v. Powell itself upon
   which to base a distinction between capital and non-capital

20     collateral review. We have applied Stone without hesitancy to
   capital cases. See, e.g., Deputy v. Taylor, 19 F.3d 1485, 1491 (3d

21     Cir.), cert. denied, 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853
   (1994).  Indeed, the principles of comity that underlie Stone v.

22     Powell, as well as the cost-benefit analysis postulated in

23  

24    [11]  Petitioner adds a one liner that publicity about the competency trial, a trial held in a
different county than the penalty phase, somehow infected the penalty phase.  This one-liner is

25  completely unsupported as it applies to the jury as a whole.  This does not rule out, however, that
a particular juror disobeyed the court's instructions and sought out, or otherwise was provided

26  with such publications.  Prejudicial pre-trial publicity is a different claim than juror misconduct.
See Thompson v. Borg, 74 F.3d 1571, 1574 (n.1) (9th Cir. 1996) (Reinhardt, J. dissenting).

1
2
3

> Stone--i.e., the deterrent value vis-a-vis those tempted to violate the proscriptions against illegal search and seizure weighed against the risk that risk that trustworthy evidence would be excluded--militate against the distinction Marshall would have us draw.

4  Marshall v. Hendricks, 307 F.3d 36, 81 (n.34)  (3rd Cir.2002) .

5                                                                ***

6
7
8
9

> As a result, under the clear language of Stone v. Powell, [FN26] the district court did not err in holding that it lacked authority to review these claims. [FN27] Devier urges that this doctrine does not apply to capital cases.  This court, however, has applied this doctrine to capital cases in the past, [FN28] and we see nothing in the language or reasoning of Powell itself or the Supreme Court's more recent pronouncements to support such a distinction.

10  Devier v. Zant, 3 F.3d 1445, 1455 (11th Cir. 1993) (footnotes omitted).

11  See also McQueen v. Scroggy, 99 F.3d 1302, 1332 (6th Cir.1996), overruled on other grounds, In
12  re Abdur Rahman, 392 F.3d 174 (6th Cir. 2004).

13         Petitioner next posits that even if Stone v. Powell applies in capital proceedings,

14  he did not receive the required fair opportunity to litigate his suppression claims.  No inkling of

15  the specific Fourth Amendment claims at issue are set forth by petitioner.  However, petitioner is

16  simply wrong that he did not receive a fair opportunity to litigate his claims.  As set forth in

17  People v. Stanley, petitioner's litigation of Fourth Amendment issues in the trial court, the

18  suppression proceedings, filled over 3,500 pages of transcript.  The trial court outcome was then

19  heard (as appropriate under California law) on petitions for writ of mandate by the Court of

20  Appeal, and review was denied by the Supreme Court.  Id, 10 Cal. 4th at 786, 42 Cal. Rptr. 2d at

21  554.  This alone bespeaks a fair opportunity to litigate the Fourth Amendment issues, and there is

22  not a scintilla of legal authority that suggests that this state process denied due process.  But, the

23  issue was raised again on direct review of the judgment in the state supreme court, and after

24  finding that the law of the case doctrine barred further review, the state supreme court reviewed

25  the Court of Appeal rulings to determine whether they resulted in any substantial injustice.  It

26  found none.  Petitioner's Stone v. Powell argument is meritless.

In a discovery motion reprise, petitioner next contends in his operative petition in Claim 4 that the trial judge who heard the suppression motion was biased on account of his dual role as adviser to the grand jury who was reviewing yet another murder attributed to petitioner. Petitioner does not mention Claim 4 in the motion for evidentiary hearing, except to summarily lump it with other claims to which petitioner claims entitlement to an evidentiary hearing.  At a discovery hearing wherein petitioner requested an opportunity to discover this claim, the undersigned found as follows:

> Petitioner asserts that he was denied a fair opportunity to have adjudicated his motion to suppress on account of judicial bias. Petitioner paints a picture that Judge Patton, the judge who presided at the motion, and one borrowed from Colusa County, was actively seeking the indictment of petitioner in Colusa County for the murder of Sheryl Wright.  Petitioner alleges that: "Judge Patton took it upon himself to pursue an indictment and to determine why none had been obtained already."  Ultimately no indictment occurred, notwithstanding Judge Patton's insistence. In requesting voluminous and difficult discovery of Grand Jury records, all correspondence of County Officials related to the Wright murder/prosecution, amidst other requests, petitioner proffers not a single fact supportive of the notion that Judge Patton "pursued an indictment."  Despite the years of investigation, petitioner's counsel have not presented a single declaration attesting to any conduct on the part of Judge Patton which might even infer impropriety, much less recount it.  Yet, the court is asked to let loose a discovery barrage into events transpiring over twenty years ago.  Counsel did not even know at hearing whether Judge Patton was alive at the present time to respond to any requests.

