IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERALD F. STANLEY,

    Petitioner,

vs.

STEVEN ORNOSKI, Acting Warden of the California State Prison at San Quentin,

    Respondent.

No. CIV S-95-1500 FCD GGH P

**DEATH PENALTY CASE**

<u>ORDER</u> and
<u>FINDINGS & RECOMMENDATIONS</u>

*Introduction*

    Petitioner, who underwent a competency trial in state court years ago, and was found competent, who underwent competency proceedings early on in this federal habeas case in order to determine if petitioner could waive his federal habeas proceedings, and was found competent (but then determined that he would withdraw his request to withdraw from the habeas proceedings), and who counsel characterized as being competent to proceed in this action a scant year ago, has recently communicated with his counsel, and now asked that counsel seek a stay of these federal habeas proceedings because, having been transferred to Corcoran from San Quentin, petitioner believes he is not "in [his] rightful frame of mind." Petitioner's habeas counsel join in petitioner's request.

1

Petitioner is so self-focused on a perceived problem that he is either unable to communicate rationally with his counsel in order to assist counsel in this petition, or he has thrown a temper tantrum over being transferred and/or denied creature comforts in prison, and is, once again, attempting a manipulation of proceedings.  An analogy to the present situation which favors petitioner's counsels' position is a child who needs to go to school, but is so wrapped up in a temper tantrum about his inability to take a video game to school, that he is unable to focus on the need for school; therefore, he refuses to assist anyone in taking him to school.  Or, another possible analogy favorable to respondent is the child who does not want to go to school, but who knows from experience that if he throws a temper tantrum over any ostensible issue, which makes it difficult for his parents to take him to school, he may ultimately get out of going to school in the short run, or at the very least, will make the situation uncomfortable for all concerned with his attendance at school.

For the reasons expressed below, the court finds petitioner's actions to be a manipulation, counter-productive or otherwise, which do not warrant a suspension of these proceedings.

*Factual Background*

The precipitating factor for petitioner's motion to be found presently incompetent, and hence requiring a hiatus in these ten year old federal habeas proceedings, was petitioner's transfer from San Quentin to Corcoran for medical reasons.  When counsel and his expert attempted to interview petitioner at Corcoran:

> Around mid-September 2005, Mr. Stanley became extremely upset at learning of possible plans to transfer him to the Acute Care Hospital at Corcoran State Prison.  Despite my agreement to look into the issue, which I expected to have at least somewhat of a calming effect on him, he could speak of little else.  He was generally aware of the time-consuming effort Assistant Federal Defender Tim Schardl had devoted to the issue, which culminated in a successful effort to enjoin the transfer, but insisted that we had only "acted like prison guards" in ignoring his serious concerns.  It was not simply that he was angry or resentful at our failure to prevent the move that raised my concerns.  It was rather that his

emotional outpourings were rambling, disjointed and illogical.

Shortly after his transfer, he began communicating concerns that he was emotionally unable to assist us and that he believed he was incompetent to proceed. He also persisted that there was no legitimate reason for him to be at Corcoran. Although I share many of his concerns regarding the purported "high risk" assessment, he seemed utterly incapable of grasping simple concepts – such as the possibility that they had made the high risk assessment because he had made numerous complaints that they had failed to take his heart condition seriously in the past. To this day he is adamant that he is being punished for attempting to provide news outlets and politicians with information about the CDCR. During the few telephone conversations counsel have been able to have with him while he has been at Corcoran he has rambled endlessly and often incoherently about the disposition of various small food items that were in his possession at San Quentin. He is irritable and distracted by counsel's inability to give him day-by-day updates on the welfare of his adult children living in California and Oregon.

I arrived at Corcoran State Hospital with Dr. Victoroff on October 26, 2005. After a lengthy admission process we arrived at a nurse's station adjacent to Mr. Stanley's cell/hospital room around 10:30 a.m. I could see Mr. Stanley through a narrow double glass panel in his door, and he appeared to be agitated and emotionally upset, pacing his cell frantically. As we were to be admitted to his cell, he began to rant and shout about not having a television, reading materials and personal items. I tried reasoning with him, but it became apparent that he was refusing the visit, regardless of whether I could address any of these problems. When Dr. Victoroff tried to speak to him through the door, he darted over to the corner of the room was [sic] if to hide or cower.

