1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GERALD F. STANLEY,

11            Petitioner,              No. CIV S-95-1500 FCD GGH P

12        vs.

13   ROBERT WONG, Acting              **DEATH PENALTY CASE**
     Warden of the California State Prison
14   at San Quentin,

15            Respondent.              FINDINGS & RECOMMENDATIONS

16   _____/

17   _Introduction and Summary_

18            Petitioner made a motion to find "prosecutor" Raymond Brosterhous, and two

19   others assisting him,[1] liable for "prosecutorial misconduct" because of the manner of his

20   investigation into petitioner's claims for jury misconduct concerning both the guilt/penalty phase

21   and the competency trial jurors, and which claims were initially asserted in the state habeas

22   \\\\\

23   \\\\\

24   _____

25        [1] For efficiency's sake, the court will utilize "Brosterhous"as the target of petitioner's
     motion in that he was indeed the target for the most part, and recitation of title or constant
26   referral to others involved is unwieldy.

                                     1

1 exhaustion proceedings.[2]  Petitioner alleges that attorney Brosterous interviewed the jurors in

2 such as way as to intimidate or unduly influence them so that previously obtained declarations

3 acquired by petitioner's investigators, and made under penalty of perjury, would be changed.

4 Most significantly, petitioner sought to have a finding that certain sub-claims of Claim 21 of the

5 Amended Petition were true, i.e., strike respondent's denial of same.  Since the time the motion

6 was made, petitioner has attempted to expand the grounds for misconduct, now including

7 statements made in briefing to the court on the misconduct issue which petitioner asserts were

8 misleading.

9          First, the motion was made on juror interview technique, and those will be the

10 grounds subject to adjudication.  While misleading statements in a pleading may be subject to

11 Fed. R. Civ. P. Rule 11 sanctions, no such procedure has been formally employed here, and the

12 court will not adjudicate a Rule 11 motion in disguise.  Of course, to the extent a party has made

13 misleading statements to the court, a pall is cast upon the credibility of that party.

14          Secondly, to the extent respondent's defense is that petitioners' investigators

15 engaged in improper conduct as well, such a defense will not serve to excuse prejudicial

16 misconduct performed on respondent's behalf.  The court is not adjudicating a motion brought in

17 respect to alleged petitioner misconduct.

18          Thirdly, a great deal of evidence has been produced regarding the juror

19 misconduct issue.  The undersigned will not attempt to discuss or include every piece of that

20 evidence in this discussion.  Only the evidence substantially important to the decision will be

21 discussed.

22          Having set the parameters of the misconduct motion, the court finds that it has

23 jurisdiction to adjudicate a claim of misconduct occurring in state exhaustion proceedings, and

24 _____

25      [2]  All are familiar with the unique capital case trial involving petitioner – the guilt phase,
the commencement of the penalty phase, the interruption of that phase by a jury trial on
competency and finally, resumption of the penalty phase.  The court will not detail those
26 procedures or the facts of the case herein.

that Attorney Brosterhous engaged in overreaching (misconduct) in conducting interviews with jurors, aka the 2000 interviews, and that such overreaching was prejudicial in the case of juror Mitts.

*Procedural Background*

Even the procedures utilized in resolving the above motion were subject to debate; thus, the court describes in some detail the procedural background of the motion.

On September 2, 2005, the undersigned issued an order regarding evidentiary hearing. That order included issues of juror misconduct where the basis of the court's decision to have an evidentiary hearing included declarations which the court *and the parties* found conflicting. In the run-up to the evidentiary hearing, then scheduled in January 2006, petitioner filed his motion to find prosecutorial misconduct based upon the 2000 interview methodology of Brosterhous used to obtain rebuttal declarations. This motion was discussed at a hearing on December 19, 2005. Rather than make a finding on Brosterhous misconduct, and given the undersigned's need to hear from the jurors on the reasons why declarations ostensibly changed in any event at evidentiary hearing, the undersigned determined that petitioner could call Brosterhous as a witness at the evidentiary hearing on juror misconduct. Brosterhous was also thereby precluded from interrogating the jurors at evidentiary hearing.[3] The undersigned's reasoning was set forth in a Memorandum dated January 5, 2006.

Respondent sought reconsideration of this order. The reconsideration was granted by the Honorable Frank Damrell on March 28, 2006. Judge Damrell concluded that petitioner had no "compelling need" to call Brosterhous as a witness. No ruling was made on petitioner's motion for prosecutorial misconduct, and the undersigned was ordered to decide the motion for

---

[3] Petitioner made a related motion for protective order that the Attorney General be precluded from further contact of the juror/witnesses; that motion was denied and petitioner sought reconsideration. However, events caught up with the reconsideration making it more or less moot, i.e., further AG contacts were made in the interim. The protective order reconsideration was denied by Judge Damrell in the order of March 28, 2006. This motion for protective order is not at issue at this time.

1   prosecutorial misconduct at the initial day of the evidentiary hearing, but also that the magistrate

2   judge was permitted to decide what evidence was necessary to decide the motion.

3         With Judge Damrell's order in mind, the undersigned came to the first day of

4   evidentiary hearing in a quandary.  The juror witnesses would be needed for both the lawyer

5   misconduct issues and juror misconduct issues.  The lawyer misconduct motion could not be

6   decided without hearing from the jurors as to events associated with the Brosterhous interviews –

7   the transcript and tapes of the Brosterhous interviews were insufficient to determine the motion.

8   While the tapes and transcripts clearly showed the "what" of the changes, the "whys" remained

9   elusive.  Even petitioner, in his motion, had asked for further fact development regarding

10  Brosterhous' actions toward juror witnesses – development which would necessarily have

11  involved the juror-witnesses in this case.[4]  Moreover, the reasons why the jurors

12  changed/modified/clarified their declarations were pertinent to the prejudice issue on the

13  misconduct claim, i.e, whether actions of Brosterhous, if found to be misconduct, had a

14  substantial, prejudicial effect on the jurors such that their declarations were changed afterwards.

15  Misconduct without prejudice is rarely actionable in the sense of imposing draconian case-

16  altering sanctions such as those sought by petitioner.  Of course, the reasons why the declarations

17  were changed were also of critical importance to the juror misconduct issue.  If the court

18  accepted the second set of declarations executed in response to the Brosterhous interviews, there

19  was no misconduct of the jurors in the first place.  On the other hand, if the court found the

20  reasons for the changes in the second set of declarations as being substantially related to

21

22      [4] Petitioner had, at one time, requested discovery on juror interviews conducted by
    Brosterhous in other cases.  However, discovery regarding juror interviews in other cases, as

23  described by the undersigned as "not worth the candle," was denied.  Either Brosterhous had
    committed misconduct in *this* case, or he had not.  Since the interviews with the jurors in this

24  case were transcribed, there was nothing to gain by dredging through juror interviews in other
    cases.  In other words, the fact, if it were a fact, that Brosterhous had engaged in misconduct in

25  another case(s), would not change the words or context of those words to the jurors *in this case* at
    all.   The court's attempting to determine whether Brosterhous had committed misconduct in

26  other cases would have been a fool's errand as far as this case was concerned.

1   improper conduct, the first declarations would stand and could very well occasion a finding of

2   juror misconduct.

3           Superimposed on the need to hear the jurors no matter whether the issue was

4   misconduct of the attorney or of the jurors was the court's strong desire not to have the jurors

5   testify twice to the identical facts.  The jurors had undergone interview after interview, and had

6   executed declaration after declaration; if the court piled atop these interviews and declarations a

7   requirement that they testify twice in court, an untoward burden would have been placed on the

8   jurors, some of whom had to travel great distance to the court house.