> In his discovery motion, petitioner exacerbates the problem by making further improbable conclusions, i.e., that Judge Patton encouraged the Grand Jury to investigate the District Attorney who was declining to prosecute petitioner, and that he "sent the Grand Jury legal authorities supporting its decision to try to force Mr. Stanley to be prosecuted."  Again, no facts supporting this assertion, even obliquely, are presented.  Rather, the uncontested facts set forth by respondent indicate that Judge Patton was the single judge in Colusa County at the time of the Lake County suppression motion, and part of his duties were responding to requests of the Colusa County Grand Jury.  It does appear that the Colusa County Grand Jury was at odds with the District Attorney over the Wright murder; it asked Judge Patton general questions about the Grand Jury's rights and authority in the matter.  Judge Patton generally advised the grand jury about its prerogatives.  See

14

1    Exhibit 46 to the state habeas petition.

2    The court in no way finds the facts of this matter as it stand before
     the court to even possibly suggest that Judge Patton acted in a
3    manner which biased him in respect to his duties as the visiting
     suppression judge in Lake County in the murder at issue for
4    petitioner's conviction (Cindy Rogers (Stanley)).[12]  Petitioner is not
     entitled to "'explore [his] case in search of its existence.'"  <u>Rich v.</u>
5    <u>Calderon</u>, 187 F.3d 1064, 1067 (9th Cir. 1999).  As respondent
     aptly observed: "Petitioner could just as easily have claimed that
6    Judge Patton was a relative of one of Petitioner's victims or had
     been bribed by one of Petitioner's enemies.  Although any of those
7    claims, if true, would support an allegation of judicial bias, the
     claim Petitioner has made is just as barren of specific supporting
8    allegations as those suggested at random by Respondent."
     Opposition at 3-4.

9

10   Order at 2-3.

11   This order was affirmed by the district judge on November 18, 2004.  In this order, the

12   Honorable Frank Damrell thoroughly re-reviewed the entire Judge Patton question.  He

13   concluded that:

14   "The magistrate judge correctly concluded that Judge Patton
     complied with existing California law permitting grand juries to
15   elicit the advice of the court, or the judge thereof.  Cal. Penal Code
     §§ 917-918, 934.  Here, the proffered documents suggest that
16   Judge Patton, the only superior court judge in Colusa County,
     simply responded to the grand jury's repeated requests for legal
17   advice regarding its authority to investigate the case and question
     the District Attorney.  Although Judge Patton contacted Deputy
18   Attorney General Tuton directly, petitioner fails to provide specific
     allegations that this contact was anything but proper.  In fact, the
19   inquiry supports respondent's contention that Judge Patton merely
     attempted to provide the grand jury with the information requested.

20

21   Order at 12-13.

22   Judge Damrell also concluded that Judge Patton was not required to recuse

23   himself under California law (even assuming a violation of this law would have stated a federal

24   issue).

25   ───────────────

26   [12]  Evidence relating to Ms. Wright's murder was introduced in petitioner's penalty phase,
     but the motion to suppress did not involve facts pertinent to Ms. Wright's murder.

Conversely, in the present case, petitioner fails to demonstrate that Judge Patton's actions would have resulted in disqualification.... Petitioner has failed to provide statutory or case law supporting his contention that his former Lake County attorney should have been notified that Judge Patton was providing advice to the jurors in via (sic) purported "ex parte communication. The facts simply do not support disqualification. Judge Patton acted within his authority when upon request, he provided advice to [grand] jurors.

Order at 15-16.

In seeking an evidentiary hearing, petitioner adds not one colorable fact which would entitle him to evidentiary hearing despite this court's scheduling order requirements. The undersigned again notes petitioner's years long access to investigators who could have contacted any of the "players" in this alleged improper conduct. The record is completely silent as to such investigation. The court can only conclude that having an evidentiary hearing would simply replay the already known facts—this replay would not result in a different ending for petitioner.

Accordingly, because Claim 4 has been procedurally barred, and is without merit, i.e., is not a colorable claim at this juncture, no evidentiary hearing will be ordered for Claim 4.

Claim 21

This claim, involving juror misconduct, by partial agreement of the parties, will be the subject of evidentiary hearing. However, the precise issues for which hearing will be held must be set forth.

Petitioner asserts that in Claim 21 the allegations of juror misconduct herein involve the guilt phase, penalty phase, and competency phase jurors. Respondent agreed that a hearing was necessary for the competency trial jurors.

The issues upon which an evidentiary hearing will be held are[13]:

1. Voir Dire Responses of Juror Mitts (undisputed)[14]

\\\\\

---

[13] The court will not discuss shackling here in that shackling is the subject of a specific claim. That claim is discussed infra.

[14] As to the need for a hearing.

16

2.  Improper communications and contact with trial outsiders by Juror Mitts (undisputed)

3.  Experiment by Juror Forbes

4.  Penalty Phase Juror – Herbert (learning of competency verdict from outside source)

5.  Juror Franich – threatening note (Robinson also)

6.  Juror Franich – staying with her mother – discussing with her mother facts of the case

No evidentiary hearing will be held on:

7.  Juror Schmedth belief that Franich felt intimidated by Stanley

8.  Discussion of meaning of LWOP

9.  Juror Expertise – Juror Robinson

10.  Sleeping Juror

11.  Discussion of Extraneous Victim Impact (interests of the victims)

12.  Juror Note Taking

The court chooses to discuss the issues in the order set forth below.  No discussion will be made on those juror misconduct issues whose necessity to be aired at an evidentiary hearing is undisputed.