In fact, I spent the next one or two hours discussing Mr. Stanley's issues with the hospital staff, including the lieutenant in charge of the hospital. The staff members uniformly noted that Mr. Stanley seemed to have issues and problems that were unique among any of the San Quentin inmates that had been transferred there. I noticed while we were talking that Mr. Stanley returned to the glass panel to peer nervously in my direction every few minutes with a level of anxiety I had never seen in all the time that I have known him. I felt that I was able to iron out many of the problems he seemed to be having with his property, but he seemed unable to comprehend what I was accomplishing by negotiating with the custodial staff.

The next day, I returned to Corcoran alone in the hope that Mr. Stanley would agree to see me, which he did. Throughout the visit, he was uncharacteristically nervous, and distracted, and he seemed to have great difficulty concentrating. Mr. Stanley rather illogically "explained" that he very much wanted to meet with Mr. Victoroff, had taken a liking to him as a result of a few shouted

> exchanges through a locked door, but for reasons he could not adequately describe or defend, could not meet with him or Dr. Watson at Corcoran.  Although this was clearly related to resentment and paranoid beliefs about the reasons for his transfer to Corcoran, he could not explain any logical connection to his refusal of visits, especially in light of his desire to cooperate with the proceeding and be seen by an independent physician.  He completely lost his train of thought when counsel casually mentioned that the sergeant in charge of the hospital had told him that inmates are able to shower thrice per week, and became fixated on convincing counsel that it is only twice.
>
> I tried to get him to focus on his case by bringing up the issue of whether he was handcuffed or shackled during any portion of the competency trial.  He seemed to exert a genuine effort to recall whether he had been handcuffed in front of the jury on occasion, but said that he was too confused and upset to concentrate.  He then abruptly ended the visit, something he had never done in all my years of visiting with him.

Declaration of Joseph Schlesinger at 11-13.

As put succinctly by Mr. Schlesinger: "The events surrounding his transfer to Corcoran appear to have put him on the very low[est] end of his always unusual behavior."

*The Legal Standard*

In certain circumstances, a petitioner in a capital habeas proceeding may seek to stay his proceedings because he is unable to rationally communicate with his counsel to assist in his petition. It is important to focus upon the precise words of the Ninth Circuit in establishing this right, as the court assumes that the words were chosen with care.  It is also important to set forth what the Ninth Circuit expressly determined was not being decided when it established the basic right in federal habeas:

> Accordingly, we hold that, where an incompetent capital habeas petitioner raises claims that could potentially benefit from his *ability to communicate rationally*, refusing to stay proceedings pending restoration of competence denies him his statutory right to assistance of counsel, whether or not counsel can identify with precision the information sought.

Rohan ex rel Gates v. Woodford, 334 F.3d 803, 819 (9th Cir. 2003) (emphasis added).

\\\\\

The Ninth Circuit was quick to add: "It goes without saying that the mere fact that Gates does not communicate rationally does not mean that he is *incapable* of doing so." Id. (Emphasis in original).

Thus, the Ninth Circuit initially did not task the district court with determining whether petitioner could understand his proceedings. It repeated its position several times that the criteria for staying a federal habeas petition was an inability to rationally communicate with counsel. However, at the tail end of the opinion, the court found that the relevant question was whether its petitioner "now has the capacity to understand his position and to communicate rationally with counsel." Id. Nevertheless, counsel here present no facts that petitioner is unable to understand the nature of these proceedings; indeed, the record of this case indicates that he understands it only all too well. Therefore, the court's inquiry is directed to the "rational communication" prong.

The Ninth Circuit expressly *determined not to decide*:

1. Whether the entire action had to be stayed, or only those portions of the action in which petitioner's communication was necessary;

2. What showing a petitioner had to make to warrant a competency determination;

3. The weight to be attached to prior competency proceedings;

4. Whether exhaustion of a claim of incompetent to proceed was necessary;

5. While we hold that competence to pursue habeas relief encompasses some rational communication requirement, we need not decide whether the standard is the same as the standard for competence to stand trial.