9           In light of the need to have the juror testimony, the need to have that testimony

10  only once, and the leeway given to the undersigned to conduct the hearing as he saw fit, the

11  undersigned ordered that the testimony to be taken on the lawyer misconduct motion would do

12  double duty for the juror misconduct issue.  Attorney Brosterhous could be present at all times,

13  argue the case as well as conduct the examination of non-juror witnesses, but not conduct

14  examination of the juror witnesses.[5]  While the parties, especially respondent, did not necessarily

15  like the dual aspect of the hearing, no better procedure was suggested.

16  *The Lawyer Misconduct Motion*

17          1.      The Federal Court's Authority to Police Alleged Misconduct

18                  Originating in State Proceedings

19          The parties simply assume that this federal court has authority to police alleged

20  misconduct originating in state proceedings, albeit related to this federal habeas proceeding.  The

21  undersigned has much doubt in this area.[6]

22  \\\\\

---

23          [5]  Petitioner did not attempt to call Brosterhous as a witness, and as told to the parties at
24  hearing, the court would not have permitted such.

25          [6]  The undersigned made a comment on this issue during the course of the hearing; the
     significance of the comment became clear to the undersigned when fashioning a decision for the
26  issue of misconduct.

1    The undersigned is reticent indeed to raise issues that the parties have not raised,

2  and would do so only if the jurisdiction of the federal court was at issue.  That jurisdictional

3  concern is present in that the court questions the authority given to it to sanction parties or

4  attorneys for conduct which took place during state court proceedings.

5    There is no doubt that the conduct sought to be sanctioned by petitioner occurred

6  during the state court exhaustion process.  The Brosterhous juror interviews occurred in 2000 at a

7  time when this federal case was stayed.  The declarations obtained as a result of the Brosterhous

8  interviews were initially filed in response to an order from the California Supreme Court

9  directing respondent to file an informal answer to allegations raised by petitioner.  Those

10  declarations were ultimately also referenced/filed in federal court in each party's briefing

11  concerning the need for an evidentiary hearing.  Although there was some follow-up juror

12  investigation by both parties in this federal proceeding, i.e., further juror interviews based upon

13  what had been acquired during state court proceedings, the parties did not argue that these second

14  round of juror interviews could be a basis for a misconduct finding – and the court would not

15  find that they were.  Petitioner's injury, if any, occurred at the time some jurors recanted their

16  initially favorable-to-petitioner declarations.  Although petitioner could reasonably argue that the

17  effect of the recantations has continued into the present proceedings, the fact remains that the

18  alleged misconduct and initial injury took place during an investigation conducted under the

19  auspices of state court.

20    Nor does the fact matter that at the time the declarations were obtained the parties

21  anticipated that further federal court proceedings were likely.  Respondent was acting at state

22  court direction for a filing which was going to be made in state court.  A hearing on the filed

23  declarations could well have been ordered by the state court.[7]

24  \\\\\

25
26    [7] It would be insulting to comity with the state courts to find that federal courts may directly oversee the activities of party and counsel in those courts.

1    Federal courts are not ombudsmen roving about on a commission to right wrongs.

2  See Plum Creek Lumber Co. v. Hutton, 608 F.2d 1283, 1289 (9th Cir. 1980).  Federal courts are,

3  of course, courts of limited jurisdiction, and enjoy no general appellate oversight of state courts.

4  Dubinka v. Judges of the Superior Court of California etc., 23 F.3d 218, 221 (9th Cir. 1994)

5  (refusing to involve the federal courts insofar as plaintiffs sought relief in individual state

6  criminal action discovery disputes); Demos v. USDC, Eastern Dist, WA, 925 F.2d 1160, 1161

7  (9th Cir. 1991) (federal court has no authority to issue writ of mandamus to state court).  Indeed,

8  attorney misconduct in general is best reviewed by the organization which oversees the bar,

9  which does have authority to review misconduct occurring anywhere.  Lawrence v. District of

10  Columbia Crt. of Appeals, 629 F. Supp. 579, 581 (D.D.C. 1986).  While courts can and must

11  police misconduct occurring directly before them, the policing is limited to misconduct which

12  occurs within the confines of a case over which the court has jurisdiction.  "As we said long ago,

13  '[w]hen an attorney appears before a federal court, he is acting as an officer of *that* court, and it is

14  *that* court which must judge his conduct.'"  In re Larry's Apartment, L.L.C., 249 F.3d 832, 838

15  (9th Cir. 2001) (emphasis added).  It works both ways – when appearing before a state court, it is

16  *that* court which must judge the conduct.  Thus, in sanctioning a party, it has been generally

17  understood that a court has no authority under federal rules to sanction an attorney or party for

18  misconduct occurring outside of the case at bar.  See Robinson v. Reynolds, 129 F.R.D. 15

19  (D.Mass. 1989).

20    An exception to the rule of non-involvement occurs when the misconduct taking

21  place elsewhere is affirmatively continued in the federal court.  Id, (citing Foval v. Firt National

22  Bank of Commerce, 841 F.2d 126, 130 (5th Cir. 1988)).  As Robinson made clear, however, it is

23  the conduct taking place in federal court that was to be sanctioned.  That is not the situation here.

24  Petitioner has foregone any Rule 11 proceeding; indeed, petitioner does not reference the federal

25  \\\\\

26  \\\\\

7

1  sanction statute or rule under which he proceeds.[8]  And again, petitioner made the motion solely

2  based upon the activities which transpired while the case was in state court.

3  　　　　　　In a Fifth Circuit case, appropriately entitled, In the Matter of Case, 937 F.2d 1014

4  (5th Cir. 1991), the court found the bankruptcy court without authority to award sanctions for

5  vexatious conduct taking place in state court.  And, this was so even if the sanctions were

6  otherwise appropriate under the court's inherent authority.

> The power to assess attorneys fees, like other inherent powers
> possessed by the district court, is based on the need to control court
> proceeding and necessity of protecting the exercise of judicial
> authority in connection with those proceedings. Id. (and citations
> therein).  These principles are equally applicable to the bankruptcy
> court.
>
> However, a bankruptcy court's inherent power to punish bad-faith
> conduct does not extend to actions in a separate state court
> proceeding.  The state court proceeding in the instant case is
> completely collateral to the proceedings in bankruptcy court.  The
> conduct of the parties in the state action cannot be said to affect the
> exercise of the judicial authority of the bankruptcy court or limit
> the bankruptcy court's power to control the behavior of parties and
> attorneys in the litigation before it.  Inherent power must arise from
> the litigation before that court.

16  Case, 937 F.2d at 1023 citing Chambers v. NASCO, 501 U.S. 32, 111 S. Ct. 2123 (1991).

17  　　　　　　However, in Western Systems Inc. v. Ulloa, 958 F.2d 864 (9th Cir. 1992) the

18  Ninth Circuit disagreed.  This case involved vexatious litigation commenced in a Guamanian

19  court which had followed a long and extensive litigation in federal court.  The aggrieved party

20  (the successful party in the previous federal court action and the defendant in the Guamanian

21  litigation) filed another action in federal court seeking to enjoin the Guamanian litigation and

22  seeking sanctions for the fact that further litigation was filed in Guam.  Grasping upon the

23  language in Chambers:  "Fourth, Chambers challenges ... the imposition of sanctions for conduct

---

[8]  While petitioner does cite to federal statutes for the substance of his misconduct argument, petitioner does not reference the authority to punish respondent in this civil habeas action.

8

before other tribunals....Our cases are to the contrary, however, <u>Chambers</u>, 501 U.S. at 57, 111 S.

Ct. at 2139," the Ninth Circuit found that sanctions levied by a federal court for activities in the

Guamanian court were not without authority.