### *Discussion of Meaning Of LWOP – #8 above*

Petitioner alleges that the jurors in this case discussed the meaning of LWOP (life without the possibility of parole), and whether that really meant life without parole.  To the extent that petitioner refers to the juror discussion of the subject itself as "extrinsic" because it violated court instructions or misconstrued the law, the claim is non-actionable.  However, to the extent that the jurors brought evidence into the jury room, pertinent to the subject of the meaning of LWOP, such a claim would be actionable.  Petitioner presents no facts as to this latter scenario.

1       This case proceeds under AEDPA, and one looks first to established Supreme

2  Court authority for direction.  That direction is found in Tanner v. United States, 483 U.S. 107,

3  107 S. Ct. 2739 (1987), in which the Supreme Court refused evidence elicited from a juror that

4  her co-jurors had consumed alcoholic beverages during the trial.  The Supreme Court, concerned

5  that post-verdict investigation into the jury's verdict to see, *inter alia*, whether instructions had

6  been followed, whether jurors had "played nice," and the like, would not permit the jury system

7  to survive the constant scrutiny to perfect the system.  Any review of juror deliberations could

8  only be authorized where information truly "external" had been presented or sought out.  Thus, a

9  failure to follow jury instructions (commenting on defendant's failure to testify) in deliberations

10 is non-actionable, United States v. Rutherford, 371 F.3d 634, 640 (9th Cir. 2004), as is improper

11 comment on the absence of a co-defendant, United States v. Falsia, 724 F.2d 1339 (9th Cir.

12 1983).  Juror statements on feelings whether availability of therapy warranted a life sentence are

13 unreviewable.  Beardslee v. Woodford, 358 F.3d 560, 591 (n.22) (2003).  Fed. R. Ev. 606(b)

14 which codifies the exclusion of impeachment of verdict testimony by jurors is fully applicable in

15 habeas corpus proceedings, Fed. R. Ev. 1101(e), in the absence of habeas rules or established

16 case law which directs otherwise.  Petitioner's cited case of Silva v. Woodford, 279 F.3d 825,

17 834 (9th Cir. 2004) is not to the contrary in that the issues there did not involve jury discussion

18 per se of the meaning of LWOP, but rather "because the jurors may have used extrinsic evidence

19 in ascertaining the meaning of 'life without parole.'"  Id.  Finally, Grotemeyer v. Hickman, 393

20 F.3d 871 (9th Cir. 2004) is also inapposite to petitioner's contention in that the court refused to

21 permit an evidentiary hearing on juror comments: (1) that the juror had been through this before,

22 and the defendant was guilty; (2) that the juror referred to her own medical expertise in opining

23 that the defendant was mentally ill; (3) that an insanity defense should have been mounted; (4)

24 that the defendant, if convicted, would receive adequate health care.  Although Grotemeyer

25 expressed concern about statements regarding sentencing during guilt deliberations in a non-

26 capital case, id. at 880, this is also inapposite in that the jurors in petitioner's case were rightfully

18

1  discussing sentence at the penalty phase of a capital case.

2           Petitioner presents evidence that several jurors did not believe that life without

3  parole really meant such.  Petitioner, having fully investigated the juror's statements, produces no

4  evidence that, for example, an outside magazine article was brought in, or a T.V. show opining

5  the same was discussed.  Rather, all petitioner brings forward is that the jurors did not believe

6  that "life meant life."  Conclusions based on general life experience are not susceptible to post-

7  verdict review.  <u>Grotemeyer</u> <u>supra</u>.  An alleged failure to follow instructions is not actionable.

8  Petitioner is silent about any extraneous evidence concerning such, and the pretrial scheduling

9  order required a proffer.  The court can only find that no such evidence exists, and that an

10 evidentiary hearing on such would be a waste of resources.

11          No evidentiary hearing will be held on this sub-claim.

12                *Experiment by Juror Forbes – #3 above*

13          No party takes issue with the premise, in the abstract, that a juror who performs an

14 experiment outside the confines of the courtroom has engaged in jury misconduct.  Respondent

15 relies on a declaration by the juror that the experiment was attempted long after the verdict.

16 Petitioner has presented evidence that the experiment may have been performed during the

17 course of the competency proceedings.  Petitioner is correct that an evidentiary hearing is

18 necessary to sort this out.

19                *Juror Robinson's Use of Expertise – # 9 above*

20          Accepting petitioner's proffered facts as true, the court finds that the denial of this

21 claim by the California Supreme Court was correct on its merits.  Hence, no evidentiary hearing

22 need be held.

23          Petitioner has proffered the following facts from two declarations by Juror

24 Robinson:

25          I learned about Jerry Stanley's cleft palate from the video tape of
           him that was shown in court.  Other than the video little was
26          explained about his cleft palate.  I work as a Speech Therapist, and

19

have worked with students with cleft palates that have not been
seriously affected by this disability.  I gave a simple explanation
about cleft palates to the other jurors.

*** 

That in my employment as a speech therapist, I am familiar with
individuals who have cleft palates.  That during the jury
deliberations, I believe I provided the other jurors a simple
anatomical explanation of what a cleft palate is.  However, due to
the passage of time, I do not recall exactly what I said, whether the
comment was made during the guilt or penalty phase of the trial,
which jurors were present when the comment was made, and at
which stage of deliberations this occurred at.