Rohan, 334 F.3d 819 (n.11).

A checking of subsequent citations does not reveal that the Ninth Circuit (or any other court) has determined the questions expressly left open.

\\\\\

The undersigned will answer the open questions as follows in that such questions cannot be avoided here.[1] Because only communication to assist counsel factually is at issue, it makes no sense in the circumstances of this case to stay those adjudication of those issues which do not reasonably require petitioner's communication on factual matters. If only in part, the issues in this case should be finally decided as to delay them even further serves no purpose. If petitioner were to prevail on any of these "non-communication" issues, it might well moot the necessity of finally determining (after appeal) petitioner's competence, an always difficult issue.

Petitioner assumes that the standards for assessing the need for a competency hearing at trial (bona fide doubt as to competency) are the same standard to be applied in this habeas proceeding. The court disagrees for substantial reasons. First, the doubt at trial is readily apparent, or not, in most cases to the trial judge from the defendants' appearances and actions in court. Moreover, at trial, counsel will be working with his client on a day-to-day basis, thereby permitting for a more informed assessment by counsel of facts rendering his client incompetent. The situation is different for habeas proceedings. The habeas judge rarely, if ever, sees the petitioner and can only glean facts about competence from secondary sources such as petitioner's communications. Counsel will not often see their client in a habeas case on a day-to-day basis, and often obtain their information only on a hearsay basis. Thus, the foundation for real and significant doubts is much more attainable to the judge in trial proceedings than it is in habeas. Importantly, in a capital case habeas proceeding, a petitioner will have much more incentive to malinger and manipulate than he would in a trial setting where the decision of the defendant's guilt and/or penalty is very much up in the air. Often it would be counter-productive and not without discomfort for a defendant, situated in a jail setting, to delay the trial to obtain a competency determination. On the other hand, delay will serve a petitioner already sentenced to

---

[1] Neither petitioner nor respondent directly addressed all the questions expressly left open by the Ninth Circuit. Respondent's concession that petitioner has "accurately stated the legal principles set down by the Ninth Circuit" cannot, of course, be applied to questions that were expressly and purposefully not set down.

6

death almost as well as a victory. To permit such a de minimis standard for the stopping of habeas proceedings as "bona fide doubt" is to invite wholesale manipulation of already complex and lengthy habeas proceedings. Finally, in many, if not all capital habeas cases, petitioners are being currently investigated and tested by mental health professionals. A capital petitioner will have the where-with-all to impart to the court something more than a bona fide doubt. If all habeas proceedings are to stop until petitioner regains his competency (never if some petitioners have their way), the court should require something more than a doubt as to competency. For all of the above reasons, nothing less than a prima facie case of incompetency must be set forth before the habeas court should order a competency hearing.

As to the weight that should be attached to prior competency hearings, the court cannot fashion a fixed rule. The value of prior hearings will depend on factors such as the depth into which the trial judge probed petitioner's competency, the quality of the presentation, and especially the remoteness of the decision from the present proceeding. As such, the value of prior proceedings, which should generally be considered, will depend on case-by-case analysis of the circumstances.

The short and intuitive answer to whether state court exhaustion of a claim of incompetent to proceed in *federal* proceedings should occur is—no. Of what value could a state court determination have on an issue that has arisen in the federal proceedings? The state has no record of the current events, may well have none of the federal records in which a prima facie case is made, and does not have any greater expertise in such matters than the federal courts. No comity purpose is served by deferring yet another issue to overworked state courts on which they have less information than the federal court.

Finally, the Ninth Circuit did not decide whether the competency standard set out for trial will be the same as the competency standard for capital habeas proceedings. On this point, petitioner urges that the standards should be the same. Respondent offers no analysis. For the purposes of this case, the undersigned will not attempt to set out a differing standard when

the point is not disputed by the parties.  Therefore, the standard for competency will be deemed the same in either case—an ability to comprehend the nature of the proceedings and an ability to rationally consult with counsel.  See Medina v. California, 595 U.S. 437, 448, 112 S. Ct. 2572, 2579 (1992).