With respect, the Ninth Circuit misread <u>Chambers</u>.  Sanctions were appropriate

for activities in other tribunals in <u>Chambers</u> *because* the activities were "in direct contravention

of the District Court's orders."  <u>Id</u>.  The sanctionable activity in <u>Chambers</u> did indeed directly

involve the sanctioning court.  Nevertheless, misread or not, <u>Ulloa</u> is the case which binds the

undersigned.

Although the undersigned believes that the federal court may lack jurisdiction to

sanction respondent/Brosterhous, binding case law requires a finding that the ultimate remedy

sought by petitioner, that of striking respondent's answer insofar as it has denied jury

misconduct, is a legal possibility despite the fact that the alleged activities have taken place under

the auspices of a different court.[9]  Because petitioner has not specified the basis upon which this

court would exercise jurisdiction, i.e., statute or rule which permits sanctions, the court proceeds

under its inherent authority to monitor abuse of the legal process.  <u>See</u> <u>Chambers</u>, <u>supra</u>; E.D.

Cal. Local rule 83-180(e) ("No attorney admitted to practice before this Court shall engage in any

conduct which ... in any manner interferes with the administration of justice.").

2. <u>Standards by Which to Assess Misconduct</u>

Precluding evidence so that the recalcitrant party cannot support defenses is

comparable to entering dismissal, which "represent[s] the most severe penalty that can be

imposed."  <u>U.S. v. Kahaluu Const.</u>, 857 F.2d 600, 603 (9th Cir. 1988); <u>accord</u>, <u>Valley Engineers</u>

---

[9]  Assuming for the moment that Brosterhous would be immune from federal court supervision for actions taken in connection with what was initially filed in state court, the potential result might not differ too much.  The issue would then become simply to what extent this court would exclude evidence improperly obtained during the pendency of state court proceedings.  The court might well determine to exclude evidence (and subsequently tainted evidence) which has been improperly obtained – no matter where it was improperly obtained.  But this ruling, if it were to be made, would be part of the analysis on the merits of jury misconduct.

1  v. Electric Engineering Co., 158 F.3d 1051 (9th Cir. 1998).  Accordingly, such sanctions are

2  authorized only in "extreme circumstances" for violations "due to willfulness, bad faith, or *fault*

3  of that party." Kahaluu Const., 857 F.2d at 603 (emphasis added); see also Commodity Futures

4  Trading Com'n v. Noble Metals Intern., Inc., 67 F.3d 766,770 (9th Cir. 1995) (affirming standard

5  and upholding sanctions in egregious circumstances).[10]  Bad faith does not require actual ill will;

6  substantial and prejudicial obduracy may constitute bad faith.  B.K.B. v. Maui Police Dept., 276

7  F.3d 1091, 1108 (9th Cir. 2002).

8          Petitioner and respondent have, at times, treated the misconduct motion as if it

9  were part of a criminal action, and "prosecutorial misconduct" was the issue of debate.  The

10 present case is not a criminal action; it is a civil action.  As set forth in Bean v. Calderon, 166

11 F.R.D. 452, 453-454 (E.D. Cal. 1996), although criminal law concepts may bleed into habeas

12 corpus procedures, e.g., Brady obligations continue to exist in habeas corpus, Thomas v.

13 Goldsmith, 979 F.2d 746 (9th Cir. 1992), and certainly the substance of the dispute involves

14 criminal law issues, the procedures which guide a habeas corpus action are by and large those

15 which govern any ordinary civil case.  Once discovery is authorized under habeas rules, the

16 discovery proceeds as it would in any other civil action.  Inappropriate conduct occurring during

17 discovery, or pre-discovery investigation, should be categorized under a civil rubric and

18 \\\\\

19 \\\\\

20

21     [10]  See also, e.g., Fjelstad v. American Honda Motor Co., Inc., 762 F.2d 1334, 1338 (9th
   Cir. 1985) ("'Where the drastic sanction of dismissal . . . [is] imposed . . . the range of discretion
22 is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad
   faith,'" quoting Sigliano v. Mendoza, 642 F.2d 309, 310 (9th Cir.1981); G-K Properties v.
23 Redevelopment Agency, 577 F.2d 645, 647-48 (9th Cir.1978) (bad faith crucial in Rule 37
   dismissal, citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S.
24 Ct. 2778 (1976)); Henry v. Gill Industries, Inc, 983 F.2d 943, 946, 948-49 (9th Cir.1993)
   (reviewing Rule 37 dismissal under multiple factors, including willfulness, bad faith or fault);
25 Porter v. Martinez, 941 F.2d 732, 733 (9th Cir.1991) (reviewing Rule 37 default judgment
   pursuant to multiple factors including bad faith); Wanderer v. Johnston, 910 F.2d 652, 655-56
26 (9th Cir.1990) (same).

1   sanctioned under standards applicable to civil case misconduct.[11]   However, the undersigned also

2   recognizes that the case underlying this habeas corpus action is a criminal, death penalty case.

3   Thus, examples of witness tampering derived from criminal statutes and cases are not irrelevant

4   – they are instructive.  Indeed, there is no justification to substantially separate the substance of

5   such law.  Witness tampering is no less repugnant in civil proceedings than it is in criminal

6   proceedings.

7   Any lawyer in a civil proceeding may commission investigations and query the

8   critical witnesses in the case.  But, as pointed out by petitioner at hearing, the lawyer should not

9   deal with the witnesses in such a manner as will coerce or unduly influence a witness' recall of

10  events.  Concepts of obstruction of justice apply to civil proceedings.  Perhaps the best case

11  which sets forth the general standard is an older one:

> It is not an unlawful attempt to influence or impede a witness, or
> the due administration of justice, for one to seek to obtain from a
> witness a statement of the facts as he believes them to be, *without
> the exercise of undue influence*, even though such a statement may
> conflict with prior testimony given by the one making the
> statement.  Such an effort is not regarded with favor, because of the
> temptation to influence the witness unduly; but the mere request
> for a statement believed to be true does not offend against the
> statute under which this indictment was drawn, because it is not
> corrupt conduct.

18  Harrington v. U. S.,  267 F. 97, 101 (1920) (emphasis added).

19  And, the Supreme Court has held that the mere fact that a witness changes

20  testimony is not misconduct on the part of the person presenting the changed testimony – the

21  change in testimony must be brought about by misconduct:

> The gravamen of the misconduct charged is not the fact that the
> witness changed his testimony but that the prosecuting attorney

---

[11]   This is not to say that standards governing a lawyer's conduct in a criminal action is
completely different than that in a civil action.  There are probably many more similarities than
differences, e.g., prohibition of attorney contact directed to a person known to be represented by
counsel.  But there is no need to discuss the nuances of differences which may exist since the
habeas proceedings will ultimately be governed by a civil standard.

> knowingly caused the witness to give the false testimony.  All the
> accused and his attorney knew at the trial was that the single
> prosecuting witness changed his testimony.  Obviously this in itself
> does not warrant a charge of fraud.

Price v. Johnston, 334 U.S. 266, 290-291, 68 S. Ct. 1049, 1062, viewed as abrogated in part on

other grounds by McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454 (1991).

Criminal standards provide some guidance.  The present federal witness

tampering statute, 18 U.S.C. 1512(b) precludes the knowing use of "misleading conduct" or

"corrupt persuasion" toward a witness in order to influence the witnesses' testimony.  "Section

1512(b) does not prohibit all persuasion but only that which is 'corrupt[ ].'  The inclusion of the

qualifying term 'corrupt[ ]' means that the government must prove that the defendant's attempts

to persuade were motivated by an improper purpose." U.S. v. Thompson, 76 F.3d 442, 452 (2nd

Cir. 1996).  However, the facts of unduly influencing a witness should not have to rise to the

level of a federal felony before a court can find misconduct in a civil setting.  See United States

v. Morrison (Boscia), 535 F.2d 223, 227 (3rd Cir. 1976) ("The good faith of the Assistant United

States Attorney would be relevant if he were charged with violation of 18 U.S.C. 1503.... It is

not, however, relevant to an inquiry into whether a defendant was denied his constitutional

right.")