Petitioner's Brief at 34.

Petitioner's case is directly on point with Grotemeyer v. Hickman, supra (a case which petitioner

does not cite in this section).  In Grotemeyer, a juror, who happened to be a medical doctor,

opined that Grotemeyer's mental disorders caused him to commit his crime and that he would

receive treatment as part of his sentence.

As to these issues, Grotemeyer has cited no Supreme Court case,
and we have found none, holding that such conduct amounts to a
violation of his right of confrontation, of his right to an impartial
jury, or of any other constitutional right.  It is, of course, well
established law that a juror may not bring into the jury room
evidence developed outside the witness stand such as the results of
a juror's experiment conducted while the jury was on a weekend
recess, or legal research performed during the trial in an attempt to
supplement inadequate instructions from the judge.  But what the
jury foreman did here, assuming that she should not have, did not
rise to the level of these constitutional violations.

 The mere fact that the jury foreman brought her outside experience
to bear on the case is not sufficient to make her alleged statements
violate Grotemeyer's constitutional right to confrontation.  Counsel
ordinarily learn during voir dire what a veniremember does for a
living, and use peremptory challenges to avoid jurors whose
experience would give them excessive influence.  Dr. Papadakis's
experience was not shared by the entire jury--it would be
extraordinary to have a jury of twelve physicians--but there is
nothing wrong with her using it.  Juries have long been instructed,
in state and federal courts, to do precisely what the foreman did.
Usually the boilerplate instruction reads something like, "You are
to base your verdict only on the evidence received in the case.  In
your consideration of the evidence received, however, you are not
limited to the bald statements of the witnesses or to the bald
assertions in the exhibits.... You are permitted to draw from the

facts which you find have been proved such reasonable inferences as you feel are justified in the light of your experience and common sense." [FN17] We have said in obiter dicta, and now hold, that "a juror's past personal experiences may be an appropriate part of the jury's deliberations." [FN18] "Indeed, '50% of the jurors' time [is] spent discussing personal experiences,'" according to one researcher.

The Sixth Amendment entitles a defendant to an "impartial" jury, not to an ignorant one.  That a physician is on the jury does not deprive a defendant of his constitutional right to an impartial jury, even though the physician will doubtless have knowledge and experience bearing on any medical questions that may arise.  Many trials, including this one, boil down to a question of who is lying. It is hard to know who is lying without some understanding, based on past personal experience, of the circumstances of the witnesses. For example, Wigmore cites a case that a prosecutor lost because his witness testified that a "ready-made pine door" cost ten dollars. As the foreman of the jury--a carpenter by trade--explained, "'Well, he said ten dollars--and I knew he was a liar. A door like that don't cost but four-fifty!'"  Often, jurors identify lies by comparing the testimony, to the extent it deals with the familiar, with what they already know to be true.

\*\*\*

Because no impermissible extrinsic evidence was discussed, the state court did not act improperly by denying the motion for a new trial without holding an evidentiary hearing.

Grotemeyer, 393 F.3d at 878-881 (footnotes omitted).

The present allegations are indistinguishable from those in Grotemeyer. Therefore, the undersigned can in no way say that the state court denying petitioner an evidentiary hearing in this case and deciding the claim adversely to petitioner on the record constitutes an "unreasonable application of Supreme Court authority."  No evidentiary hearing is necessary on this claim.

### Juror Herbert's Statements Re Competency Verdict– # 4 above

Petitioner alleges, based on a declaration submitted in state court, that Juror Herbert had heard about the competency verdict from an outside source and therefore put the matter of petitioner's mental health out of her mind at the penalty phase.  Respondent has introduced a declaration from Herbert that rebuts much of what she said.  An evidentiary hearing

1    is necessary on this claim.

2                    *Sleeping Juror –  # 10 above*

3                    The parties submit conflicting evidence about the propensity of one juror,

4    identified as "noodle neck," to sleep through portions of the trial.  This claim was denied on its

5    merits by the state supreme court.  As recounted above, in <u>Tanner v. United States</u>, 483 U.S. 107,

6    107 S. Ct. 2739 (1987), defendant had sought to introduce evidence about alcoholic beverage

7    intake by certain jurors causing them to fall asleep at trial in the afternoon.  The Supreme Court

8    affirmed the denial of an evidentiary hearing holding that the juror could not give testimony

9    about their perception of jurors either in court or during deliberations.  Petitioner does not

10   contend that he has evidence of sleeping outside of the juror declarations.  Therefore, given the

11   closeness of the allegations here to those in <u>Tanner</u>, the state supreme court's determination on

12   the merits cannot possibly be an unreasonable application of clearly established Supreme Court

13   law.  No evidentiary hearing will be held.

14              *Feelings of Juror Intimidation Occasioned by Stanley – #7 above*

15                   The facts here are vague and inconclusive.  Petitioner has proffered evidence that

16   a female juror, at one time sitting in close proximity to Stanley, felt intimidated.  The evidence is

17   presented through the declaration of a male juror (Schmedth) who at one time was asked by a

18   bailiff to change seats with the female juror.  Allegedly, the female juror told Schmedth that she

19   felt intimidated.  Respondent takes issues with the facts, and posits that the female juror incident

20   was separate and apart from any incident in which jurors were asked to switch seats.