*Assessment*

To put it in simple terms, petitioner's interactions with his counsel and the court have been mercurial.  At times, his habeas counsel report that petitioner is assisting them, assisting some of them, or acting contrary to the desires of all his counsel.  The court, of course, is aware of the many letters, writs and the like accusing his counsel, and the court of misfeasance and malfeasance.  The court is aware that petitioner is sometimes at peace with his habeas counsel, more often with one or two of his habeas counsel, before those counsel again lose favor for some seemingly illogical reason.  Petitioner has never expressed any outrage at his erstwhile "retained" but unauthorized counsel in this action—Jack Leavitt.  None could seriously contend that petitioner is not manipulative.  The most egregious example is petitioner's multiple attempts to use his purported knowledge of the burial place of murder victim Diana Lynn in order to obtain benefits that suit him at the moment, e.g., a change of counsel in this case, a return to San Quentin, and the like.  See e.g., Stanley Letters Docket Number 580 (attachment 1), Docket Number 507, Docket Number 500.  The question here is whether petitioner's manipulations are so bizarre as to constitute an inability to communicate with and assist counsel.

But counsel have never intimated that petitioner is unable to communicate with them; their problem stems from petitioner's counterproductive statements and actions apparent from the communications.  Petitioner's request in one of his most recent letters to counsel, and attached to the motion, obviously demonstrates that petitioner has not lost the ability to communicate for a desired purpose:

> Well, doctors at Corcoran said three days after my arrival I should
> not be here.  Will you answer this?  Can we delay evidentiary
> hearing and start competency proceedings.  I do not feel after what

> S.Q. [San Quentin] did moving me, taking everything I own I am in my rightful frame of mind.

Stanley Letter of October 11, 2005 attached to petitioner's motion.

The remainder of the letter demonstrated someone who was lost in the moment of his perceived daily difficulties, as opposed to the difficulties of his long term death penalty habeas proceeding, with little hesitancy to lash out at his attorneys who "never do anything to protect my rights." But, the question for the court is whether petitioner is oblivious to his counter-productive actions, or whether he is initiating them for some manipulative purpose.

Stanley also wrote on December 5, 2005:

> This move to Corcoran solely as reprisal by S.Q. warden and medical [department] of S.Q. has made me incompetent to proceed in this court or to co-operate with attorneys....I hereby refuse to see or co-operate with any doctor connected with the Federal Defenders. I will see this court's doctor....

Petitioner's counsel averred in court that he is "used to" petitioner's acting-up, but the present situation is different—counsel's ability to get petitioner to assist in his habeas proceeding in any rational manner has become much more degraded recently than it was in the past. Counsel's observations are entitled to weight. Odle v. Woodford, 238 F.3d 1084, 1089 (9th Cir. 2001).

Petitioner's competency/mental health expert (Dr. Victoroff), both historical and presently, primarily addressed in his declaration the lack of necessity for petitioner to be transferred to Corcoran; however, that is not an issue for the undersigned to adjudicate in connection with the present motion. In the last paragraph, Dr. Victoroff opines:

> To my observations through the cell window, Mr. Stanley was not only angry but also agitated and somewhat confused. His responses to Mr. Schlesinger revealed highly illogical thought processing. The cause for these conditions could not be determined under those circumstances. A much more extensive assessment is required to characterize Mr. Stanley's emotional, cognitive and neurological condition(s), and to determine the most likely cause or causes.

Victoroff Declaration at 12.

As respondent points out, this opinion is not a final one in which the doctor believes that petitioner is incompetent to proceed; it is probably the only opinion it could be—general, tentative and non-final.  Also, it is clear from past proceedings that petitioner has in the past permitted his experts to visit and examine him.

Respondent, without medical proffer from any observer of petitioner at San Quentin or Corcoran, concludes that petitioner is up to his usual tricks, and that "[c]ircumstances show that petitioner is angry over his transfer to Corcoran and refusing to cooperate with counsel as a way to force them to placate him by getting the court to order his transfer back to San Quentin." Respondent's position is colorable but somewhat begs the issue of whether some mental illness exists which inevitably causes petitioner to engage in his usual counter-productive activities to the point where he cannot rationally consult with his counsel.