The ABA Model Rules of Conduct, rules which have been adopted by this court,

when no on point California ethics rule is available,[12] see E.D. Cal. Local Rule 83-180(e),

prohibit the undue influence of witnesses:

> A lawyer shall not:
>    (a) unlawfully obstruct another party's access to evidence... A
> lawyer shall not counsel or assist another person to do any such
> act;
>    (b) falsify evidence, *counsel or assist a witness to testify falsely*,
>    or offer an inducement to a witness that is prohibited by law;

---

[12]  California Rules of Professional Conduct, 5-220 (suppression of evidence) and 5-310 (prohibited contacts with witnesses [but limiting that contact for the most part to improper payments]) while tangentially applicable are not a good fit for the alleged activities herein.

ABA-AMRPC Rule 3.4 (emphasis added)

[1] The procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties.  Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, *improperly influencing witnesses,* obstructive tactics in discovery procedure, and the like.

Comment ABA-AMRPC Rule 3.4[13]

And, a lawyer "shall not give legal advice to an unrepresented person, other than the advice to

secure counsel, if the lawyer knows or reasonably should know that the interests of such a person

are or have a reasonable possibility of being in conflict with the interests of the client."

ABA-AMRPC Rule 4.3

With respect to unduly influencing a witness, the position of the lawyer vis-a-vis

the witness should be considered.  As petitioner points out in the criminal context, and one which

is somewhat analogous[14] to the position of the Attorney General here:  "It is imperative that

prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of

their duties and rights."  United States v. Rich, 580 F.2d 929, 934 (9th Cir. 1978).  Moreover,

government officials must recognize their status as having the potential to influence witnesses.

See United States v. Freeman, 208 F. 3d 332, 337 (1st Cir. 2000) (status of defendant as police

_____

[13]  A lawyer shall not:
  (a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law;
  (b) communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order;
  (c) communicate with a juror or prospective juror after discharge of the jury if:
    (1) the communication is prohibited by law or court order;
    (2) the juror has made known to the lawyer a desire not to communicate; or
    (3) the communication involves misrepresentation, coercion, duress or harassment; or
  (d) engage in conduct intended to disrupt a tribunal.
ABA-AMRPC Rule 3.5

[14]  There are some differences as well.  A witness in a criminal proceeding may well have Fifth Amendment concerns which need to be the subject of some advisement regardless of whether such advisement may chill the witness' desire to testify for the defense.

1  officer relevant to determine whether witness tampering occurred).  A government lawyer

2  affiliated with law enforcement has the same potential to influence:  "A prosecutor may therefore

3  caution a defense witness about the risks of testifying, but '[w]here ... the substance of what the

4  prosecutor communicates to the witness is 'a threat over and above what the record indicate[s]

5  was timely, necessary, and appropriate,' the inference that the prosecutor sought to coerce a

6  witness into silence is strong.'"  United States v. Jackson, 935 F.2d 832, 847 (7th Cir.1991)

7  (quoting United States v. Simmons, 670 F.2d 365, 369 (D.C.Cir.1982)).  U.S. v. Johnson, 437

8  F.3d 665, 677 (7th Cir. 2006).  Government attorneys must walk a fine line, and otherwise proper

9  warnings and "advice" will soon become improper if done to excess.  United States v. Morrison,

10  supra, 535 F.2d at 226-227 (repetitious warnings unduly influenced a witness).  As the

11  undersigned stated in court:  when it comes to a government lawyer's positing a

12  factual/procedural background to a witness, or indicating to a witness that he may be in for some

13  trouble, "less is more."

14          Of course, attorneys associated with law enforcement are what they are, have a

15  duty to identify themselves to witnesses, and have a client to represent; however, when their task

16  is to determine the truth of previously sworn statements, in light of the common sense Harrington

17  supra decision, these officials must act very cautiously due to the potential that witnesses who

18  believe they are being investigated for their past statements by law enforcement officials might

19  retract them for the improper reason that they do not want to get in trouble or involved further.

20  And, when the witnesses are being told that they are being investigated for "juror misconduct,"

21  the potential for undue influence is even more heightened.

22          Finally, misconduct without significant prejudice is not actionable, at least insofar

23  as draconian sanctions such as striking part of an answer are involved.  United States v. Ross,

24  206 F.3d 896, 900 (9th Cir. 2000) ("Ross' claim that the government tampered with her most

25  important witness is also not viable because, even assuming it is true, Ross cannot demonstrate

26  prejudice.")  The Ninth Circuit has carefully delineated the factors which would allow the

14

imposition of case altering sanctions in a civil case:  Most critical for evaluating the risk of

prejudice and whether less drastic sanctions would suffice is whether the [] violations "so

damage[] the integrity of the [] process that there can never be assurance of proceeding on the

true facts."  Valley Engineers Inc., 158 F.3d 1051, 1058 (9th Cir. 1998).

        The undersigned will distill the above lengthy discussion to its essence in terms of

the issues in this case:  A lawyer commits misconduct in interviewing a witness ("fault" in the

civil context) when that lawyer knows, or should know, that the lawyer is encouraging a witness

to place his or her own interests, problems, concerns, fears, biases, and the like ahead of telling

the truth.  This is the essence of "improper influence" or "undue influence" given the facts and

circumstances of this case.  However, in order to be actionable, the misconduct must be

prejudicial, and the remedy to be employed depends upon the degree of prejudice.

*Analysis*

        The facts show that when directed to file an informal response to the exhaustion

petition filed with the state supreme court, Brosterhous, at times another attorney, and

Investigator Hagan went to interview jurors.  The jurors at issue are those who submitted

declarations to petitioner's investigators.[15]

        As discussed by the undersigned at the end of the misconduct hearing, the

undersigned finds that Brosterhous exceeded the bounds of propriety in his interviews of some

jurors (both guilt/penalty and competency trial jurors).  First, Brosterhous knew, or should have

known, that his interviews had the high potential, if done improperly, to influence the jurors.

The jurors would have taken notice that a special agent with the California Department of

---

[15]  At various times during the hearing, respondent would attack the interview methods of
petitioner's investigators.  However, as noted by both the undersigned and Judge Damrell, there
is no misconduct motion pending against petitioner.  This is not to say, however, that petitioner's
methodology in collecting the declarations is totally irrelevant.  To the extent that petitioner's
counsel/investigators obtained faulty information in their declarations, such would have an
impact on the prejudice analysis, i.e., the more unreliable petitioner's information, the less
petitioner could have been prejudiced by any Brosterhous misconduct.

Justice, and members of the Attorney General's Office had made a special trip to interview them. Ordinary people would be "on alert" in a defensive mode to avoid being accused of having engaged in misconduct as jurors or in relating facts to petitioner's counsel. Weaker individuals might well give into self-preservation instinct by retracting previous statements in order to protect themselves. This would be especially so since the investigation, for the most part, proceeded under the sobriquet of juror *misconduct* brought about by *the jurors'* previous statements to petitioner's investigators. Thus, although there was nothing wrong per se in having the official state entourage engage in the interviews, the interviewers needed to walk softly indeed lest they exercise the undue influence described above. The case law (and common sense) demanded no less.