21                   In any event, the factual controversy does not matter, because once again,

22   petitioner relies upon a juror's statement about his perceptions of another juror's state of mind

23   occasioned by what took place in the courtroom.  As such, petitioner's allegations run afoul of

24   Fed. R. Ev. 606(b).  The situation here is no different than had the juror informed all other jurors

25   in the deliberation room that she was voting for the death penalty because she felt intimidated by

26   Stanley.  Whatever the cause of the intimidation, e.g., the facts of Stanley's senseless and cruel

                                                   22

1  multiple murder history of females, or looks that Stanley may have given her, the court will not

2  accept testimony to impeach the verdict based on a juror's internal thought process.

3        The undersigned emphasizes that this is not a situation where the juror

4  communicated her significant fears to the judge, and the judge took no action whatsoever,

5  including actions to ensure that the affected jurors could remain fair and impartial.  See generally

6  Remmer v. United States, 347 U.S. 227, 74 S. Ct. 450 (1954); Williams v. Woodford, 384 F.3d

7  567, 624-628 (9th Cir. 2004).  Petitioner does not cite to any record where the judge was

8  informed about any alleged intimidation.  The facts presented by petitioner, even assuming their

9  truth, do not make out a colorable claim, and hence no evidentiary hearing is necessary.

10                  *Juror Franich – Claim #'s 5 and 6 above*

11        Petitioner first alleges that this juror stayed with her mother while the trial was

12  underway and she spoke to her mother about the proceedings.  Petitioner alleged in the Amended

13  Petition at page 170:

14          Franich stayed with her mother off and on during the course of the
            trial, and she spoke with her mother about the testimony in the case
15          while the testimony was ongoing.  Her mother told her that
            Petitioner was a really bad person, whereupon Franich agreed with
16          her mother.[15]

17        The allegation is asserted based on petitioner's "investigation," and petitioner

18  belatedly produced the declaration of the investigator setting forth what would appear to be

19  inappropriate comments by Juror Franich.  An evidentiary hearing will be held on this sub-claim.

20        The second Franich allegation does have substance derived from the record.

21  There is no dispute that a threat to this juror, and one other, was sent and received by Franich's

22  parents.  Police reports have been submitted which verify these facts.  The police reports indicate

23  that Franich's parents agreed not to tell her about the note.  However, petitioner has submitted

24

25  [15]  Petitioner does not ask for an evidentiary hearing on the allegation that "During the
    course of trial male jurors in the case told her that she looked like one of Petitioner's former
    wives, and they told her that they would protect her from becoming another murder victim."
26  Amended Petition at 170.   Therefore, that sub-claim will be denied at the appropriate time.

1  facts which indicate that some jurors were aware of "something" in that some jurors discussed

2  their awareness of police surveillance.  The facts here are insufficiently clear to rule one way or

3  the other whether petitioner's jury, or some jurors, were aware of death threats, whether the

4  threats were seriously taken, etc.  An evidentiary hearing will be held on this sub-claim.

5  *Extraneous Victim Impact – # 11 above*

6          Petitioner asserts that during deliberations a juror argued in favor of a death

7  sentence because death was the only way to vindicate the interests of the victims or the victims'

8  families.  Citing <u>Payne v. Tennessee</u>, 501 U.S. 808, 111 S. Ct. 2597 (1991), petitioner argues that

9  the Supreme Court has proscribed such evidence from being considered at trial.  Petitioner

10  confuses what evidence may not be permitted during the course of trial with juror misconduct.

11  Petitioner presents a case of quintessential juror deliberations which may not be inquired about at

12  evidentiary hearing.  If the system permits such interrogation of jurors after the fact on every

13  possible errant thought that a juror might have, we might as well place video and tape recorders

14  in the jury room, and inform the jurors they are being watched at all times for any mistake.  Of

15  course, as <u>Tanner</u> pointed out, we would then destroy the jury system through qualitative

16  oversight.  Based on the authority set forth above of Rule 606(b), petitioner's request for an

17  evidentiary hearing on this topic is denied.

18  *Juror Note-Taking – # 12 above*

19          Petitioner asserts that the jury relied too much on the notes of one juror who

20  happened to be a copious, if not excessive, note taker.  Although the undersigned is aware of jury

21  instructions that caution a juror about reliance, or excessive reliance, on the notes of other jurors,

22  the undersigned is aware of no Supreme Court authority that establishes that such reliance on the

23  notes of others constitutes a constitutional violation.  Nor is the court convinced that petitioner's

24  argument is anything on a variant of several other attempts to intrude on the deliberations of the

25  jurors.  An evidentiary hearing on this sub-claim will be denied.

26  \\\\\

Claim 25 – Shackling

The operative petition alleges that Stanley was shackled at some point during the competency hearing.  Petitioner's counsel presents evidence from juror declarations which suggest, vaguely, that "a number of jurors" saw Stanley in shackles at some point during the competency trial, but judging from subsequent declarations, it is not at all clear whether such a sighting was in the courtroom or on the way to the courtroom.  Without discussing all the law on shackling herein, normally, an evidentiary hearing would have to be held.