However, respondent's position is aided by petitioner's own letters in which he seeks to bargain with the court.  Petitioner will (for the moment and until pressed) be glad to see a court appointed doctor, especially the one who found him competent before in these federal proceedings; he simply will refuse to see any doctor sent by the Federal Defender.  While only petitioner can fully explain the [il]logic of his position, he clearly is acting upon a template first created at the penalty phase of his case in state court where petitioner understands he can tie the courts and his keepers in knots if he simply refuses to participate and assist his counsel.  Having read petitioner's numerous letters over the years, and being an observer of his manipulations to withdraw his petition on numerous occasions, and manipulations for other reasons, the undersigned clearly believes that petitioner gets some perverse pleasure out of such tangled proceedings where petitioner believes that he is thereby exercising some control over the system.[2]

\\\\\

---

[2] The undersigned will not characterize the entire, mammoth docket in this case.  Suffice it to say that the undersigned has read nearly every document on the docket, including the misconduct letters, the writs, and so forth.  It is hardly possible to get a clear picture of petitioner's actions in this case unless one has experienced them.

Moreover, while quite dated, two findings of competency, one by the state after jury trial, and one federal, early on in these federal proceedings, have been made. These favor a finding that petitioner has not set forth a prima facie case of incompetency. Moreover, the "now-I-want-this-, now-I-don't" aspect of petitioner's participation in the federal competency proceeding is typical of many actions of petitioner over the years. For example, petitioner sought to terminate his federal habeas proceedings, and was found competent to do so by the court's appointed doctor (Shawn Johnston). However, when this point became clear to petitioner, he retracted the request to terminate, and only when this request was safely granted, did petitioner immediately begin anew his attempts to disrupt the proceedings. Included within this ongoing disruption were petitioner's long term efforts to proceed in this case with Bay Area counsel Jack Leavitt in order to once again commence procedures for termination of his habeas proceedings. This pattern of disruption is a continuing feature of this case.

Finally, the fact that counsel did not seek writs for petitioner's appearance at the previously scheduled evidentiary January 3, 2006 hearing weighs in favor of not delaying the hearings on the merits, i.e., the need for petitioner's significant assistance is dubious.

Thus, in the final analysis, the court views petitioner's latest tirade as one in which he again attempts to manipulate the system in order to obtain some short term goal, and/or to rail against the system which keeps him in prison. While working with petitioner is undoubtedly very difficult, even temporarily not possible, and while petitioner undoubtedly has mental issues, petitioner's counsel have not set forth a prima facie case of incompetence to proceed. Again, as stated by the Ninth Circuit, "[i]t goes without saying that the mere fact that [petitioner] does not communicate rationally does not mean that he is *incapable* of doing so." (Emphasis in original).

It will come as little comfort to petitioner's counsel, who deserve a more assistive client, that this court has empathy for their predicament. Petitioner's counsel in this case are skilled advocates who find their energies being constantly sapped by the manipulations of their

11

client. Rather than being able to focus on the colorable, complex issues in this case, counsel find themselves diverted by petitioner's demands and diatribes, including those in which petitioner accuses his counsel either singly or collectively in nefarious, sometimes criminal, conduct. However, the undersigned did not get to choose this now over ten year old case either, and did not bargain for all the time consuming diversions he has had to make from the ultimate adjudication of this case. None of us signed up in this case for a life sentence, and the undersigned has done his level best not to permit the case to become one. Tying up the proceedings once more, on account of petitioner's probable manipulative actions, is not likely to accomplish any necessary due process task. This case should be decided.

*Conclusion*

Accordingly, the undersigned will not order a competency hearing for petitioner's recent actions. The undersigned will not recommend to the district judge that the case be stayed pending competency hearings.

As discussed at hearing, and in order to alleviate if only a little, counsel's expense of time dealing with this competency side-issue, the evidentiary hearing on the merits ordered in this case for January 3, 2006 shall commence instead on January 17, 2006 at 9:00 a.m. The court will not repeat the other orders made at pre-hearing conference, but they were effective when given.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). No later than January 3, 2005, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed no later than January 7,

\\\\\

\\\\\

\\\\\

2006. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 12/21/05

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

stan1500.comp