It was not the tone of the interviews that exceeded the bounds of propriety, but the "setting up" of the jurors with gratuitous characterizations which did. Brosterhous did not badger or expressly threaten the jurors. He was not belligerent, pugnacious or overbearing in manner. However, he made comments which would make the ordinary person feel guilty, or foolish, or fearful, or all three about what they had stated previously. His lengthy characterizations to some jurors would have indicated that petitioner's investigator's, or even they, might have engaged in something improper in relating the information which they did. As detailed below, some jurors were impacted by this, most were not. And, it is not just the singular comments themselves (except with respect to juror Mitts) but the totality of the characterizations. Examples of the type of statements made by Brosterhous are as follows with bracketed comments by the undersigned:

> Juror Mitts (Competency Trial Juror)
>
> [This competency trial juror had previously asserted to petitioner's investigators that she had not informed the judge in voir dire about being the victim of a crime [rape], had prejudged the matter before her, *had lied to the court* about here ability to be impartial, had disobeyed the judge's instructions not to read media accounts of the trial or discuss the case prior to deliberations, see Exhibit 1]
>
> [After having already given initial background as to why Brosterhous was interviewing Mitts, Brosterhous continued, see

Exhibit 2]:

Brosterhous.   Mr. Stanley had an automatic appeal to the California Supreme Court....[it] upheld Mr. Stanley's sentence judgment and the verdicts of both your jury and the other jury... the vote was 7-0.  It was unanimous....These appeals go on forever...

....Convicted prisoners also have another kind of appeal called habeas corpus...[it] can reach other subjects and issues.  And such an issue would be *misconduct by the jurors*.  In other words, if the jurors *didn't follow the orders* and directions of the court, *did something inappropriate* that could result in Mr. Stanley getting a new trial...They have file[d] a writ.  In that writ one of the major issues is that the jurors in both the guilt penalty trial and in your trial, the competency trial[,] committed or engaged in several forms of *misconduct*....and cause the case to be completely overturned. Okay, you follow me so far?

A. [Ms. Mitts]: [not unpredictably] Yes I follow you.

***

Q. .... You can tell us to go away and we'll go away.  *I would advise you not to*, and I'll tell you why and...this should make sense to you.  The CSC has ordered us to respond to these allegations and what's going to happen and the reason I'm on this case, is this is kind of like what I do, is *jury misconduct*.  They're going to order a hearing in Oroville.  There is almost no doubt of it, and because you've signed that declaration, *you[']re going to be [the] star witness*.

A. Oh wonderful. [said on the tape with a frustrated, what-have-I-got-myself-into inflexion].

Q.  Yeah, well, I'm sorry.  I'm not going to call you as a witness. But you see to overturn the Stanley verdict, this piece of paper isn't enough.  They have to have your testimony.  This piece of paper [Mitts' declaration] can get them a hearing, but it cannot overturn the verdict.  They have to have a human being subject to cross-examination testify that *that person committed jury misconduct*. So what typically happens and I would say is 90 plus % possibility, probability is that the court is going to order what is called an evidentiary hearing.  Typically it is ordered in the county of commitment which in this case is Butte [proximate to Mitts' residence]....the Supreme Court will order one of the judges in Butte County to hear the evidence and make a decision *on whether or not this misconduct occurred*....  So I'm telling you right now you're going to get a subpoena from Mr. Stanley's attorneys.  Do you understand that?

[the transcript shows that Mitts understood this lengthy admonition

on her misconduct only all too well, as she immediately began to back-peddle on her previous statements.]

A. [Mitts]  Okay, well I'm very confused.  I mean I'm not confused about the fact that I signed this statement.... I wasn't fully aware of what was going on at the time.... It wasn't really made clear to me what was going on.  Okay, so now I've signed this statement and now I'm involved in this situation. *I don't really care to be involved in it.*  I don't want to reopen up this stuff. [She then reaffirms her jury verdict].... But I realize *that they're trying to find some misconduct with me* or somebody so they can get him off.... Am I correct, am I following you?

Q.  Yeah.  You're right.

A. Okay, *so, now what am I supposed to do about all of this?*  I don't know–

Q.  *My advice is* that the best thing – this is going to sound corny, but the truth will set you free, and the best thing you could do at this point, since it's going to come out anyway, is provide an explanation of what, in fact, happened.  *Perhaps, no guarantees, but maybe the explanations will be good enough so the court's not going to need a hearing*.  But that's where we're at.

[At this point, any juror with four working cylinders out of eight was going to know what "truth" would set her free, and how good the explanations had to be in order to forestall the hearing.  All the exhortations to tell the truth after this colloquy, and some were made, would be viewed in light of the previous discussion.  It is not surprising, therefore, that every aspect of juror misconduct set forth in the first Mitts' declaration became either repudiated or unrecalled.  The loaded and/or leading questions to arrive at this result were in themselves over the top.  A small exemplar follows]

Q. Do you feel that you lied to the court during the jury selection?  You were under oath, if you recall.  Do you feel at this point in time that you lied to the court during jury selection?

A.  No.

***

Q.  I'm sorry, the question wasn't guilt or innocence it was whether or not Mr. Stanley was competent to understand the proceedings, and you hadn't prejudged that decision at the time you were selected as a juror?  So you did not – I don't want to put words in your mouth – but it would be your statement that you did not lie to the court during the jury selection process while you were under oath, is that correct?

18

A.  To the best of my ability.  I don't believe I did.

\*\*\*

Q. Did you violate his order and discuss the case with other people during the trial?  If you can recall.

A.  I can't recall.

\*\*\*

Q.  Would it be a fair statement then to say that during the course of the trial you never read newspaper accounts of the Stanley case?

A. I never actually read the newspaper accounts[,] no.

[Towards the end of the interview, Ms. Mitts spontaneously volunteered:]
....At the time [of executing the first declaration] that this statement was taken, yes, I was very ill.  I have since recovered.  I am not ill any longer.  My mind is clear.  I know what I feel.  I know what I think.   I know that I feel that man is mentally competent...

\*\*\*

Q. Would it be fair to say that you just signed it [first declaration] to get rid of them, make them go away?

A. Basically feeling that I was having to sign this piece of paper, yes.

[emphasis added]

The court will continue with examples from other juror interviews; however, they will be abbreviated so as to not simply be repetitious.

Juror Forbes (Guilt/Penalty Juror)

Q. ...I'm going to give you a little legal lesson first because I think it's important that you understand.  California law has some special provisions with regard to jurors who have served on a jury and to protect you actually.  California law says that subjective mental processes are inadmissible in court.  *That means it's improper for lawyers to ask what your thinking was*....It's improper for anybody to ask you why you reached that conclusion... It sounds like a real difficult distinction but it's the law and I'm going to honor it in the sense of you know *I think it's a travesty after all these years that we have to get involved in jury misconduct and issues*....but I really dislike the process of taking apart a verdict after it's been reached

19

after so many years.  You follow me so far?.....

[First, while Brosterhous was correct on his admissibility
statement, he was decidedly incorrect in advising that it was
improper for anybody to question a juror on the subject of mental
thought processes.  See Cal. Code Civ. Pro. § 206; Cal. Evid Code
1150 which does not provide such. The point here is that such a
statement by the Deputy Attorney General would lead an ordinary
juror to the conclusion that petitioner's investigators who did ask
about her mental processes had done something improper – thereby
(incorrectly) ingratiating "his side" with an aura of dignity and
poisoning the well with respect to petitioner's side.  It was setting
up the juror/witness with an idea of exactly how to respond to the
questions.  Why was this speech necessary at all if not to prejudice
the juror?  Moreover, while some judges on their own may well
think that it is improper to delve into mental thought processes, the
point here is not the correctness of the practice, but rather, when
juror questioning is being performed, not to bias the witness with
gratuitous personal opinions.  Obviously, the "travesty" comment
would prejudice the witness in answering questions and against
further petitioner contacts. [16]]

[The remaining jurors at issue had similar introductory speeches.
However, the gratuitous statements  given before the other jurors
were not as lengthy, and/or not as strong as the ones previously
recited to the extent that there was not also pre-recordation
discussion.  One other example will be given.]