However, Stanley himself has filed statements where he retracts this claim and unequivocally asserts that he was never shackled during the trial itself, and perhaps, never shackled at any time he was in the courthouse.  Letter of June 6, 2005.[16]  Also, petitioner's counsel point to no discussion of shackling in the record—a point which almost would have to have been discussed had shackling in the courtroom been permitted.  Counsel assiduously avoid any reference to trial counsels' past or present observations in this regard.

Because neither petitioner, nor his counsel, assert that Stanley is incompetent to proceed in this habeas action, the court will accept Stanley's retraction as it is based upon a percipient fact within Stanley's knowledge and does not require expertise; it also appears credible due to the absence of any contemporaneous comment by court personnel.  No evidentiary hearing will be held on this claim.

Ineffective Assistance of Counsel – Claims 1, 22, 23, 24, 26

The ineffective assistance issues for Claim 1 have been adjudicated in the section discussing Claim 1, supra, and will not be repeated here.

\\\\\

---

[16]  Stanley has overwhelmed the court with correspondence, and the court's general practice pursuant to previous order was to disregard such correspondence.  However, this letter posits facts, among other things, within the personal knowledge of Stanley.  The letter was filed in the public record, scanned, and the deputy attorney general would have had knowledge of this letter.  Certainly, the deputy attorney general could present this letter with a request to expand the record.  Since the letter is now "of record," the court sees no need to expand it.

1          Claim 22 is only an ineffective assistance of counsel claim in part.  The first part

2   of the claim is that the presiding judge in the guilt and penalty phases should have know

3   petitioner was incompetent.  This claim mirrors Claim 1(a), which was procedurally barred;

4   however, for whatever reason, this claim was not procedurally barred.  By repetition, petitioner

5   has overcome the bar to a retrospective competency hearing.  The court has also previously

6   addressed this assertion in Claim 1 insofar as petitioner will be granted an evidentiary hearing to

7   attempt to prove retrospective incompetency within the prejudice prong of ineffective assistance

8   of counsel.  However, most of this part of Claim 22, i.e., the "judge should have known" will be

9   decided on the record, unless judges are now held to the expertise standards of Board certified

10  psychiatrists.  The court does not find, however, that expert testimony will be useless on this

11  point.

12         The second part of Claim 22 also mirrors Claim 1 in that petitioner claims that his

13  counsel were ineffective in not "sooner" recognizing that petitioner was incompetent.  As related

14  earlier, an evidentiary hearing will be held.  In either case, the ineffective assistance of counsel

15  claim will rise and fall with this determination.

16         Claim 23 asserts an ineffective assistance of *counsel* claim with respect to the

17  penalty phase presentation.  Petitioner argues that counsel did not inform their expert(s)

18  sufficiently for them to arrive at opinions that would have "undermined" confidence in the death

19  verdict.

20         Respondent is correct in that no claim of ineffective assistance of *expert* exists.

21  Harris v. Vasquez, 949 F.2d 1497, 1519-1522 (9th Cir. 1990) (rejecting such a claim within a

22  Teague analysis).  Moreover, an attorney cannot be faulted for relying upon the informed opinion

23  of his experts—no matter whether other experts believe the opinion to be wrong.  Hendricks v.

24  Calderon, 70 F.3d 1032, 1039 (9th Cir. 1995).  See also Boyde v. Brown, supra, 404 F. 3d at

25  1168.  However, the Ninth Circuit has held that counsel have duties to supply their capital case

26  experts with sufficient information, to which presumably the expert does not have ordinary

26

access, <u>Wallace v. Stewart</u>, 184 F.3d 1112, 1117-1118 (9th Cir. 1999), and duties to present factual evidence which corroborates the basis for the expert's opinion.  <u>Hendricks</u>, 70 F.3d at 1044.

The court needs to hear from trial counsel as to the background investigated, accepted, provided to experts and/or rejected.  If deficient in one of these areas, the court will need to assess expert evidence on the prejudice issue.  An evidentiary hearing must be held on this aspect of Claim 23.

Finally, the court turns to Claim 24.   Petitioner collectively asserts herein that petitioner's mental deficits indicates that he is "not guilty," i.e., actually innocent, and that he was not competent in any aspect of his trial.  The former claim is not actionable on latter day expert opinion, <u>Boyde v. Brown</u>, 404 F.3d at 1168.  The latter claim has been thoroughly hashed out in the previous claims, and an evidentiary hearing will be held, or not, as indicated.  The court will order an evidentiary hearing on Claim 24, along with the other claims for these reasons.

Claim 26 is a catch-all ineffective assistance.  No evidentiary hearing will be held on this claim, except, of course, as other individual claims of ineffective assistance warrant a hearing as previously discussed.

<u>Prosecutorial Suppression of Material Information – Claim 27</u>

Claim 27 has two aspects to it – (a) allegations that the prosecution suppressed the "evidence" of a district attorney's opinion at the penalty phase trial; (b) the threatening note sent to a juror's (or jurors') family was not disclosed to the defense.  No one disagrees with the proposition that the prosecution has a duty to turn over "exculpatory" or "impeaching" evidence.