Juror Robinson

[the same travesty statement was made to Robinson, plus others]

Q. I assume they never told you this document potentially could be
sued to overturn the Stanley-they didn't

A. No they did not.

Q. Could overturn the Stanley judgment?

---

[16]  Some courts agree with Brosterhous.  See Cook v. Rockwell Intern. Corp.,  2006 WL
1071896, *4 (D.Colo. 2006) (and cases cited therein).  See also cases cited by respondent in the
Opposition to the motion to find prosecutorial misconduct at pp. 7-12, generally decrying the
extent and intrusiveness of juror investigations.  However, the point here is not the correctness of
Brosterhous' opinions, or whether juror investigation should be allowed at all.  For better or
worse, the initial investigation had been conducted, Brosterhous had been tasked by the
California Supreme Court with acquiring a response, and that response should have been
procured without the rendering of personal opinions which would make it seem to the ordinary
juror that petitioner had engaged in misconduct in even asking the jurors any questions.  Such a
mindset would make it easier for jurors to discard their initially stated facts as having been the
product of overreaching conduct towards them by petitioner's investigators.

1          A. No, they did not.

2          The undersigned has bracketed his comments with each juror above.  Those will

3   not be repeated.[17]  However, especially with respect to juror Mitts, the inference to be drawn is

4   that Brosterhous knew he needed to have the jurors retract parts of their declarations (*he*

5   *essentially told Mitts that her declaration, if its facts were accepted at hearing, would cause a*

6   *new trial*) and was not willing to simply see if that would happen without lengthy, designed-to-

7   prejudice preambles, and without non-loaded questions.  Certainly, he should have known that

8   his preambles and questions were directed towards unduly influencing the jurors/witnesses.

9   Brosterhous also should have known that his government position and that of those persons who

10  accompanied him made it imperative that he zealously guard against his introductions and

11  questions having a biasing effect on the witnesses.  Even Investigator Hagan related at

12  evidentiary hearing that he did not believe it to be a good idea to offer opinions when conducting

13  a juror misconduct investigation.

14          Therefore, the undersigned finds that Brosterhous did commit misconduct

15  (overreaching) in his interviews of the jurors listed above.  The misconduct was not all to the

16  same degree, and appeared to lessen in conformance with how "bad" the juror had been with

17  respect to respondent's case.  The effect that misconduct had on each contested juror, the amount

18  of prejudice, if any, was worked to petitioner's case (includes whether any cognizable claim

19  existed in the first place), and the appropriate remedy are discussed below.

20  \\\\\

---

22      [17]  The undersigned does not know what to make of the repeated attempts to have the
    jurors identify one Scarlet Nerad.  This person had no connection with petitioner's juror
23  investigation – a fact which was obvious after the first or second juror interview.  Yet,
    Brosterhous and Hagan persisted.  Petitioner believes the questions and photograph showing
24  were other attempts to intimidate the witnesses into believing that great misdeeds had been
    perpetrated on them by petitioner's investigators, and the "law" was hot on at least one
25  investigator's trail.  But if it was, it appeared to universally fall flat with the jurors.  The jurors
    matter of factly related that they did not recognize the woman, or had difficulty in recalling
26  petitioner's investigators at all.  The undersigned saw no real prejudicial effect from the Nerad
    questions, and relegates this questioning to the curiosity file.

1  *Prejudice*

2        Two somewhat intertwined aspects of prejudice are pertinent to the discussion

3  here.  The first is, obviously, to the extent that a juror was unduly influenced to change/modify

4  the initial declaration, petitioner was prejudiced.  However, if the factual statement which was

5  changed as a result of undue influence involved a non-cognizable aspect of juror misconduct, or

6  other non-cognizable error, the lack of any legal detriment involved in the change of statement

7  requires a finding of no prejudice.

8        The undersigned finds that with all jurors, save Mitts, the misconduct either did

9  not ultimately relate to a cognizable issue of juror misconduct, or did not appreciably cause

10  changes in the jurors' declarations, or did not unduly influence the juror when they did make

11  changes – *some* of which were made for the purpose of clarifying what a juror thought was taken

12  out of context for the initial declarations.

13        <u>Robinson (Guilt and Penalty Phase Juror)</u>

14        Juror Robinson became very agitated at petitioner's investigators/counsel because

15  he later said that he had been mislead by them (a feeling in no small part initiated by

16  Brosterhous).  This hostility was evident even at the evidentiary hearing in this case.  However,

17  the initial declaration did not concern matters of cognizable juror misconduct, and in any event,

18  his second declaration did not change in substantial ways from his first one.  The undersigned

19  finds no prejudice from any overreaching on the part of Brosterhous.

20        <u>Forbes (Guilt and Penalty Phase Juror)</u>

21        This juror had allegedly related in her first declaration that she had conducted an

22  "experiment" during the course of Stanley's trial (the penalty phase).  Even assuming that her

23  private activity mimicking a scene from the shown Stanley/Axelrad videotapes to be misconduct

24  (doubtful), Ms. Forbes later statement that she conducted this experiment after trial was

25  convincing.  First, the undersigned listened carefully to Ms. Forbes at evidentiary hearing.  While

26  affable, Ms. Forbes did not appear to be a person who could be pushed into making a factual

statement which was not true.  She did not appear defensive about the misconduct with which she was accused.  The undersigned found credible her testimony at hearing, confirming what she had told Brosterhous, that any such experiment was conducted after the trial (a fact which appeared to be the opposite of what she had initially stated[18]).  In addition, the Brosterhous interview tape and transcript demonstrated that her comment about the post-trial nature of the experiment was spontaneous and not the product of undue influence.  Finally, her objective benchmark for believing the experiment to have been conducted after trial (she was in a different home at the time of the experiment than when she was a juror) lent credence to her testimony.  The remainder of her initial declaration did not involve cognizable misconduct as set forth in the order for evidentiary hearing.  No actionable prejudice can be found.

        Sarten (Competency Trial Juror)

        Again, listening to this witness at evidentiary hearing was helpful.  Ms. Sarten had a good recollection of the salient issues which had been raised by her declaration.  Ms. Sarten did make changes to her initial declaration because she believed some of her statements had been taken out of context.  While an inference could be drawn that the unedited paragraphs were her beliefs even after correcting other paragraphs, the court found her explanations for further clarifications made to Brosterhous and beyond to be credible.  In addition, Juror Sarten did not ever change at any time a significant factual statement – the fact that she saw Stanley shackled during two days of proceedings at the competency trial.  Sarten was not a slender reed to be easily blown about by a lawyer's advocacy.  The Brosterhous "introduction" made at the time of the 2000 interview did not appreciably change this juror's testimony.

        Moreover, in closely scrutinizing the Sarten initial declaration, Exhibit 11, the court finds precious little in the way of cognizable misconduct, and much inadmissible matter

---

[18]  The clear inference from the initial Forbes declaration was that such "experiment" had taken place during trial.  Even Brosterhous was surprised when interviewing her in 2000 that such was not the case.

23

1   about the juror's thought process during deliberations.  Obviously, petitioner desired to highlight

2   Ms. Sarten's purportedly conflicting thought process about petitioner Stanley's insanity and his

3   competency.  Whether or not Sarten had such a conflicting belief, and whether she had other than

4   a layperson's understanding of legal sanity, or whether she was correct in her beliefs, is

5   ultimately non-cognizable.  Ms. Sarten expressed her belief as part of her deliberative thought

6   process, and hence, any misconduct on the part of Brosterhous could not have been legally

7   prejudicial.