With respect to the latter aspect of the threatening note (b), an evidentiary hearing has been ordered in another context, <u>see</u> <u>above</u>, and therefore, an evidentiary hearing is ordered for this aspect of the claim as well.

\\\\\

However, no hearing will be ordered for the former aspect (a), i.e., the District Attorney opinion, because such opinion would not be relevant evidence, even in a penalty phase where the rules of evidence are relaxed with respect to the presentation of mitigating evidence.

This issue of the District Attorney opinion came about with respect to introduction of aggravating evidence in the penalty phase—the introduction of unadjudicated violent activity on the part of petitioner involving the uncharged murder of Cheryl Renee Wright.[17]  To place this issue in context, the court repeats the summary of evidence set out by the state supreme court:

> The prosecution presented evidence showing defendant murdered Cheryl Renee Wright on August 10, 1980.  Beverly Johnston, Wright's mother, testified she spoke with Wright at 6:30 p.m. that day.  Wright was then at her sister Rhonda's house in Sacramento. Rhonda testified Wright left to return to her apartment in Redding around 7:15 or 7:30 p.m., dressed in a wine-colored strapless jumpsuit in a flowered pattern.  She had no more than $50 with her.  Johnston attempted to reach Wright in Redding at 10 p.m. Wright's boyfriend, Randy Orum, was waiting there for her. Wright had called him at the apartment around 8 p.m. and again within the hour.  Johnston called Wright's apartment again around midnight and still later, at 2 a.m., and then called the Highway Patrol.
>
> Around 9 p.m. two employees of a service station in Williams saw defendant drive into the station in a light-colored Camaro.  He was with a girl identified as Wright.  She made several phone calls and changed her clothes.  Defendant discussed with the service station employees how to fix the tire on her Vega.  Defendant had previously been seen at the station driving a brown and tan pickup truck with an Oakland Raiders sticker.  Defendant and Wright discussed towing her car.  He claimed he had a friend about six miles out in the country who had a Vega, and that he could get two tires and wheels so she could get her car fixed.  The tow service operator had been in the area for 22 years and knew almost everyone; according to him, no one in the area owned a Vega. When defendant left the station, he drove toward the northbound I-5 ramp, which also led to Highway 20.
>
> Wright's Vega, with a badly damaged rear tire and low left tire, was found north of Williams at 2:40 a.m. on August 11, 1980.

\\\\\

---

[17]  The California Supreme Court used the letter "C" for Cheryl's first name.  The undersigned will do likewise.

> On August 17, 1980, Wright's body was found buried under gravel at an abandoned oil well on Bear Valley Road off Highway 20. She had died as a result of a head wound inflicted by a .25-caliber bullet fired from a semiautomatic pistol. Death had occurred between two days and two weeks earlier; the exact time of death could not be determined due to deterioration of the body.
>
> Police collected samples of the gravel that covered the body and of the gravel that covered the floorboards on the driver's side of the Camaro defendant was driving on August 10. John Rapp, a geologist for the California Division of Mines and Geology and a specialist in rock identification, examined the samples and concluded the gravel from the well site and the gravel from the Camaro were virtually identical. He testified that kind of gravel was not indigenous to Colusa County, being native only to Southern California. The gravel at the well site and in defendant's car matched a kind of gravel dug in Bakersfield and delivered to the mine by Coastal Engineering Company of Bakersfield in May 1979. Coastal Engineering Company had never delivered gravel from that source anywhere else north of Sacramento.
>
> During the search of Mrs. Stanley's house police found .25-caliber ammunition in the bedroom defendant had used, as well as in the garage and master bedroom.

People v. Stanley, 10 Cal. at 782-83, 42 Cal. Rptr. 2d 552.

The California Supreme Court dealt with issues arising under state law concerning use of this unadjudicated conduct which are not at issue in this motion. Here, the parties inform the court that the District Attorney of Colusa County in reviewing this and/or other evidence did not bring charges against Stanley for this murder.[18] Petitioner's habeas counsel assert, somewhat ambiguously, that the decision of the District Attorney not to bring charges was "suppressed" from the defense.

Respondent and petitioner miss the point of this issue. Each party speculates as to why the District Attorney may not have brought charges—ranging from insufficient evidence to "costs too much." If the court were tasked with figuring out the reason for the District Attorney's

---

[18] As the reader will recall, this murder figured in the Judge Patton issue above, i.e., whether he abused his office in seeking to influence the grand jury to override the District Attorney's decision. That issue has been adversely decided to petitioner.

1  decision, no doubt an evidentiary hearing would be necessary.  However, even assuming

2  petitioner's theory, i.e., the District Attorney chose not to bring charges because he believed that

3  the evidence was insufficient for conviction beyond a reasonable doubt, such an opinion by an

4  attorney, evidently disputed by the district attorney trying the capital case, is not admissible even

5  in the penalty stage—it is simply not reliable or relevant.