8             Herbert (Guilt and Penalty Phase)

9             Juror Herbert's initial declaration (Exhibit 20) executed at the behest of

10  petitioner's counsel did hit areas of cognizable error.  She initially related that the judge and a

11  juror had slept through portions of the trial, and indicated that she knew (at the resumption of the

12  penalty phase trial) that the case had been stopped for a "sanity" hearing, but then petitioner was

13  found "competent."  Her initial declaration concluded that as a result of the "competency"

14  finding, she did not have to take mental health into account during the penalty phase.  If Ms.

15  Herbert was not supposed to have such information at her disposal, juror misconduct might have

16  been present in terms of acquiring such information from an outside source.[19]

17            The reason for lack of prejudice from any alleged overreaching on the part of

18  Brosterhous in Juror Herbert's case requires some discussion.  At the time the penalty phase was

19  suspended for the competency hearing, the trial judge only told the jurors that the penalty

20  proceedings were being "suspended," or "in recess."   RT 22495, 22509.  The reason for the

21  suspension (competency hearings) was never made known to the jury.  The jury was strongly

22  admonished not to discuss the case or read anything about it and so forth during the recess.

23

24    [19]  The court will make ultimate findings on whether Juror Herbert disregarded the
      judge's instructions at the time the penalty phase was halted in order that a competency hearing
      be held at the time findings are made on the merits of that claim.  In other areas of her
25    declaration, the undersigned has found that statements about jurors sleeping (as opposed to the
      judge) and what she believed life without parole to mean to be non-cognizable juror misconduct
26    claims.

1   When the penalty phase was resumed, the defense asked for, but was refused, voir dire on

2   whether the jurors had actually abided by the judge's instructions.  RT 25802.

3          As indicated above, Juror Herbert's first declaration indicated that she had not

4   abided by the judge's instructions, i.e., she acquired knowledge about the competency

5   proceedings and the result of same, prior to the resumption of the penalty phase, and that she

6   used such knowledge ill advisedly during deliberations.

7          Herbert was subjected to much of the same type comments from Brosterhous, as

8   was Juror Mitts, but to a lesser degree.  After the initial introductions and identification, she was

9   informed that the trial judge had agreed with "your verdict," and that the state supreme court had

10   unanimously affirmed it; that petitioner was attempting to overturn the verdict because of "juror

11   misconduct," in that the jurors "did not follow the directions of the judge at the trial," and that

12   petitioner had filed a number of declarations (Herbert's included) to that effect.  However, the

13   repetitive emphasis on misconduct was not present in the Herbert interview as it had been in the

14   Mitts interview.  But the court need not make a final finding on the actual impact of the

15   Brosterhous comments, because the *operative* facts regarding the potential claims were never

16   retracted.

17          First of all, the 2000 interview never focused upon Herbert's declared statement

18   that the judge fell asleep, and has been already set forth, a juror's supposed sleeping is not to be

19   found from juror affidavits (the trial court expressly found adversely to petitioner on this ground

20   in any event).  Therefore, Brosterhous could not have legally prejudiced petitioner in this respect.

21   More importantly, Herbert indicated *again* in the Brosterhous 2000 interview that she had heard

22   of the result of the competency jury verdict prior to the resumption of the penalty phase.  The

23   trial judge had carefully refrained from telling the jury the purpose for the recess, and the court

24   cannot find in the record that he torpedoed that plan by relating the result of the competency

25   verdict to the jurors when the penalty phase resumed.  Indeed, the penalty phase resumed without

26   mention of the fact.  RT 25802-25804.  Nevertheless, Herbert told Brosterhous, "But I do

remember that they found him mentally competent. *At trial* I thought that that meant we needed to make our decision based on the fact that he was competent...." Exhibit 21.  Taking the two sentences together, it is clear that Herbert had not retracted her statements indicating that she must have [probably improperly] acquired knowledge about the competency verdict from an outside source, *and that she knew this "at trial."* [20]

Thus, assuming that she did acquire such knowledge from an outside source, the effect of that knowledge on her verdict [the attempted retraction] is irrelevant because the "ordinary juror" standard is used, i.e., the personal effect of the misconduct on the juror during the deliberations is inadmissible.  Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993). Hence, even if she retreated in her statement about what effect such information had on her verdict, the retreat is immaterial, and the juror misconduct issue would be decided on an objective basis.  If on the other hand, she acquired such knowledge from a legitimate source (which the court cannot find in the record), the way in which she utilized such information, for good or bad, in large or in insignificant part, is deliberative process and inadmissible to taint the verdict.  Finally, after reflection of the Herbert testimony at evidentiary hearing in its entirety, the court may determine that she learned of the competency verdict after the penalty phase had completed.  At hearing, juror Herbert was unsure of when she learned of the competency verdict, but did not believe there had been any discussion of such during deliberations.  In any scenario, petitioner could not be legally prejudiced by Brosterhous' conduct.

Finally, Herbert's views on life without the possibility of parole, whether correct or incorrect, did not stem from any demonstrated outside source, and hence would constitute inadmissible attack on the verdict.  Brosterhous could not have had a prejudicial effect on a non-issue.

---

[20]  Herbert's declaration, executed after the interview, Exhibit 22, tracked the interview statements, and no retraction was made insofar as when juror Herbert found out about the competency verdict.

1          Once again, although Herbert clarified or retracted other statements which she had

2    originally declared to petitioner's investigators, the court does not find the Brosterhous activities

3    to have any substantial influence on any cognizable juror misconduct or any other cognizable

4    claim.  Even assuming that Herbert must have learned about the competency verdict from an

5    outside source, and hence probably misconduct, the court will ultimately determine the

6    misconduct and its prejudicial effect with the merits determinations.

7                    Mitts (Competency Juror)

8          The prejudice determination regarding juror Mitts is much more problematic for

9    respondent.  Obviously, if Juror Mitts did not truthfully answer questions at voir dire, such lack

10   of truth is potentially actionable juror misconduct.  See Green v. White, 232 F.3d 671 (9th Cir.

11   2000).  Clearly, if Mitts read newspapers and discussed the substance of the case with others,

12   misconduct has also occurred.  The issue here on the lawyer misconduct motion is whether Mitts

13   retractions of the facts giving rise to the juror misconduct claim was prejudicially affected by the

14   Brosterhous commentary.

15          First, the court finds from the evidentiary hearing (witnesses Mitts and Ballew)

16   that Mitts did indeed volunteer the significant information to the Federal Defender investigators

17   that she had been the victim of a serious crime (rape), and at the time of trial that she hated men,

18   that she "lied" when she said she could be fair and impartial during the competency trial, that she

19   discussed the case proceedings with other persons prior to deliberations, and that she read

20   newspaper accounts of the proceedings she was involved with during the competency trial.

21   Nothing in the record suggests that the Federal Defender investigators had an inkling of such

22   information prior to their interview with juror Mitts.  The information conveyed by Mitts in her

23   first declaration must have come as a surprise to respondent – such information not having

24   surfaced in the decade and a half since the trial.  Thus in 2000, when respondent was tasked with

25   responding to the declaration referencing the above, Brosterhous must have known that he had a

26   significant hurdle to overcome.  The types of misconduct alleged, especially "lying to the court,"

27

1   and having failed to disclose an event in voir dire which was called for to be disclosed could be

2   grounds for a new competency trial.[21]

3          The pressure felt by Mitts as a result of the Brosterhous comments, and that of an

4   ordinary, reasonable juror in her position as well, is demonstrated by the text of the 2000

5   interview.  This pressure resulted in a retraction of her previous concession to misconduct.  As

6   quoted above, when told that her misconduct as a juror was at issue, and then when told she

7   would be a star witness, Mitts response was "Oh wonderful."  This response was followed by

8   more pressure – that the hearing regarding her misconduct was going to be held in Butte County

9   to which Mitts stated: "I don't really care to be involved in it.  I don't want to reopen up this

10  stuff.  [She then reaffirms her jury verdict].... But I realize *that they're trying to find some*

11  *misconduct with me* or somebody so they can get him off....  Am I correct, am I following you?"