6         First, the court understands that with respect to mitigating evidence, generally

7  character or background, "relaxed standards govern the admission of mitigating evidence during

8  the penalty phase of a death penalty trial."  Rupe v. Wood, 93 F.3d 1434, 1439 (9th Cir. 1996)

9         In so holding, the district court also relied upon our own decision
           in Mak v. Blodgett, 970 F.2d 614 (9th Cir.1992), cert. denied, 507
10         U.S. 951, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993), where we said
           that a court can exclude evidence at the penalty phase if it is
11         irrelevant, but cannot preclude "any relevant mitigating evidence."
           970 F.2d at 623, (quoting Skipper v. South Carolina, 476 U.S. 1, 4,
12         106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986)).

13  Rupe v. Wood,  93 F.3d at 1440.

14         The court will even assume that rebuttal to aggravating evidence might be

15  considered mitigating evidence, although such is stretching the point of the above cases.  The

16  court will assume that mitigating evidence would be considered exculpatory or impeaching.  But

17  even making all these assumptions in petitioner's favor, the court cannot find any prejudicial

18  error in not disclosing an attorney advocate's opinion on the facts of the case.

19         In California, in the penalty phase of a death penalty case, the prosecution must

20  prove unadjudicated violent, criminal activity *beyond a reasonable doubt.*  People v. Kennedy,

21  36 Cal. 4th 595, 636, 31 Cal. Rptr. 3d 160, 196-197 (2005).  Such a case is made out, or not, on

22  the *facts* presented to the jury.  Petitioner can point to no case where it is constitutionally

23  mandated that the jury receive opinions from lawyer advocates on the sufficiency of the

24  evidence.  One can just imagine the circus a penalty phase would degenerate into if both sides

25  \\\\\

26  \\\\\

30

1   started presenting lawyer opinions on the ultimate factual issues a capital jury must decide.[19]

2   Certainly, the prosecution is forbidden in the first place to vouch for the evidence.  This does not

3   mean that the defense can present legal opinions on evidence sufficiency unchecked.  An

4   advocate's opinion for either side on innocence or guilt, even on charges pertinent to a penalty

5   phase, is simply not relevant.  Moreover, it would be difficult for any person in a close case

6   (given the burden of proof) from having a relevant opinion on the facts presented to the jury,

7   unless the advocate heard those facts in person—just as the jury does.  Thus, a district attorney

8   who has simply screened evidence in a potential case months or years before is not qualified to

9   speak on the merits of what was later presented in court in a proceeding with which he had

10  nothing to do.

11          Nor would the defense have a right to the work product of that prosecutor.

12  Petitioner here had no more right to the opinion on the evidence of a prosecutor in Colusa County

13  than he had the right to listen in to strategy sessions of the prosecutor trying his case.

14          The only information asserted in Claim 1 that arguably was not
        previously known to the defense is the existence of prosecutorial
15      theories and suspicions, rather than knowledge of facts or
        evidence.  Prosecutors are under no obligation to disclose their
16      theories, thought processes, or even all investigatory work.

17  Siripongs v. Calderon, 167 F.3d 1225, 1227 (9th Cir. 1999).

18          For example, what if the prosecutor ever doubted the merits of his case.  Would

19  he then have to disqualify himself, confess his doubt to the defense, and thereby become the

20  defense witness?  Of course, not.  There is not a [good] attorney alive who has not questioned his

21  case and chances for success in difficult or close cases.  Such moments of doubt on the part of

22  advocates are not relevant mitigating evidence.

23  \\\\\

---

25  [19]  Each side could call the celebrity "talking heads" lawyers we all see on cable news; the
    facts could then be lost within a sea of celebrity.  Cross-examination would predominate on the
26  facts and circumstances of the celebrity lawyer's preparation; perhaps we would be treated to
    "war stories" of similar cases, and what happened to the jury verdicts therein.

1      Petitioner does not claim that any facts of the unadjudicated murder were withheld

2  from him, or which his attorneys could not have reasonably discovered on their own.  The

3  undersigned will rely on the presumption that the jury understood the jury instruction

4  requirement not to use this unadjudicated criminal, violent conduct unless it was established

5  beyond a reasonable doubt.  The fact that an attorney, if called as a witness, *might* disagree is

6  irrelevant.  Because it is irrelevant, it follows that any "suppression" did not occur with respect to

7  *material* evidence.  No evidentiary hearing will be permitted.

8  Conclusion

9      An evidentiary hearing is ordered as provided above.

10      If the parties seek reconsideration, because of the necessity to stay on track to the

11  completion of this case, the undersigned will not grant any request for stay or for change of dates

12  based on the request for reconsideration.  There is sufficient agreement on the need for an

13  evidentiary hearing such that insufficient prejudice will accrue to either party if the present

14  schedule is maintained.  Petitioner can rather easily be prepared for added claims in time for

15  evidentiary hearing given the amount of work performed on those claims thus far; insufficient

16  prejudice will accrue to respondent in having to prepare for a claim which may ultimately be

17  found to be inappropriate for evidentiary hearing in that a good deal of the preparations have

18  probably been performed already.  Most importantly, further delay in this many years old case

19  would be far more prejudicial than either side could legitimately present.

20      Any request for a stay made to the district judge shall include a quoted, verbatim,

21  reference to the preceding paragraph.

22  DATED: 9/2/05

23                              /s/ Gregory G. Hollows
                   _____
24                              GREGORY G. HOLLOWS
                               U.S. MAGISTRATE JUDGE

25  GGH:gh:035
    stan1500.evi

26