12  Indeed, at one time later on, Mitts exclaimed: "I almost feel like at a point like I am being tried."

13         Right after she was informed about the inevitable hearing in Butte County where

14  she would be the star witness, Mitts asked: "so what am I supposed to do about all of this."

15  When told that "explanations" may get her off the hook, she immediately retracted or did not

16  recall every previously conceded aspect of misconduct.  Of course, Brosterhous did not tell Mitts

17  to make up the retractions; he was not that unprofessional or obtuse.  The point here is that after

18  improperly setting up Mitts to fear the consequences of her own misconduct, what did he expect?

19  Mitts was under a powerful compulsion to disavow everything and avoid the misconduct hearing.

20         Mitts' proffered reason for changing her statements as expressed in the 2000

21  interview, the declaration submitted after the interview, Exhibit 3, the latter Attorney General

22  interview conducted in 2006 proximate to the scheduled evidentiary hearing (Exhibit 5), and

23  Mitts' hearing testimony itself did not indicate to the undersigned that Mitts had any legitimate

24

25         [21]  An ultimate finding on whether or not, if believed, the first Mitts declaration, if
    considered by itself, would in fact require a new trial will await the omnibus findings and
26  recommendations in the case.

28

reason for changing the statements in her initial declaration.[22]  She told Brosterhous that she was in a mentally/emotionally difficult situation when the Federal Defender investigators took her interview and provided a declaration.  How did this alleged emotional turmoil on an event in Mitts life with no connection to this case whatsoever cause Mitts to misrepresent facts to the Federal Defender investigators, and why?  No credible explanation was ever given.  This excuse appears to be a quickly grasped expedient for relating why her declaration was going to be changed 180 degrees.  Moreover, in 2006, the reason for the change in her declarations from I-withheld-on-voir-dire-my-status-as-a-crime-victim, to I-did-not-withhold-such, was now: "I think the issue with that was that I thought it was something that had happened to me when I was young, a minor, and I didn't even think it even pertained to any of that."  Exhibit 5 at 7.  Her reasoning changed once more by the time of evidentiary hearing to – I had suppressed all memory of the crime which I did not get back until some precisely unascertainable date *after the trial*.[23]  These facile changes in reasoning do not lend themselves to credibility.[24]  And while some of the jurors expressed doubts that their initial comments to the Federal Defender investigators were completely and accurately repeated in declarations given them to sign (a fact which appears from cross-outs on some of the declarations) the Mitts' declared facts were simply

---

[22] Again, the presence or absence of legitimate reasons for the change in declaration testimony was critical to the prejudice analysis.  That is why the court required the jurors to testify at the hearing.   And to the extent that Mitts' credibility was lacking, such a dearth of credibility indicated that no legitimate reasons existed.

[23] To be fair, Mitts also stated in her 2006 interview that she had probably suppressed her knowledge of the rape in the 1983 trial, but this inconsistency, even within the same interview, does not help.  She either did not relay the information to the judge because she thought her minor status made it irrelevant or she suppressed it.  One cannot both remember the reason why the known event was not related and at the same time declare that at the time the event was unknowable.  Moreover, this directly conflicts with her early-on statement that the 1983 trial exacerbated her memories of the event – the most probable scenario.  The undersigned finds the inconsistencies irreconcilable.

[24] There is a statement in the initial Mitts' declaration (para. 5) that *during the trial* she became overwhelmed by her memories as she heard the evidence; but this does not indicate that she only became aware of her memories during the trial.  Paragraph 4 clearly indicates that she was aware that she had "failed to disclose" the rape during "the jury selection process."

1  too stark to have been taken out of context or set forth in the declarations in a confused manner.

2  The court does not find that the initial Mitts declaration facts were derived from being rushed

3  into signing a declaration.

4          Finally, the overall Mitts' testimony at evidentiary hearing lacked complete

5  credibility.  It appeared to the undersigned that Mitts would "not recall" when subjected to

6  questions which were tough ones, and to which the non-recollection appeared strained.  She was

7  evasive.

8          Therefore, the court finds that petitioner was prejudiced by the Brosterhous

9  overreaching in Mitts' case in that declaration testimony was changed and there was not credible,

10  legitimate reason for that change to be found in the hearing testimony or other evidence.  Such is

11  the essence of prejudice in this matter.  (See footnote 23 above).

12          For all of the above reasons, the court finds that Brosterhous overreached with

13  competency juror Mitts to the point where the pressure involved substantially prejudiced

14  petitioner in that testimony favorable to petitioner was changed for illegitimate reasons.  Ms.

15  Mitts' recollection of the facts was tainted at the 2000 interview, and the taint remained

16  thereafter.

17  *Remedy*

18          In the normal course of a sanctions analysis in a civil case, time is spent on

19  analyzing the availability of lesser sanctions.  But lesser sanctions than exclusion of the tainted

20  testimony do not make sense here.  We are not dealing with a discovery misconduct issue where

21  a monetary sanctions slap will deter future misconduct, and ultimately, the necessary facts will be

22  available.  Prejudice in this case drives the remedy because, in the words of Valley Engineers

23  supra, the Brosterhaus overreaching:  "so damaged the integrity of the [] process that there can

24  never be assurance of proceeding on the true facts."  In the undersigned's assessment, in the

25  matter of Mitts' alleged juror misconduct, the overreaching substantially undermined this court's

26  confidence in the factual truth of Mitts' various statements commencing in 2000 and beyond.

1  There is insufficient evidence in the record to conclude that the declaration procured in 1997 by

2  the Federal Defender investigators was procured in a manner which would give rise to doubts

3  about its substantial accuracy.

4          The undersigned does not believe that striking the answer in respect to claims of

5  misconduct regarding juror Mitts is appropriate.  The Mitts' 1997 declaration remains available

6  for review on the factual merits, and the issue should be decided based on those facts and

7  applying appropriate juror misconduct prejudice standards.  The remedy most appropriate and

8  apparent to the court is to leave the parties in the same position where they were prior to the 2000

9  interview.  The court should exclude from consideration the 2000 Mitts' interview and

10  declaration and all Mitts' statements, declarations and testimony subsequent thereto.  The effect

11  of the court's exclusion will be set forth in the Findings and Recommendations on the merits of

12  the juror misconduct claim.

13  *Conclusion*

14          For the reasons set forth above, petitioner's December 6, 2005, motion to find

15  prejudicial prosecutorial misconduct should be denied except as to Juror Mitts.  With respect to

16  Juror Mitts, all statements, declarations, and testimony procured commencing with the 2000

17  Brosterhous interview, and continuing to the present, should be excluded.  The matter of juror

18  misconduct should be decided on the Mitts' 1997 declaration pursuant to appropriate legal

19  standards.

20          These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within ten days after service of the objections.  The parties are advised

26  \\\\\

1  that failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: 5/31/06

4                                         /s/ Gregory G. Hollows

                                         _____
5                                         GREGORY G. HOLLOWS
                                          U.S. MAGISTRATE JUDGE

6  GGH:gh:035
   stan1500.mis
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26