IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERALD F. STANLEY,

        Petitioner,               No. CIV S-95-1500 FCD GGH P

    vs.

WARDEN OF SAN QUENTIN STATE
PRISON,                    **DEATH PENALTY CASE**

        Respondent.        FINDINGS & RECOMMENDATIONS

_____/

*Introduction and Summary*

        The undersigned hereby issues his final Findings and Recommendations on the merits of the guilt phase (includes pre-trial). Already decided is the competency trial juror misconduct issue which will necessitate a re-trial, if feasible, in state court of petitioner's long ago competency trial. This case has been an odyssey, in length and complexity. Even the federal habeas proceedings combined with state exhaustion proceedings have themselves consumed over a decade. It is difficult for the undersigned to remember when he did not have this Stanley case on his docket. Counting from the start of criminal proceedings in state court, the case has stretched for over two decades. The case itself was more complex than usual in that it involved a guilt phase (includes pre-trial), the start of the penalty phase, interruption of the penalty phase to

hold a competency trial, and the conclusion of the penalty phase.  The case has been further

complicated by the obstreperous conduct of petitioner himself, including off and on attempts to

call off these proceedings, and/or lawyers retained outside of present counsel to thwart these

proceedings.  The complexity was further exacerbated by the need to determine whether a

counsel in these habeas proceedings committed misconduct.

         In sum, as discussed herein, the court finds no merit to any guilt phase or pre-trial

issue raised by petitioner, including the claim that petitioner was potentially incompetent during

the guilt phase (includes pre-trial).  However, because petitioner's historical competency trial,

commenced during the penalty phase, was held before a biased juror, that trial must be

retrospectively held again – if possible.  The present penalty phase verdict cannot be upheld at

this time absent a new, legitimate finding from the state courts that petitioner was competent

during his penalty phase proceedings held many years ago.  If it is found that petitioner was not

competent at the time of the penalty phase, or that a retrospective competency trial cannot

feasibly be maintained at this time, the penalty phase verdict must be finally vacated.  On the

other hand, should a second, belated verdict be rendered establishing petitioner's competency at

the time of his penalty phase proceedings, the court will once again be tasked with resolving the

penalty phase issues.  See Findings and Recommendations (Mitts juror misconduct issue) dated

April 11, 2007.  Because the present savings on judicial resources and efficiency in not having to

decide difficult/protracted competency phase issues (other than the one already decided), and

penalty phase issues, outweighed the potential impact on the case in terms of long term delay if

the case came back after a competency re-trial, the undersigned previously determined to

recommend a procedure where the issues up to the point of the historical competency trial be

adjudicated in full, but no quasi-advisory rulings on other competency trial or penalty phase

issues be decided.

         In addition, another important reason exists why the undersigned's procedure is

the only practical procedure.  Petitioner has made a claim that petitioner exhibited incompetency

1  after his competency trial and throughout the remainder of the penalty phase.  Since petitioner's

2  substantive competency at the time of his competency trial must again be ascertained, all the

3  more reason exists, therefore, to also retrospectively determine petitioner's competency at the

4  time of the penalty phase prior to advisory adjudication of penalty phase claims assuming

5  petitioner to have been competent at all pertinent times.[1]

6          In its order of July 24, 2007, the district judge has upheld this procedure.

7  Therefore, the court should enter a final, partial judgment pursuant to Fed. R. Civ. P. 54(b) as

8  there is no just reason not to do so.  Respondent should be awarded judgment on the guilt phase

9  claims discussed herein, and petitioner judgment on the Juror Mitts misconduct issue.

10  Adjudication of the remaining issues, as specified below, should be stayed pending resolution in

11  the state courts of the penalty phase competency retrial issues.

12  *Background of the Case*

13          The opinion of he California Supreme Court detailing the substantive facts is

14  helpful as background and context.

15      A jury convicted Gerald Frank Stanley of the first degree murder of Cindy Rogers
        Stanley (Pen.Code, §§ 187, 189) FN1 (count I), arson of an inhabited dwelling (§

16      451) (count II) and burglary of an inhabited trailer coach (§ 459) (count III).  The
        jury also found that defendant personally used a firearm in the commission of the

17      murder. (§ 12022.5.)  The jury found true the special circumstance allegations that
        defendant committed the murder while lying in wait ( § 190.2, subd. (a)(15)) and

18      for the purpose of preventing the victim's testimony as a witness in a criminal
        proceeding ( § 190.2, subd. (a)(10)).  In a separate proceeding the jury also found

19      true the special circumstance allegation that defendant had previously been
        convicted of second degree murder. ( § 190.2, subd. (a)(2).)  Pursuant to the

20      parties' waiver of jury trial, the court found true the allegation that defendant had
        served a prior prison term and had not remained free of prison custody for five

21      years without commission of another felony offense resulting in a conviction. (§
        667.5, subd. (b).)  Following a competency trial (§ 1369) at which the jury found

22      defendant mentally competent, the jury returned a verdict of death; the court
        entered judgment accordingly.  This appeal is automatic. ( § 1239, subd. (b).)

23

24          [1] In other words, the undersigned cannot conceive that a retrospective competency trial
        would not encompass the entire penalty phase.  Certainly, the evidence at such retrospective trial

25      would not simply be confined to the record at that instant of time at which the competency trial
        was held despite alleged, clear evidence of incompetency demonstrated right after the historical

26      competency trial was concluded.

3

FN1. All further statutory references are to the Penal Code unless otherwise indicated.

We affirm the judgment.

I. FACTS
A. Guilt Phase

Defendant met the victim, Cindy Rogers, on July 3, 1980, at the fairgrounds in Hayfork, Trinity County.  He was introduced to Cindy by Gary Wells, a friend of defendant's brother John.  Defendant was a professional hunting guide.  At the time, he was on parole and trying to gain custody of his two children by his second wife, whom he had murdered in 1975.  FN2  On July 7, 1980, he and Cindy were married in Reno.  On their return to California the next day, the pair went to Lake County where Cindy's parents, the Spatigs, owned and operated the Spatig motel-resort in Nice, near Clear Lake.

FN2.  During the guilt phase of trial, the jury knew only that defendant was on parole and seeking custody of his two children.  Not until a separate trial on the prior-murder-conviction special circumstance did they learn that the crime for which defendant had been imprisoned was the second degree murder of his previous wife.

On July 16 defendant allegedly committed three felony offenses against Cindy, the nature of which were kept from the jury.  FN3  On July 18 defendant burned down Cindy's house in Lucerne, Lake County.  On July 20 he burned her car.

FN3.  Defendant allegedly beat and raped Cindy and forced her to orally copulate him.

On July 20 Cindy filed felony charges against defendant for the July 16 offenses; based on the charges, a parole violation warrant issued for defendant's arrest.

From July 20 to August 11, the day of her death, Cindy stayed away from defendant.  On July 20 she and her entire family spent the night in a motel in Ukiah.  Thereafter Cindy stayed variously with a long time friend and co-worker, Stan Simpson, a new friend, Patrick Pounden, and her parents at their resort.  On the evening of August 11, 1980, defendant, armed with a high-powered scope rifle, positioned himself behind a tree across the road from the Spatig resort.  Just before 10 p.m., Cindy, her father Frank Spatig, and Simpson moved their lawn chairs from a patio area where they had been seated to a more open location near the resort swimming pool facing Highway 20.  Cindy's son was playing in the pool.  Shortly after the three seated themselves by the pool, Frank Spatig got up and turned on the pool area lights.  As Spatig sat down again, defendant shot Cindy through the heart; she died almost instantly.  Defendant then fled.

On August 12, defendant burglarized a mobile home.  On August 13 he was arrested at the house he shared with his mother in Anderson, Shasta County.

The evidence against defendant was circumstantial.  Briefly stated, the prosecution evidence showed defendant was concerned he would not obtain

custody of his children if Cindy pressed the criminal charges against him. Sometime in the latter part of July, defendant's mother, Mrs. Stanley, called Cindy's mother, Bobbie Spatig, to ask her to convince Cindy to drop the charges against defendant. On July 20 defendant made an anonymous telephone call to Sergeant Adkins of the Shasta County Sheriff's office in which he reported he had met Gary Wells at the Harbor Bar in Clear Lake a few days earlier, they had been drinking heavily, and Wells had told him he was going to kill Jerry Stanley and Cindy Stanley, because Cindy had been his girlfriend and Jerry Stanley had married her after knowing her only a few days. On August 4 defendant's mother, Mrs. Stanley, rented a silver-gray Camaro for defendant at his request, because the other vehicles to which he had access were known to law enforcement and he was unwilling to turn himself in on the parole violation at that time. On the day of the shooting defendant was seen at the Island Park Cafe in Lake County and, about 4 p.m. the same day, in nearby Williams in Colusa County.

After the shooting, witnesses near the site from which the shot was fired saw a man running past their home, carrying a gun and wearing what appeared to be a jacket. He disappeared into the darkness. Shortly after, they saw a car start to move, its lights and engine off. After the headlights were turned on and the engine started, the car turned left onto Highway 20 east toward Lucerne and the Harbor Bar. The murder weapon, a Browning rifle with a Redfield scope, subsequently was found about 18 to 20 feet out in the lake off the Harbor Bar. The rifle had been purchased by Edna Stanley.

About 10:50 or 10:55 p.m., a car traveling east on Highway 20 approached a police roadblock. The car pulled to the side of the road for a second or two and then made a U-turn and proceeded westbound in the direction from which it had come. Police officers gave chase. They noticed a cloud of dust floating across the highway from a private driveway, indicating someone had turned up the driveway at a high speed. Following the trail, the officers found the Camaro abandoned behind a residence where it had come to a skidding stop due to a log blocking the driveway.

During the early morning hours of August 12, defendant broke into a mobile home on the Spartan Ranch, 9 to 10 miles from where the Camaro was abandoned. Later that day he walked to Highway 20, where he hitched a ride with the Pauls, a couple returning from a camping trip in Fort Bragg. The Pauls dropped defendant off in Anderson. The next day, after the Stanley house was surrounded by police, defendant surrendered.

A search of the Camaro yielded, among other things, a loaded rifle, an empty rifle case, binoculars out of their case, a corduroy jacket, a knit cap, a ski mask, and a spiral notebook containing a letter in defendant's handwriting to his parole agent, John Ransom. Defendant's fingerprints were found on the car trunk and the notebook. The dome light, intact and working when the car was rented, had been removed from the ceiling of the car, thus preventing a light from going on when the car door was opened. An excerpt from the letter to Ransom read in part as follows: "John, when you read this I will be dead! Better this way as my life and everything I fought for has been destroyed. My fight for my kids I can never win now."

5

1
2
3
4

A search of defendant's room in the Stanley residence in Anderson yielded Winchester 30.06 150-grain ammunition consistent with the spent cartridge in the chamber of the Browning rifle and with the lead taken from Cindy's body, as well as a photograph of defendant holding the Browning rifle. A spent 30.06 cartridge was found in the living room. The evidence also showed that the Browning had been carried in the empty rifle case found in the Camaro.

5
6
7
8
9

While in custody, defendant, at his request, spoke with Sergeant Coulter. Defendant told Coulter that the evening of the murder he was with two people named Gary and Linda, who were involved in drug deals in Lake County. He went with them to the Harbor Bar, where he waited in the car while they made some phone calls. He then drove them east on Highway 20. When they approached the roadblock, Gary told defendant to turn around. As they got to the dirt driveway, Gary told him to stop, whereupon Gary and Linda jumped out into the brush while defendant continued up the driveway. At trial defendant admitted the entire story was a lie.

10
11
12
13
14

Defendant testified in his own defense. He denied killing Cindy. He stated he was on the telephone talking to his mother at the time of the murder. Mrs. Stanley corroborated his testimony. Defendant's theory was that Cindy had been killed either by his brother, John Stanley, or by Gary Wells or Mike Saylor, but most likely by Wells. Wells had introduced Cindy to defendant and allegedly was jealous that Cindy had married him. Wells also supposedly was concerned about a conversation overheard by Cindy that implicated John Stanley, Saylor and himself in a robbery they had committed. Neither Wells nor Saylor had a verifiable alibi for the evening of the murder.

15 People v. Stanley, 10 Cal. 4th 764, 777-781, 42 Cal. Rptr. 2d 543, 549-551 (1995).

16      The penalty phase also involved evidence of petitioner's murder of his second

17 wife, Kathy Stanley, and the murder of a woman Stanley picked up, Cheryl Renee Wright.

18 *Pertinent Procedural History*

19      State habeas proceedings were not instituted prior to the commencement of the

20 federal proceedings herein, and from a procedural complexity standpoint, the federal proceedings

21 were ominously commenced in 1995 by petitioner pro se with a "petition not to file a petition."

22 No point is served in exhaustively detailing the proceedings herein prior to the return from state

23 court for exhaustion proceedings. Suffice it to say that prior to exhaustion in state court, time

24 was taken up with petitioner's attempt to dismiss these federal proceedings, his ultimate

25 voluntary withdrawal of his request to withdraw from the habeas proceedings, getting an

26 operative petition on file (September 22, 1997), and on starting to adjudicate an initial summary

6

1 judgment motion.  The case was ultimately stayed pending state habeas exhaustion of newly

2 raised claims.

3          The case came back from state court habeas proceedings in late July of 2002.  An

4 amended petition was filed in September 2002.  The issue of petitioner's ability to, once again,

5 seek to withdraw the habeas petition surfaced, and was litigated over a long period of time – up

6 to May 7, 2004.  The withdrawal issue also involved sanctions on petitioner's sought-to-be-

7 substituted attorney, Jack Leavitt.

8          Prior to the scheduling of the evidentiary hearing, and the delineation of issues for

9 evidentiary hearing, the court was also involved in adjudicating further allegations of petitioner's

10 competency in *these federal proceedings.*  Such first resulted in a statement by petitioner's

11 counsel that at the time the statement was made, petitioner was competent to proceed herein.  See

12 filing of December 10, 2004.  Nevertheless, some months later, petitioner's counsel made a

13 motion to declare petitioner incompetent in these proceedings which was denied on December

14 21, 2005 and affirmed and adopted on March 1, 2006.

15          Many of petitioner's newly raised claims had been procedurally barred in the

16 belated state habeas proceedings due to their untimeliness (Clark bar).  Also, some new habeas

17 claims which should have been raised on direct appeal (Dixon bar) were also barred.  In Findings

18 and Recommendations dated March 2, 2004, the undersigned found that none of the "time

19 barred" claims could be so barred in federal court, but that the "should have been raised on direct

20 appeal" procedural bar applied to various claims.  In an order dated August 3, 2005, the district

21 court adopted the March 2, 2004, Findings and Recommendations in full.  Those claims will be

22 identified within the text and conclusion of these Findings.

23          After much ado, the order setting forth the issues at evidentiary hearing was issued

24 on September 2, 2005.  In conjunction with the delineation of the evidentiary hearing issue

25 determination, petitioner made a motion to find that one of the deputy attorney generals, and

26 persons working with him, had committed misconduct in investigation of the juror misconduct

7

1   issues.  Ultimately, after a request for reconsideration and remand to the undersigned, the deputy

2   attorney general misconduct evidentiary hearing was held at the start of the case evidentiary

3   hearing.  Because of the intertwining of issues, this attorney general misconduct hearing had to

4   be held in conjunction with the juror misconduct issues in the case.  The evidentiary hearing

5   commenced on April 17, 2006.  The case evidentiary hearing continued over the course of

6   several days, intermittently interrupted by witness schedule concerns.

7            On May 31, 2006, the undersigned issued Findings and Recommendations (sic

8   Order) on the attorney misconduct issue finding that with respect to juror Mitts, attorney

9   Brosterhous had committed misconduct in his interviews with juror Mitts.  The penultimate

10   conclusion determined that this attorney had unduly influenced juror Mitts to retract the

11   petitioner-helpful statements she had made within her first post-trial declaration regarding juror

12   misconduct.  The undersigned imposed a sanction which essentially required the juror

13   misconduct issue to be decided on juror Mitts first post-trial declaration.  The Honorable Frank

14   Damrell (correctly) understood the Findings and Recommendations to be an order in that the

15   matter of attorney misconduct was not dispositive of a claim in the case, although as is the case

16   with many sanction orders, the outcome of the sanctions order greatly influenced the outcome of

17   the claim.  Utilizing the magistrate judge "order" standard of review, Judge Damrell issued his

18   order affirming the undersigned with respect to the attorney misconduct issue on October 13,

19   2006.[2]

20   \\\\\

21

22         [2] In any event, respondent never requested the district judge to hold a further evidentiary
     hearing – simply conduct a review of the record.  See Objections filed July 17, 2006.  In the
23   absence of such a request for further testimony, and an evidentiary hearing held by the district
     judge, the factual matters decided primarily on a credibility basis (the vast bulk of the
24   undersigned's findings) could not be overturned.  See United States v. Hernandez-Acuna,
     __F.3d__, 2007 WL 2325141 (9th Cir. Aug. 16, 2007).  While Judge Damrell could have
25   disagreed with the undersigned's ultimate factual conclusions based on a review of the record,
     Judge Damrell obviously reviewed the entire record and found no error in the undersigned's
26   analysis, either factually or legally.

*Issues*

1   The court organizes its Findings herein by setting forth each claim of the amended

2   petition, and indicating whether it will be the subject of discussion herein.  Where necessary and

3   available, the court will reference the specific order which characterizes the status of each claim

4   at this time.

5   Amended Petition filed September 30, 2002:

6   Claim 1(a) –  The trial court erred in not finding sufficient doubt about petitioner's competency

7   so as to order a competency hearing prior to the time it actually did so order, i.e., for the guilt

8   phase and presumably, pretrial proceedings; petitioner also alleges incompetency during the

9   penalty phase/sentencing process (post-competency hearing).

10         *This claim was procedurally barred under* <u>*Dixon*</u>, <u>*see*</u> *Findings and*

11   *Recommendations filed March 3, 2004, and Order re Evidentiary Hearing Issues of September 2,*

12   *2005 at 5-6.*  <u>*But*</u> <u>*see*</u> *Claim 22, in part the mirror image of this claim, decided on its merits.*[3]

13   Claim 1(b) – Ineffective Assistance of Counsel by not expressing doubt about petitioner's

14   competency prior to the time in which they did, and by virtue of their performance at the

15   competency trial itself.

16         *This claim is discussed on the merits herein.*[4]  *The latter part of this claim, that of*

17   *ineffective assistance at the competency hearing will be deferred as is 1(e) which reprises*

18   *ineffective assistance of counsel at the competency hearing.*

19   Claim 1(c) – The trial court erred in appointing counsel to represent petitioner in the competency

20   trial insofar as this counsel was representing petitioner's desire to be found competent.

---

[3] For purposes of citation brevity, the undersigned will not include reference to the fact that the Findings were generally and fully adopted by Order of August 3, 2005.

As is made clear in these Findings and elsewhere, petitioner's penchant for repetition of claims actually moots the procedural bar finding for Claim 1(a).  Petitioner repeated the substance of Claim 1(a) in Claim 22 which for some reason was *not* procedurally barred.  Claim 22 is decided on its merits.

[4] "The merits" includes any legal reason why a claim should or should not be found valid.

1    *This claim was initially procedurally barred, but later recognized as a Waltreus*

2    *claim, i.e., it had been raised on appeal and should not have been raised again in habeas.  See*

3    *Order re Evidentiary hearing Issues at 5-6.  This claim ultimately may be decided on its AEDPA*

4    *merits, but briefing/adjudication has been deferred.*

5    Claim 1(d) – Once a competency hearing is ordered, a court may not accept "waivers" of federal

6    constitutional rights until the court determines the defendant is competent.

7    *This claim was procedurally barred under Dixon.  Findings and*

8    *Recommendations, supra; in any event, judgment on this claim is deferred.*

9    Claim 1(e) – Ineffective assistance of counsel at the competency trial.

10    *Briefing/adjudication on the merits has been deferred.*

11    Claim 1(g) – "The jury was never instructed whether the standard for determining if petitioner

12    was able to rationally cooperate with counsel in his own defense was satisfied merely by

13    petitioner engaging in discussions with counsel and making decisions which could, in theory,

14    have rational justifications, or whether the standard required a finding by the jury that petitioner's

15    decision-making process was not affected by his mental illness."

16    *This claim was procedurally barred under Dixon and differs substantially from*

17    *the jury instruction claim which was made on direct review.  Findings and Recommendations,*

18    *supra.; see People v. Stanley, 10 Cal. 4th at 815-818, 42 Cal. Rptr. 2d at 574-575.  In any event,*

19    *final briefing and adjudication has been deferred.*

20    Claim 2 – The long interruption of the penalty phase by itself, or in combination with the refusal

21    of the court to voir dire the jurors after interruption requires retrial.

22    *Briefing/adjudication on this penalty phase has been deferred.*

23    Claim 3 – The jury instruction defining competency failed to satisfy due process.

24    *Briefing/adjudication has been deferred.*

25    Claim 4 – The state courts did not give petitioner a full and fair opportunity to have his fourth

26    amendment claims adjudicated; the trial court judge who decided the fourth amendment claims

10

was biased, and a new trial or direct appeal is required.

*These guilt phase (pre-trial) claims are decided herein.*

<u>Claim 5</u> – The State's seizure of and introduction of evidence violated petitioner's
Fourth...Amendment rights.

*These guilt phase (pre-trial) claims are decided herein.*

<u>Claim 6</u> – The court's restriction on petitioner's evidence that petitioner's family opposed his
execution violated the Eighth and Fourteenth Amendments.

*Briefing/adjudication on this penalty phase issue has been deferred.*

<u>Claim 7</u> – Evidence of the facts and circumstances surrounding petitioner's prior murder
conviction was improperly introduced in aggravation in violation of the Eighth and Fourteenth
Amendments.

*Briefing/adjudication on this penalty phase claim has been deferred.*

<u>Claim 8</u> – Presentation of other crimes committed by petitioner, including a first degree murder,
denied petitioner a fair penalty phase.

*Briefing/adjudication has been deferred.*

<u>Claim 9</u> – The use of a prior murder conviction as both a special circumstance and a prior
conviction was an impermissible double aggravation.

*Briefing/adjudication on this penalty phase issue has been deferred.*

<u>Claim 10</u> – The court's refusal to delete the references in various tapes to the mysterious
disappearance of Diana Lynn and rape of Cindy, and its instruction prohibiting the jurors from
considering the videotapes for whatever mitigating value they found in them, were prejudicial
errors.

*Briefing/adjudication on this penalty phase claim has been deferred.*

<u>Claim 11</u> – Use of Photographs of deceased victims at the penalty phase.

*Briefing/adjudication on this penalty phase claim has been deferred.*

\\\\\\

<u>Claim 12</u> – The California sentencing statute fails to perform its constitutionally mandated narrowing function.

     *Briefing /adjudication on this penalty phase claim has been deferred.*

<u>Claim 13</u> – The finding of the special circumstance of the killing of a witness violated the Eighth and Fourteenth Amendments.

     *This claim is decided on its merits herein.*

<u>Claim 14</u> – The court's refusal to instruct the jury that it may be guided by mercy.

     *Briefing/adjudication of this penalty phase has been deferred.*

<u>Claim 15</u> – The court's refusal to instruct in the penalty phase that it must find death appropriate beyond a reasonable doubt.

     *Briefing /adjudication on this penalty phase claim  has been deferred.*

<u>Claim 16</u> – The several type and numerous instances of misconduct by the prosecutor during his closing arguments requires reversal for a new penalty determination.

     *Briefing/adjudication on this penalty phase claim has been deferred.*

<u>Claim 17</u> – The jury was misled as to the scope of its sentencing discretion.

     *Briefing/adjudication on this penalty phase claim has been deferred.*

<u>Claim 18</u> – The aggravating circumstances...violate the Eighth Amendment restrictions against vagueness.

     *Briefing/adjudication on this penalty phase claim has been deferred.*

<u>Claim 19</u> – The State's use of lying-in-wait theory to prove murder of the first degree violated petitioner's constitutional rights.

     *This claim will be decided herein.*

<u>Claim 20</u> – The malice instruction violated the <u>Winship</u> provision that the state must prove every element of the crime beyond a reasonable doubt.

     *This claim will be decided herein.*

\\\\\

Claim 21 – Circumstances surrounding the selection and service of the jurors in petitioner's case violated the Sixth, Eighth, and Fourteenth Amendments, and provisions of California law.

*Briefing/adjudication on this claim has been deferred with the exception of the already decided Juror Mitts issue (21(a)).  A review of the text of the claim reveals that petitioner attacks only selection practices and/or misconduct in the competency and penalty phases.*

Claim 22 – By not conducting a hearing on competency before and after the hearing that was conducted, and by not disclosing to defense counsel the incompetent behavior of petitioner, [petitioner's constitutional rights were violated].

*This claim will be decided on its merits insofar as the guilt phase (includes pre-trial) is concerned.  This claim, in part, mirrors that of 1(a) which was procedurally barred, but this claim was not procedurally barred.  The allegation of non-disclosure took place after the guilt phase, and briefing/adjudication on this part of the claim has been deferred.  Likewise, for any incident of alleged incompetency occurring after the competency trial at issue, briefing/adjudication on this penalty phase claim has been deferred.*

Claim 23 – Petitioner's right to present a defense and to effective assistance of counsel was violated.

*To the extent that this claim involves the guilt phase, it will be decided herein. Otherwise, briefing/adjudication on this competency trial/penalty phase claim has been deferred.*

Claim 24 – Petitioner's mental illnesses present multiple claims for relief.

*To the extent that this claim involves the guilt phase, it will be decided herein. Otherwise, briefing/adjudication on this penalty phase claim has been deferred.*

Claim 25 –  Shackling the petitioner in front of the jurors violated [petitioner's constitutional rights].

*Briefing/adjudication on this  claim has been deferred.  The facts of this claim concern the competency trial only.*

\\\\\

13

Claim 26 – Trial and appellate counsel rendered ineffective assistance in violation [of petitioner's constitutional rights].

*To the extent that this claim involves the guilt phase, and the issues related to presentation of evidence at the guilt phase, it will be decided herein as duplicative of the specific attorney ineffectiveness issues raised in Claims 22 and 23.  This claim, appearing at page 184 of the Amended Petition, merely incorporates all allegations of the petition and leaves it at that. No specific assertions of attorney ineffectiveness are set forth in the federal petition.  To the extent that petitioner asks the court to simply guess at specific allegations of ineffective assistance of counsel, unlike the specific assertions set forth in other claims, petitioner has failed to state a cognizable claim.  Earp v. Ornoski, 431 F.3d 1158, 1167 (n.4) (9th Cir. 2005) (petitioner is required to allege specific facts).*

Claim 27 – The State suppressed, and /or misrepresented the true facts regarding, material exculpatory evidence.

*Briefing/adjudication on this penalty phase claim has been deferred.  The facts relate only to the penalty phase.*

Claim 28 – The Special Circumstance Finding, that petitioner intentionally killed the present victim for the purpose of preventing her testimony in a criminal proceeding, was not supported by substantial evidence.

*Although not technically a penalty phase claim, its only effect, if true, would be found in the penalty phase, i.e., the jurors would have one less special circumstance to consider. Because the jury found other special circumstances, petitioner would still be liable for life without the possibility of parole in the event the penalty phase were overturned.  Therefore, briefing/adjudication on this claim has been deferred.*

*Discussion*

The court below adjudicates those guilt phase claims (includes pre-trial) listed above.  However, because the parties were permitted to rely on past filings with respect to the

14

1    guilt phase, and were also given permission to brief further as necessary, the briefing is not all in

2    one place.

3             By order of August 16, 2006, the court advised the parties that they could, if they

4    desired, rely on briefing made in connection with the 1999 summary judgment hearing.  That

5    briefing is found in the motion filed June 2, 1998, opposition filed November 17, 1998, and reply

6    filed on or about March 8, 1999.  The parties also filed post-evidentiary hearing briefing on

7    December 14, 2006.  The court has looked to the aforementioned briefing in the main to resolve

8    the guilt phase issues.

9       *Legal Standards*

10            Although this case was initiated prior to the effective date of AEDPA, the first

11    actual petition in this case was not filed until well after AEDPA was effective.  Thus, under

12    Woodford v. Garceau, 538 U.S. 202, 123 S. Ct. 1398 (2003), all AEDPA standards will govern

13    this case for issues on which an evidentiary hearing were not held.

14        On the merits, and under AEDPA, [a petitioner] may obtain relief only in one of
two circumstances.  First, he may obtain relief if the state courts' denial of his

15        claim "resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme

16        Court of the United States."  28 U.S.C. § 2254(d)(1).  "Clearly established Federal
law" refers to the holdings, as opposed to the dicta, of the Supreme Court's

17        decisions.  See Carey v. Musladin, --- U.S. ----, ----, 127 S.Ct. 649, 653, 166
L.Ed.2d 482 (2006).  A state-court decision is "contrary to" clearly established

18        Supreme Court precedent if the decision "contradicts the governing law set forth
in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct.

19        1495, 146 L.Ed.2d 389 (2000).  A state-court decision will be an "unreasonable
application" of federal law "if the state court identifies the correct governing legal

20        rule from this Court's cases but unreasonably applies it to the facts of the
particular state prisoner's case."  Id. at 407.

21

22        Second, [a petitioner] may obtain relief if the state courts' decision was "based on
an unreasonable determination of the facts in light of the evidence presented in the

23        State court proceeding."  28 U.S.C. § 2254(d)(2).  Federal courts must presume
the correctness of the state court's factual findings, but [a petitioner] may rebut

24        the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).
Finally, a federal court sitting in habeas jurisdiction must be convinced that the

25        state court's decision is "more than incorrect or erroneous."  Lockyer v. Andrade,
538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).  The state court's

26        decision must be "objectively unreasonable."  Id.

1  Winzer v. Hall, __F.3d__, 2007 WL 2080154 (9th Cir. 2007).

2        The nature of review is different for those issues upon which the court held an

3  evidentiary hearing.  Although in the final analysis, the alleged constitutional violation must be

4  established by demonstrating that the alleged violation directly contravened an on-point Supreme

5  Court case, or contravened fairly close-to-the-situation analogous Supreme Court authority, the

6  district court will make this determination de novo both as to law and fact.  See Killian v. Poole,

7  282 F.3d 1204, 1208 (9th Cir. 2002); see also Silva v. Woodford, 279 F.3d 825, 835 (9th Cir.

8  2002) (summary dismissal of claims cannot stand as the basis for a factual adjudication of

9  disputed facts).

10       *Guilt Phase (and Pre-trial) Competency Claims*

11  *Claim 1b* – *Defense counsel rendered ineffective assistance by not expressing a doubt as to*

12  *Petitioner's competency earlier in the proceedings....*[5]*;*

13  *Claim 22* – *By not conducting a hearing on competency before... the hearing that was conducted,*

14  *the trial court and State violated petitioner's [constitutional] rights*[6]

15       *Summary*

16        Petitioner makes a fundamental flaw in his guilt phase/ pre-trial competency

17  assertions by conflating the evidence and legal standards applicable to trial court Pate error and

18  Strickland ineffective assistance of counsel error.  Indeed, in his closing brief, petitioner points to

19  *nothing* before the *trial judge* which indicates that substantial evidence of incompetency existed

20  prior to the time the trial judge decided, upon motion during the penalty phase, that a competency

21  hearing was necessary.  Rather, the entire thrust of the factual argument is that because of events

22  _____

23      [5] The remainder of this claim addresses counsel's performance at the competency hearing,

24  an issue which has been mooted by the court's finding of juror misconduct during the
competency proceedings.  It will not be reviewed here on its merits.

25      [6] Again, allegations which concerned the competency trial or penalty phase need not be
addressed on their merits as the court's ruling on the competency phase juror misconduct may

26  well make such a ruling superfluous.

1 transpiring outside of the court's cognizance, counsel should have had a bona fide doubt about

2 petitioner's competence prior to the time that they moved for such before the trial judge, *and that*

3 *counsel should have so informed the judge at an earlier time.*  Obviously, from this argument,

4 the purported incompetency facts were not before the trial judge during the guilt phase, and

5 competency facts outside the record cannot be imputed to the judge.

6        With respect to the ineffective assistance of counsel claim, petitioner forgets all

7 about the Strickland prejudice requirement, i.e., that the outcome of the proceedings would have

8 been likely different – here, petitioner would have been found incompetent at a competency

9 hearing if it had been held earlier (just at what precise time, petitioner never actually specifies).

10 Rather, counsel erroneously argue that once it is determined (if it were to be determined) that

11 substantial evidence of incompetency was known, or should have been known, to counsel at any

12 snippet of time, that is the end of the matter regarding ineffective assistance of counsel.

13        Petitioner presents insufficient facts and is incorrect on the law.

14    *Analysis*

15       1. Trial Court Error

16        Generally, one is incompetent if he is (1) incapable of understanding the nature of

17 the proceedings, including an understanding of the charges and the basic proceedings which the

18 defendant will encounter in adjudication of the charges, or (2) incapable of providing rational

19 assistance to his counsel in defense of the charges.  See Douglas v. Woodford, 316 F.2d 1079,

20 1094 (9th Cir. 2003).  The mere fact of a defendant's significant mental difficulties does not

21 render a defendant per se incompetent to stand trial.  Hoffman v. Arave, 455 F.3d 926, 938 (9th

22 Cir. 2006).

23        In habeas proceedings, two types of competency claims are recognized:

24 procedural and substantive.  Lounsbury v. Thompson, 374 F.3d 785, 788 (9th Cir. 2004).  The

25 former claim involves assertions that the court should have acquired a bona fide doubt about

26 petitioner's competency such that a hearing should have been held on the issue [but was not].  Id.

1    The latter claim involves assertions that no matter whether anyone should have recognized

2    petitioner's incompetency, he was in fact incompetent such that the verdict was obtained in

3    violation of due process.  See Williams v. Woodford, 384 F.3d 567, 603-610 (9th Cir. 2004)

4    (reviewing both types of claims).  Petitioner's claim 22 addressed above involves procedural due

5    process, i.e., prior to the time such was recognized during the penalty phase, counsel and/or the

6    court should have recognized that petitioner was not able to rationally assist his counsel during

7    the guilt phase and even pre-trial.

8            A trial court is in error in not granting a motion for competency hearing, or sua

9    sponte recognizing that one is necessary, *if the record before the trial judge* indicates that the

10   judge should have had a *bona fide doubt* about competency of the defendant.  Davis v.

11   Woodford, 384 F.3d 628, 644 (9th Cir. 2004).  A bona fide doubt arises when *substantial*

12   *evidence* exists on the record before the court.  Id; Cacoperdo v. Demosthenes, 37 F.3d 504, 510

13   (9th Cir. 1994); Williams v. Woodford, supra (only evidence before the trial judge may be

14   considered on a procedural due process claim).  Of course, the "trial record" referenced is that

15   record current up to the alleged time when the trial judge should have recognized incompetency;

16   for example, the trial judge during pre-trial proceedings (if that is a period for which petitioner

17   now claims incompetency) is not expected to prognosticate the unknowable future record which

18   came into existence only at the penalty phase.

19           Petitioner's Claim 22 (not procedurally barred) incorporated the allegations of

20   Claim 1– procedurally barred in part.  The allegations are wholly deficient in demonstrating that

21   any judge, prior to the time the post-guilt phase competency trial was ordered, should have

22   maintained a bona fide doubt of competency, i.e., any substantial evidence of incompetency was

23   before the trial judge.  The court will break down the allegations to pre-trial evidence, and guilt

24   phase evidence.

25           A procedural theme which ran throughout trial preparation, and as explained at

26   evidentiary hearing, Stanley opposed any notion, sometimes vociferously, that he committed the

crime at issue on account of mental deficiencies.  RT 6 (Evid. Hrng.) at 96, 225, 230, RT 7 (Evid. Hrng.) 59-63.   His conflict with his lawyers, who wanted to make the opposite contentions, sometimes flared into open controversy.  After the jury found him guilty, petitioner seemingly had difficulty accepting that fact, and confrontations with counsel about the conduct of the penalty phase became more frequent.  See e.g., RT 140 Vol. A at 21401, 21409; RT 6 (Evid. Hearing) at 113-114.

In line with the above theme, the *only* time any mention of petitioner's potential incompetence was raised before the trial judge it had to do with this overrarching theme, or counsel's mentioning of possible competency problems in the midst of an entirely different subject.  The first reference in the operative petition (p.33, para 116) occurred before the judge adjudicating the motions to suppress (Lake County).  In a somewhat confusing passage, attorney Neill was telling the judge that petitioner would waive his appearance for the playing of a particular tape:

> Mr. Neill: Your Honor, one last matter.  The court ordered the Sheriff's Office this morning for the duration of the hearing for Mr. Stanley to dress out.  Apparently they misunderstood the order.  He's willing to waive his presence while the tape is being played.  This might seem like a small item, but there have been at least three times during the course of these proceedings and the proceedings in Justice Court that I've almost requested the court to initiate 1368 [competency] proceedings.  This is something that really bothers the defendant, and you know, I've had difficulty from time to time, and I really don't need any additional problems on top of what is going on in court.  He's willing to waive his presence during the playing of tapes.  So, I'd like to have him taken back over and dressed out.

RT (Lake County) 93-94.

This was the sum total of "evidence" before the judge that day.

A little over a month later, Neill was describing some frustrating experiences dealing with Stanley's medication regime.  He exclaimed that he had thought about making a 1368 competency motion on "at least six occasions" because of petitioner's anxiety hindering petitioner's ability to cooperate with counsel.  However, counsel explained that the anxiety had to do with occasions where Stanley had been denied medication or when it had been

19

underprescribed.

> [Mr. Neill] So what I'd like to suggest, I don't want to declare a present doubt as to the defendant's ability to cooperate or to understand the nature of the charges, *because I think his current state can be immediately rectified by the proper medication and the proper treatment.*
>
> ***
>
> [The Court] I appreciate Mr. Neill's comments, and I think it's in the interests of everyone to have the defendant emotionally stable so that we can proceed and complete this matter.  And therefore, I am inclined to do anything I can to further that objective.
>
> And I wish to emphasize, however, that you do not now state any doubt, that is correct, is it, Mr. Neill, you are not expressing any doubt as to the defendant's present competence to stand trial?
>
> Mr. Neill: I am not expressing any doubt, that is correct, your Honor.  And I am not requesting the court to initiate any 1368 proceedings.
>
> *I have seen the defendant in this state on a number of occasions, and it has been cured when he received the medical attention.*
>
> The Court: *Nor have I seen or observed anything about the defendant in the course of the many days of proceedings in which he has been before the court which would indicate to me that there is any doubt as to his mental ability or present capacity to stand trial.*

RT (Lake County) 1160-1162 (emphasis added).

Thus, petitioner would have to overcome this factual finding by the trial judge, with *record* clear and convincing evidence, to show that the judge was incorrect in his factual finding.  28 U.S.C. § 2254(e)(1).  All petitioner can muster, nevertheless, is the statements of counsel that petitioner had a medication problem, not a competency problem.

Petitioner's last attempts to show record evidence of incompetency during the trial court suppression hearings occurred near the end of the hearing when the court was discussing with counsel, in camera, whether to release to the prosecution a letter Stanley had written.  Counsel Neill attempted (somewhat desperately) to invoke a layperson diagnosed "schizophrenic privilege," i.e., because petitioner had written the letter when in his "second

\\\\\

\\\\\

1  personality," it should not be disclosed.  RT (Lake County) 2662.[7]  Petitioner contends that this

2  counsel statement about mental illness should have triggered a competency hearing.  However,

3  counsel's statement has nothing to do with "substantial evidence" of incompetency that the trial

4  court should have recognized.  Nor did expert Axelrad's suppression hearing testimony about

5  petitioner's drug usage constitute any substantial evidence that petitioner was incompetent.  If

6  drug abuse prior to arrest were something sufficient to raise a bona fide doubt about trial

7  competency, nearly every prosecution would result in a competency trial.

8           In sum, if petitioner contends that he was so incompetent during the suppression

9  proceedings such that the trial judge should have halted these proceedings and invoked the Cal.

10 Penal Code § 1368 procedures, the evidence he has presented falls far short of substantial.  It

11 approaches non-existence.  In the opinion of the undersigned, the evidence repudiates the

12 incompetency contention.

13          Moving to the next pre-trial phase – a lull in trial court proceedings while the

14 suppression denial ruling was on appeal – Stanley suffered one more temporary incident of

15 emotional upset.  In fact, Stanley was sent to the prison system medical facility in an attempt to

16 relieve this upset.  The emotional turmoil was serious enough that petitioner's trial expert

17 Axelrad *allegedly* opined *to counsel* (but not contemporaneously to the court as no trial court

18 proceedings were ongoing) that Stanley was incompetent for this relatively short period.  RT

19 (Evid. Hearing).  The evidence presented at evidentiary hearing shows that the momentary

20 emotional upset was taken care of, and Stanley resumed competency – all before any further

21 proceedings commenced in the trial court.  In any event, insofar as petitioner's claim of Pate trial

22 court error is concerned, petitioner does not show where this evidence was placed before the trial

23 court prior to the time the competency trial itself was held.  While Dr. Axelrad's impressions

24 about Stanley's pretrial competency will be discussed below in connection with the ineffective

25

26        [7]  No expert has diagnosed petitioner as schizophrenic.

1   assistance of counsel <u>Pate</u> claim (Axelrad presently found overall "marginal competency"), the

2   expert's undisclosed-to-the-court impressions have nothing to do with asserted trial court error.

3           The guilt phase is even more devoid of on-the-record, substantial evidence of

4   incompetency.  The amended petition points only to an incident where counsel and petitioner

5   disagreed on tactics, and petitioner desired attorney Neill off the case (a tactic that has survived

6   to this day).  Amended Petition at 35, para. 124.  However, even the petition concedes that

7   attorney Neill believed "*that up to this point Petitioner had been able to cooperate with counsel,*

8   *and that things were going well.*"  <u>Id</u>. at 126.  Petitioner's comment during the hearing that he

9   could not "communicate" with counsel is an alleged <u>Marsden</u> problem, not one of incompetency.

10  Of course, petitioner's usual hyperbole about his counsel would not indicate to the court

11  anything but that petitioner was having one of his intemperate moments.  Habeas counsel give no

12  reason why Neill was not to be believed when he said that things were going well.  But the

13  bottom line here is that no trial judge would believe this exchange constitutes evidence of

14  incompetency.  The petition continues that a month later, petitioner Stanley had another

15  disagreement with counsel that was quickly resolved.  <u>Id</u>. at paras. 127, 128.

16          Even *after* the guilt phase, and into the penalty phase, counsel were representing

17  to the judge that their client was competent:

18  August 15, 1983

19  [controversy about calling petitioner's mother as a witness or Dr. Axelrad]

20      [by Mr. Neill]  There are three possibilities for the defendant's what I would
        characterize as lack of cooperation.  One possibility is that it's an intentional lack
21      of cooperation to create a record which clearly shows us being placed in a bind.

22      The second is that the defendant is 1368.  *Both Mr. Petersen and I agree that he is*
        *not 1368.  The defendant agrees that he is not 1368.  He has the capacity to*
23      *cooperate.  It's just that he will not cooperate.*

24      The Court: He understands what 1368 is?

25      Mr. Neill.  Yes.

26      The Court: What is it?

22

1    Defendant Gerald Frank Stanley: Would you like me to explain?

2    The Court: Mr. Neill?

3    Mr. Neill: Yes. 1368 is that he doesn't have the mental capacity to cooperate with his attorneys or to understand the nature of the charges against him.

4             ***

5    The Court: Mr. Petersen, do you concur in what Mr. Neil has stated?

6    Mr. Petersen. Yes, and I have nothing else to state, your Honor.

7 RT 140. Vol. A [in camera proceedings] (Butte County)

8    This colloquy proves that there was no time up through and including the entire

9 guilt phase that counsel had communicated to the judge that they believed their client was

10 incompetent.

11    The trial judge, of course, had many opportunities to observe petitioner.  During

12 the guilt phase, petitioner testified in his defense.  RT (Butte County) 14547-14697, 17952-

13 18362.  Petitioner also responded on the record at various times in the proceedings.  The

14 undersigned has reviewed that testimony and those statements.  Nothing about that testimony

15 revealed an incapacity to understand proceedings or an inability to assist counsel.  At the start of

16 the penalty phase, the trial judge once again commented that he had seen nothing up to that point

17 to give him pause about petitioner's competency.  RT 140 Vol. A 21353. "[A]nd there's nothing

18 before the court to indicate any 1368 situation here."  See also Id. at 21431; 21440-21441 ("The

19 court does not believe that there has been any substantial evidence of mental incompetency in

20 connection with the failure of the defendant to assist – his attorneys in the conduct of the defense

21 in a rational manner.")[8]   No expert up through the end of the guilt phase indicated to the court

22 that Stanley was incompetent.  Importantly, counsel *expressly disclaimed to the court* during pre-

23

---

24   [8] This statement was made when counsel first brought up in the penalty phase their changed view that petitioner Stanley was incompetent to assist his counsel.  The court finally

25 acceded to a competency trial when Dr. Axelrad testified that, in his view, Stanley was then incompetent.  The point to be focused upon here is that the trial judge had seen nothing up to that

26 point, i.e., past the guilt phase, in which he recognized any incompetence.

1   trial and the guilt phase that their client was incompetent.  Moreover, adjusting medication to

2   keep a defendant from "dropping out" is a common, even every day, occurrence.

3           There is no doubt that petitioner was difficult with his counsel and sometimes

4   became emotionally unstable.  Stubborn might be a mild word.  Focusing on minutiae to the

5   detriment of the bigger picture was also clearly evident.  At times, petitioner's holding tactical

6   beliefs at odds with the strategy of his counsel hindered the defense.  Certainly, from an objective

7   viewpoint, petitioner's desire to pursue an innocence defense was problematic.  However, in the

8   end, at least during the pre-trial and guilt phase, difficulties with counsel were worked  out – the

9   antithesis of an incompetent defendant.  And, a lay defendant who holds tactical ideas different

10  from counsel, e.g., desiring to testify, not taking a plea bargain, is guaranteed by the Constitution

11  to be able to make these potential mistakes.  The fact that a defendant is stubborn, or makes

12  mistakes, even clear mistakes, does not mandate a trial judge to stop proceedings and hold a

13  competency hearing.

14          Moreover, from the trial judge's vantage point, a defendant like petitioner Stanley

15  was not unlike many defendants a trial judge would have observed.  Many defendants are

16  difficult, argumentative, and many have some mental/emotional problems.  It is no news flash to

17  recognize that a great many defendants have previous drug abuse problems.  It is only when those

18  problems rise to the level of deafening a defendant to the entreaties of his counsel, or blinding a

19  defendant from seeing the disaster of his ideas, *and when these incapacities are evident to a trial*

20  *judge*, should a trial judge be held in error if he does not suspend proceedings to engage in

21  competency hearings.  Habeas counsel should not be able to expand every client-counsel

22  argument, every ill advised client decision into "irrationality," i.e., substantial evidence of

23  incompetency.  *Cf.* Torres v. Prunty, 223 F.3d 1103, 1109-1110 (9th Cir. 2000) (finding a bona

24  fide doubt as to incompetency where the record showed a defendant insisting on wearing jail

25  clothing, being handcuffed during proceedings, threatening to assault his attorney, and disruption

26  to the point where the defendant had to be removed from the courtroom).

1    Finally, and again, *two* separate trial judges found nothing from their observations

2  which would have triggered an incompetency hearing.

3    "Although no particular facts signal a defendant's incompetence, suggestive

4  evidence includes the defendant's demeanor before the trial judge, irrational behavior of the

5  defendant, and available medical evaluations of the defendant's competence to stand trial.

6  Williams v. Woodford, supra, 306 F.3d 665, 702 (9th Cir. 2002).  In addition, courts "deem

7  significant the fact that the trial judge, government counsel, and [petitioner's] own attorney did

8  not perceive reasonable cause to believe [petitioner] was incompetent."  Hernandez v. Ylst, 930

9  F.2d 714, 718 (9th Cir. 1991).[9]  All of these factors, as known to the trial judges, indicated

10  competency, not incompetency.  Petitioner has failed to show clear and convincing evidence to

11  rebut the factual findings of those judges, and has failed to show that the decision of the

12  California Supreme Court, which had the same trial record before it as the undersigned, was

13  unreasonable in rejecting the Pate claim.  Petitioner cannot cure this lack of evidence before the

14  trial court, in a Pate determination, by intermingling evidence that was only known to counsel.

15    2.  Ineffective Assistance of Counsel

16    Trial counsel had more information regarding the actions of their client than did

17  the trial judges, and counsel's decisions not to raise the issue of incompetency prior to the time

18  that they did was a *superficially* closer question in terms of reasonableness of counsel's actions;

19  nevertheless, counsel are entitled to make reasoned judgments about tactical decisions and such

20  were made here.  Present habeas counsel mistake a difficult decision for a deficient one.  When

21  the entire record is reviewed, without a doubt, counsel did not have substantial evidence of

22  petitioner Stanley's incompetence up through and including the guilt phase, with the possible

23

24    [9] The court gives no weight to trial co-counsel Petersen's latter day (evidentiary hearing) opinion that in retrospect, petitioner Stanley was incompetent.  For the reasons set forth by respondent in post-evidentiary hearing briefing, Petersen remembered next to nothing about the trial.  His present assertion, at odds with his conduct at trial, up to the start of the penalty phase, simply will not stand as evidence that the trial judge should have recognized a bona fide doubt as to competency.  See further discussion below.

25

1   exception of a brief inconsequential to the case waiting period (awaiting an appellate decision on

2   the motions to suppress).  Moreover, petitioner has completely failed to demonstrate the required

3   Strickland prejudice.

4          It is well established that the habeas reviewing courts are not to simply second

5   guess the tactical decisions of trial counsel in that such hindsight ignores the realities of the

6   decision making process, i.e., in real life, the ultimate outcome or correctness of a decision made

7   with pro and con decision-making factors is not known ahead of time.  The federal courts cannot

8   continually demand a re-do in the state courts because it appears now that a petitioner may have

9   warded off a particular adverse judgment if another path had been taken.  Bell v. Cone, 535 U.S.

10  685, 698, 122 S. Ct. 1843, 1852 (2002) ("In Strickland we said that '[j]udicial scrutiny of a

11  counsel's performance must be highly deferential' and that 'every effort [must] be made to

12  eliminate the distorting effects of hindsight...and to evaluate the conduct from counsel's

13  perspective at the time.'").

14          The court will not repeat verbatim the record evidence above, but it is

15  incorporated into this subsection and will be weighed.  Additional evidence was received at

16  evidentiary hearing concerning counsel's knowledge of petitioner's alleged incompetence during

17  the pre-trial and guilt phases, but the court first discusses significant gaps in the hearing

18  evidence.

19          The years after the Stanley case were not kind to attorney Neill.  The record

20  reflects that Neill became an alcoholic and was also disbarred.  His troubles with the State Bar

21  commenced with DUI convictions and culminated with a false testimony conviction occasioned

22  by Neill attempting to get a client to "take the fall" for an accident occasioned by Neill's drunken

23  driving.  At the time of evidentiary hearing, Neill was unavailable to testify as he was in

24  alcoholic rehabilitation.  During the course of proceedings to determine how Neill's testimony

25  would be received, Neill died in a house fire on June 3, 2006, ostensibly started by Neill's

26  smoking in his bedroom and his subsequent falling asleep.  Petitioner offered Neill's declaration

26

to stand in lieu of testimony, but this offer was rejected by the undersigned and upheld on

reconsideration before the district judge.  The undersigned had reasoned that given Neill's

alcoholism and false testimony, such rendered his declaration potentially suspect, and cross-

examination was necessary to test its reliability.  Thus to the extent that Neill had any memory of

the long ago trial proceedings, there is no *latter day* Neill testimony to explain his decision

making process regarding Neill's alleged failure to inform the judge that he had doubts about

petitioner's competency during the pre-trial and guilt phase proceedings.

We *do have* Neill's fairly contemporaneous testimony under oath at the 1983

competency trial that he believed petitioner Stanley *competent during the pre-trial and guilt*

*phases.*

> Q. And when you [Mr. Neill] came into court on the change of venue motion and
> the discovery motion, Mr. Stanley was there?
>
> A. [Mr. Neill] Yes, he was.
>
> Q. And, at that time you, as an officer of the Court, didn't you tell the Court you
> believed your client was not [sic] competent by reason of mental disease or
> developmental disability, did you?
>
> A. I did not tell the Court that.
>
> Q. And that's because in your opinion, he was not?
>
> A. *In my opinion, he was competent.*

RT 124:24346-24347 (emphasis added).

****

[on one day during the suppression motion hearings]

> A. [Mr. Neill] Yes, there was one particular day, as I recall, where Mr. Stanley
> had not received his medication, and I did not feel was stable enough to proceed,
> and we did not proceed on that day.
>
> Q. By that, did you represent to the Court, pursuant to 13–...did you represent to
> the court during that time period, pursuant to 1538 [sic], that you had a doubt to
> his competency and requested the proceedings be initiated under 1368
> [competency proceedings]?

27

A. No, I did not.

Q. And had you have had [sic] a doubt about his competency within the meaning of 1368 at that point, it would have been your obligation to initiate those proceedings?

A. Yes, it would have.

RT 124: 24357.

****

[ after questions about his and co-counsel Petersen's pre-trial consultations with Dr. Axelrad]

Q. And, at the completion of the suppression hearing, did you ever, as an officer of the Court, tell the Court, "I have a doubt that my client is mentally competent to proceed"?

A. No.

Q. Did you hear Mr. Petersen do that at any time?

A. No, I didn't.

Q. And at that time, you didn't have any doubt, correct?
....

A. Yes, I had some doubts during that period of time, and there was several times that in a sense, I was almost ready to give up, but in each instance, when we came down to the wire, by spending a lot of time with Mr. Stanley and making a lot of effort, there was never a time we appeared in court that we were not able to proceed or that was necessary for me to indicate to the Court that Mr. Stanley was 1368.

***

Q. Because, you, as an attorney, wouldn't want to be put in a position of representing an incompetent, would you?

A. I certainly wouldn't, and especially not in a case like this.

RT 124:24371-24373

Neill also testified that he believed Stanley understood the nature of the charges and his rights during the early pre-trial stages, and was able to assist counsel at the preliminary hearing.  RT 124: 24323-24333.  And, it should be emphasized that Neill was delivering this testimony in connection with his belief that Stanley had only become incompetent during the

28

1   penalty phase.

2           Co-counsel Petersen at evidentiary hearing also had no material *facts* to offer

3   concerning these phases of trial regarding competency.  As respondent accurately recounts in his

4   post-evidentiary hearing briefing at 7-8, Petersen remembered next to nothing about his

5   representation of Stanley.

> For example, when asked if Stanley had testified at trial, a matter that must have
> been the subject of serious thought and discussion at the time, Petersen testified
> that he simply did not remember. (4-28-06, RT 48). Yet the record shows that not
> only did Stanley testify at great length (his testimony consumed over 400 pages of
> transcript) but it was Petersen who conducted the examination.  (90 RT 17952 to
> 91 RT 18367)
>
> Much of Petersen's testimony consisted of concessions that he did not remember,
> admissions that matters taken from the record did not refresh his memory, things
> he assumed, things he hoped he would have done, things he had to state in terms
> of "I believe", "I'm not sure" or "I think" or about which he only had "some"
> memory.  (*See* RT 10, 11, 13, 16, 18, 20, 28, 30, 32, 33, 34, 35, 36, 37, 38, 41, 42,
> 44, 45, 46, 48, 51, 52, 53, 56, 63.)  At one point, Petitioner's counsel objected to
> responses during cross-examination because "almost all of this is what would
> have happened as opposed to what did happen.  There seems to be no memory of
> what did happen."  (*Id*. At RT 49.)
>
> Petersen's flat statement at the evidentiary hearing that he believed Stanley to be
> incompetent at some point in the guilt phase [*id*. at RT 15] is contradicted by the
> trial court record as noted below and was made somewhat ambiguous by later
> testimony at the evidentiary hearing.  That is, Petersen testified that he did not
> remember if he expressed a doubt about competency to the trial court. [In fact, as
> related below, Petersen made the opposite representation on several occasions vis-
> a-vis the guilt phase] Asked if it would refresh his memory if the record shows he
> did not, he responded: "No it wouldn't, but that wouldn't have changed my
> opinion that during this stage when we're done with this stage, if we can't
> straighten it out, he will have to be found incompetent." (*Id*. at RT 46.)  Later the
> Court asked if Petersen recalled that it was at the start of the penalty phase when
> he determined he "wanted to go for a 1368."  Petersen responded in a way that
> again indicated that he had little memory of the trial and had not refreshed his
> memory based on the actual record but was making judgments based on whether
> what Petitioner's counsel told him prior to the hearing sounded reasonable.
> [footnote omitted]:
>
>> I was reminded of that just in the last dew days, Your Honor.  What they
>> [petitioner's habeas counsel] –what I was told because I haven't looked at
>> the record is, is that I asked how this came about and I was told that Edna
>> Stanley, the mother, testified or was going to testify and that's when this
>> happened.
>>
>> And that would fit because Jerry Stanley would have been very sensitive

29

1    and very upset about us, probably over his objection, calling his mother,
     his father, or any member of the family.  *(Id.* at RT 50.).

2

3    Petersen testified that he did not even remember the penalty phase
     being interrupted by the competency hearing until a day or two
     prior to his testimony at the evidentiary hearing.  Even then he did

4    not know that the competency hearing followed the mother's
     testimony but only that he had been told that.  (*Id.* at RT 53.).

5

6    Post-Evidentiary Hearing Brief at 7-8

7              At the evidentiary hearing in this case, Dr. Axelrad testified that he believed

8    petitioner Stanley to be "marginal in his competency" during the pre-trial stages except for one

9    time, when the trial court activities were stayed pending resolution of an appeal on the

10   suppression motions.  RT (Evid. Hearing) 34, 38-39, and possibly, for a short time prior to the

11   suppression motions.  RT (Evid. Hearing) 36.  As set forth above, Stanley had been sent to

12   Vacaville for a short while during the stay period and had been decompensating in his emotional

13   health until such time as his medication regime was improved.  It was at this time that Dr.

14   Axelrad felt Stanley was [temporarily] incompetent.  Axelrad related (now) that he had informed

15   counsel of his opinions.  RT (Evid. Hearing) at 34-35.

16             However, Dr. Axelrad testified to something quite different at the 1983

17   competency trial.

18        Q. (Petersen) Have you at any time in this case, *since the inception of this case to
          the present date*, been able to determine whether or not Mr. Stanley was unable to

19        reationally (sic) assist his counsel in the preparation of his defense?

20        A.  I had questions about that throughout the course of my contact with Mr.
          Stanley, Mr. Petersen, and I think I communicated those to you occasionally, but

21        ultimately, even though I had questions, my bottom line was, *until most recently*,
          that assuming your behavior continued, your behavior and Mr. Neill's behavior–

22        and that's very critical in competency assessments, to evaluate the attorneys' role,
          *that I could find him competent*, for forensic reasons.

23

24        Now, to make myself very clear that that has no legal standing.  It's just an
          opinion.  So ultimately, when you had those discussions, you would ask me the
          bottom line question, *and I indicated to you that I felt he was competent*, but I felt

25        that you and Mr. Neill needed to be very careful throughout your contact with him
          to do all you could to maintain his competence.

26

                                          30

1   RT 127: 24926 (emphasis added).

2          Thus, the important *contemporaneous* testimony demonstrates the opposite of

3   what petitioner contends now.  That is, petitioner's trial counsel were *not* told that petitioner was

4   incompetent.  The court rejects the present day Dr. Axelrad testimony to the contrary.

5          But perhaps the most telling statements establishing petitioner's competency and

6   the reasonableness of counsel's actions in regards to the competency question were those set

7   forth at length in respondent's briefing, capturing counsel Petersen's sincere, candid,

8   *contemporaneous* statements:

9          1. [Questions arose between counsel and Stanley, but up to the penalty phase:]
       "with patient reasoning and use of logic, we've been able to rationally present a
10      defense that was a combination of not only Mr. Stanley's wishes, but also the–
       taken advantages [sic] of the ability and work of Mr. Neill and myself."  RT In
11      Camera A Vol. A. RT 21400.

12         2. "The issues became more frequent that we had differences as we got into and
       close to the stage of punishment, probably because of the build-up of pressures...
13      and reality of dealing with life and death."  Id. at 21401.

14         3. "We've worked together a long time, and there's been many demands that Mr.
       Stanley has made, and some of them we've conceded to, because in frankness, we
15      thought that Mr. Stanley was correct on thought and research and consideration."
       Id. at 21406 [if this does not show an ability to rationally assist counsel, nothing
16      ever can].

17         4. "Mr. Neill and I have found Mr. Stanley *to be an intelligent fellow* to – if we
       were patient and we didn't– ourselves, lose our tempers...we've always found that
18      we would, through the wash of that sort of necessary dialogue, that necessary
       time, be able to show Mr. Stanley, at the times we considered him to be irrational
19      in the past, to the point where it would damage his case, our case, but his case,
       *and we've always been able to work it out, but in the last two days*..."  Id. at
20      21408-21409 (emphasis added).

21   Respondent's Post Evidentiary Hearing Brief at 9-10.

22          Keeping in mind that counsels' decisions regarding competency in this case are a

23   question of timing only, the record does not permit a finding that counsel were unreasonable in

24   their determination not to make an incompetency request to the court prior to the time when they

25   made it.  Asking a court to find a client incompetent to proceed is not a decision to be lightly

26   taken.  Competency proceedings delay a final decision on the merits, and it is clear here that

31

1  petitioner Stanley did not want the guilt phase delayed.  Competency treatment is something that

2  a person might well not desire to undergo.  The stigma of being found incompetent is not

3  pleasant.  Importantly, an attorney representing a client should not take action against that

4  client's wishes in such a fundamental decision such as incompetency proceedings unless there is

5  doubt based on substantial evidence of incompetency.

6          Present habeas counsel mistake the difficulty of determining whether to ask the

7  court to hold competency proceedings, and the weighing of pros and cons of the evidence in an

8  *overall* context, with a purported unreasonable failure to petition the court at the first signs of any

9  evidence of uncooperativeness.  Habeas counsels' position is much like arguing that as a matter

10  of law reasonable doubt in a case exists because the jury was troubled by the facts and took a

11  long time to finally determine the case.  The point here is that *within the standards that govern*

12  *counsel conduct regarding petitioning for incompetency*, that decision may take some time to

13  evolve, and the determination will not be black and white.

14          Petitioner's position on counsel's "unreasonable" conduct is especially transparent

15  in that trial counsel did everything they could to do the right thing.  They analyzed the situation

16  carefully themselves; they asked a competent expert his opinion.  The bottom line was that

17  petitioner was competent "until most recently," i.e. during the penalty phase.

18          To second guess the *considered, contemporaneous* judgment of counsel,

19  considered in terms of time, personal interaction and expert advice, would itself be clearly

20  violative of Supreme Court authority.  Bell v. Cone, supra.  Petitioner has failed to satisfy the

21  first prong of Strickland – were the actions of counsel unreasonable in not sooner making known

22  to the court an assertion that petitioner Stanley was incompetent to participate in trial.

23          Even if trial counsel could have been said to be unreasonable in terms of not

24  sooner making an incompetency motion, present habeas counsel have omitted *any* argument that

25  petitioner was prejudiced by counsels' actions.  Certainly, prejudice must be something more

26  than simply a hearing was not held.  Even assuming a hearing should have been held earlier (at a

32

1    time unspecified by petitioner), petitioner must show that the outcome of the proceeding at issue,

2    here a competency hearing, would have likely shown that petitioner was incompetent.  Another

3    way of putting the issue is whether confidence in the outcome of the guilt phase was undermined

4    by not having a competency hearing.  The need to show "difference in the outcome" prejudice

5    was the precise point at issue in <u>Hoffman v. Arave</u>, 455 F.3d 926, 937-938 (9th Cir. 2006):

6    "Hoffman claims that his attorneys were ineffective because they did not contest his competency

7    to stand trial....In this case, we find that there is no reasonable probability that the court would

8    have found Hoffman incompetent to stand trial."[10]

9            The undersigned could simply find that petitioner's failure to address the question

10   of prejudice suffices to require a denial of the claim.  However, the undersigned will go further.

11   The fact that counsel at the time unequivocally represented to the court that petitioner was

12   competent through the guilt phase, and the fact that the competency expert Axelrad *at trial*

13   opined that petitioner was competent through the guilt phase, would render any assertion that

14   petitioner Stanley was, in fact, incompetent up through the guilt phase an easily resolved issue –

15   despite the latter day, weak attempts, at evidentiary hearing through counsel Petersen and Dr.

16   Axelrad, to counter their contemporaneous statements and opinions to the contrary.  However,

17   there is more.

18           Petitioner's primary mental health expert at evidentiary hearing, Dr. Woods, never

19   questioned petitioner's ability to understand the charges or the nature of the proceedings.  RT 6[11]

20   (Evid. Hearing] 192-193.[12]  All that was ever at issue then and now was petitioner's ability to

21

_____

22           [10] Indeed, <u>Hoffman</u> did not even analyze the first <u>Strickland</u> prong.  It went straight to the
      prejudice inquiry and required a showing that Hoffman would have been found incompetent if a

23   hearing had been held.

24           [11] Day 6.

25           [12] The Witness:  Oh.  I think that Mr. Stanley was pretty consistently competent in
      understanding the charges that he was facing, and pretty consistently competent in understanding

26   the possible outcome, the various outcomes of those charges.  I think that Mr. Stanley understood

rationally assist his counsel.  Dr. Woods, could not offer an opinion concerning Stanley's competency in this area up through the guilt phase.  "And I don't feel as though I can make a conclusion to a medical degree of certainty during those periods, really before the sentencing phase."  RT (Evid. Hearing) 15.  On second attempt, petitioner's habeas counsel fared no better:

> Q.  Well, so you are not – do you have an opinion to a reasonable degree of medical or scientific certainty regarding whether Mr. Stanley was competent, or rather was incompetent during the guilt phase of the trial?
> A.  The guilt phase?
>
> Q.  Yes, sir.
>
> A.  No, Mr. Olive, I really doubt.  I think there are red flags all the way through, but I would not say that my opinion rises to a medical certainty as it relates to the guilt phase itself.

RT (Evid. Hearing) 17.

See also RT (Evid.Hearing) 48 [discussing time period between August 1980 and July-August 1983, i.e., from the time of the murders up through the end of the guilt phase] : "Well, let me tell you this Mr. Witt, I would opine that during that period of time I would not come to the conclusion that he was incompetent;" RT (Evid.Hearing) 141 "I don't believe that he – I don't have an opinion as to whether he was competent at that time [pretrial proceedings]..."

A negative opinion, or lack of an opinion from petitioner's primary mental health expert at evidentiary hearing seals the issue to the extent it was not already sealed, but petitioner's counsel even went further.

> The Court: Let me see if this helps short-circuit anything about the guilt phase.  Is it petitioner's position, after Dr. Woods opinion, that you will not be contesting Mr. Stanley's competency at any time prior to the start of the sentencing phase?
>
> Mr. Olive: Your Honor, our proof is that this expert has no opinion on competency at trial, at his guilt phase.  And so our proof goes solely to sentencing of substantive competency, but we do argue that there were signposts and red flags throughout the guilt/innocence and pretrial proceedings that should have led

the roles of the officers of the court....And it's really being able to assist his attorney... being able to assist his attorney in the preparation of his defense [that was at all an issue in his mind].  RT 5 (Evid. Hearing) 192-193.

to a determination at that time.  But that's a separate procedural issue due process claim and not substantive.

The Court: Well, it is, but it's hopeless unless you have an opinion that there was something to get from it.  In other words, there were signs and red flags, so what? If the opinions today...but the opinion today is, I don't have an opinion.  It seems pretty hopeless to me.

Mr. Olive: Well, our argument would be that you have a procedural due process right if a judge ought to order a hearing....and if that right is violated you win....

The Court: And so per se, there's no prejudicial error component.

Mr. Olive: Well, there is a – there are – no.

RT (Evid. Hearing) 141-142.

As set forth above, ineffective assistance of counsel in the competency context *does* require a prejudicial error (substantive) component – when petitioner is claiming that his counsel should have sought a competency hearing from the court.  Hoffman v. Arave, supra.  By conceding that petitioner could not prove that petitioner was in fact incompetent during the guilt phase, the issue of ineffective assistance of counsel in not requesting a competency hearing prior to the time they did is over.

*Conclusion to Pre-trial and Guilt Phase Incompetency Issues*

      1.  The trial court (several judges) did not have substantial evidence of petitioner's incompetency *before it* during the pre-trial and guilt phases which should have triggered a competency hearing;

      2.  Trial Counsel reasonably did not request a competency hearing prior to the time at which they did request one during the penalty phase;

      3.  Petitioner was not prejudiced by any alleged failure of counsel to request a competency hearing prior to the time they did request one.

*Fourth Amendment Claims (Claim 4)*

      Petitioner makes several claims regarding violations of the Fourth Amendment:

1.  Stone v. Powell, 428 U.S. 465, 96 S. Ct. 3037 (1976) does not apply to capital cases;

35

2.  Petitioner did not receive a full and fair opportunity to adjudicate his Fourth Amendment claims because the California Supreme Court did not review the decision (on writ) of the California Court of Appeals affirmation – in part –, reversal – in part, of the trial court rulings;

3.  The trial court judge who ruled on the motions to suppress was biased.

None of these assertions has merit, and none have required an evidentiary hearing.

### 1. Stone v. Powell

Neither in the Amended Petition, nor in the summary judgment motions filed earlier in this case (1998), nor at any place in these habeas proceedings does petitioner cite any authority for his proposition that Stone v. Powell does not apply in capital cases.

"Where the State has provided an opportunity for full and fair litigation for a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial." Stone v. Powell, 428 U.S. 465, 494, 96 S. Ct. 3037 (1976).  Moreover, the Ninth Circuit has held that the relevant inquiry is "whether the petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided."  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

The Circuits which have addressed the issue of Stone's applicability in a capital case context disagree with petitioner.  Marshall v. Hendricks, 307 F.3d 36, 81 (n.34) (3rd Cir. 2002); McQueen v. Scroggy, 99 F.3d 1302, 1332 (6th Cir. 1996) overruled on other grounds, In re Abdur-Rahman, 392 F.3d 174 (6th Cir. 2004), which was itself vacated by the Supreme Court; Devier v. Zant, 3 F.3d 1445, 1455 (11th Cir. 1993).  For the reasons expressed by those courts, petitioner's claim has no merit.

### 2. Full and Fair Opportunity

Petitioner does not contend that he was not given ample opportunity to litigate his Fourth Amendment claims in the trial court and the Court of Appeal.  The fifteen volumes of transcript (Lake County) on the suppression motions would belie such a claim.  Nor does

1   petitioner allege that his counsel were ineffective in presenting their Fourth Amendment claims.

2   Rather, the sole contention on full and fair opportunity is the refusal of the state supreme court to

3   hear an appeal from the writ determination of the Court of Appeal.  Petitioner presents no

4   authority for the proposition that, absent a state statute creating a liberty interest, a defendant has

5   a Due Process Constitutional right to have a state court of last resort rule on the merits of any

6   claim, much less a Fourth Amendment claim.  In any event, the California Supreme Court did

7   ultimately review the merits of the Fourth Amendment claim.

8           In California capital cases, direct review after judgment is automatically by statute

9   sought in the state supreme court.  Cal. Penal Code § 1239(b).  However, interlocutory writs in

10  capital cases may proceed through the state appellate courts.  After petitioner litigated his Fourth

11  Amendment claims in the trial court, writ review was sought and received in the appellate court.

12  This appellate court granted in part and denied in part the petition.  On July 22, 1982, the state

13  supreme court denied review.  On direct review after judgment, petitioner again raised the Fourth

14  Amendment issues.  However, the state supreme court found no reason to depart from the law of

15  the case.  People v. Stanley, 10 Cal. 4th at 786-790, 42 Cal. Rptr. 2d at 554-557.  Nevertheless, in

16  so doing, the state supreme court did review the merits of the claims, albeit under standards

17  related to law of the case.  Id.

18          Petitioner's destitute contention that the review here somehow does not qualify as

19  a full and fair adjudication falls under the weight of review which was actually undertaken by all

20  of the state courts.  No further, lengthy discussion is needed.

21                  3.  The Suppression Motion Trial Judge Was Biased

22          This sub-claim was so hyperbolic and devoid of merit, after the record was

23  reviewed, it did not qualify for an evidentiary hearing.  In the Order re Evidentiary Hearing

24  Issues, at 14-16, the undersigned completely discussed why no evidentiary hearing would be

25  ordered on this claim.  For ease of reference, that discussion is quoted verbatim herein.

26  \\\\\

In a discovery motion reprise, petitioner next contends in his operative petition in Claim 4 that the trial judge who heard the suppression motion was biased on account of his dual role as adviser to the grand jury who was reviewing yet another murder attributed to petitioner. Petitioner does not mention Claim 4 in the motion for evidentiary hearing, except to summarily lump it with other claims to which petitioner claims entitlement to an evidentiary hearing. At a discovery hearing wherein petitioner requested an opportunity to discover this claim, the undersigned found as follows:

> Petitioner asserts that he was denied a fair opportunity to have adjudicated his motion to suppress on account of judicial bias. Petitioner paints a picture that Judge Patton, the judge who presided at the motion, and one borrowed from Colusa County, was actively seeking the indictment of petitioner in Colusa County for the murder of Sheryl Wright. Petitioner alleges that: "Judge Patton took it upon himself to pursue an indictment and to determine why none had been obtained already." Ultimately no indictment occurred, notwithstanding Judge Patton's insistence. In requesting voluminous and difficult discovery of Grand Jury records, all correspondence of County Officials related to the Wright murder/prosecution, amidst other requests, petitioner proffers not a single fact supportive of the notion that Judge Patton "pursued an indictment." Despite the years of investigation, petitioner's counsel have not presented a single declaration attesting to any conduct on the part of Judge Patton which might even infer impropriety, much less recount it. Yet, the court is asked to let loose a discovery barrage into events transpiring over twenty years ago. Counsel did not even know at hearing whether Judge Patton was alive at the present time to respond to any requests.
>
> In his discovery motion, petitioner exacerbates the problem by making further improbable conclusions, i.e., that Judge Patton encouraged the Grand Jury to investigate the District Attorney who was declining to prosecute petitioner, and that he "sent the Grand Jury legal authorities supporting its decision to try to force Mr. Stanley to be prosecuted." Again, no facts supporting this assertion, even obliquely, are presented. Rather, the uncontested facts set forth by respondent indicate that Judge Patton was the single judge in Colusa County at the time of the Lake County suppression motion, and part of his duties were responding to requests of the Colusa County Grand Jury. It does appear that the Colusa County Grand Jury was at odds with the District Attorney over the Wright murder; it asked Judge Patton general questions about the Grand Jury's rights and authority in the matter. Judge Patton generally advised the grand jury about its prerogatives. See Exhibit 46 to the state habeas petition.
>
> The court in no way finds the facts of this matter as it stand[s] before the court to even possibly suggest that Judge Patton acted in a manner which biased him in respect to his duties as the visiting

suppression judge in Lake County in the murder at issue for petitioner's conviction (Cindy Rogers (Stanley)).[13]  Petitioner is not entitled to "'explore [his] case in search of its existence.'"  Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999).  As respondent aptly observed:  "Petitioner could just as easily have claimed that Judge Patton was a relative of one of Petitioner's victims or had been bribed by one of Petitioner's enemies.  Although any of those claims, if true, would support an allegation of judicial bias, the claim Petitioner has made is just as barren of specific supporting allegations as those suggested at random by Respondent." Opposition at 3-4.

[Discovery] Order at 2-3.

This order was affirmed by the district judge on November 18, 2004.  In this order, the Honorable Frank Damrell thoroughly re-reviewed the entire Judge Patton question.  He concluded that:

> "The magistrate judge correctly concluded that Judge Patton complied with existing California law permitting grand juries to elicit the advice of the court, or the judge thereof.  Cal. Penal Code §§ 917-918, 934.  Here, the proffered documents suggest that Judge Patton, the only superior court judge in Colusa County, simply responded to the grand jury's repeated requests for legal advice regarding its authority to investigate the case and question the District Attorney.  Although Judge Patton contacted Deputy Attorney General Tuton directly, petitioner fails to provide specific allegations that this contact was anything but proper.  In fact, the inquiry supports respondent's contention that Judge Patton merely attempted to provide the grand jury with the information requested.

[Damrell] Order at 12-13.

Judge Damrell also concluded that Judge Patton was not required to recuse himself under California law (even assuming a violation of this law would have stated a federal issue).

> Conversely, in the present case, petitioner fails to demonstrate that Judge Patton's actions would have resulted in disqualification.... Petitioner has failed to provide statutory or case law supporting his contention that his former Lake County attorney should have been notified that Judge Patton was providing advice to the jurors in via (sic) purported "ex parte communication."  The facts simply do not support disqualification.  Judge Patton acted within his authority when upon request, he provided advice to [grand] jurors.

[Damrell] Order at 15-16.

---

[13]  Evidence relating to Ms. Wright's murder was introduced in petitioner's penalty phase, but the motion to suppress did not involve facts pertinent to Ms. Wright's murder.

In seeking an evidentiary hearing, petitioner adds not one colorable fact which would entitle him to evidentiary hearing despite this court's scheduling order requirements. The undersigned again notes petitioner's years long access to investigators who could have contacted any of the "players" in this alleged improper conduct. The record is completely silent as to such investigation. The court can only conclude that having an evidentiary hearing would simply replay the already known facts – this replay would not result in a different ending for petitioner.

Accordingly, because Claim 4 has been procedurally barred, and is without merit, i.e., is not a colorable claim at this juncture, no evidentiary hearing will be ordered for Claim 4.

Order Re: Evidentiary Hearing Issues at 14-16.

Without an evidentiary hearing, petitioner could not prevail on the bias issue, i.e., the record completely refuted the claim. Petitioner was given an opportunity to develop *any* extra-record facts which might add some facts which would then require, at the very least, an evidentiary hearing. Petitioner could not do so. Thus, the issue of trial judge bias could be, was and is, resolved on the record; the claim should be finally denied. See Rich v. Calderon, 187 F.3d 1064, 1067-1068 (9th Cir. 1999) (where petitioner was given an opportunity to present facts showing the need for an evidentiary hearing, but did not, final adjudication was appropriate).

### *Fourth Amendment Issues (Merits) (Claim 5)*

Undeterred by Stone v. Powell, petitioner briefs the merits of the Fourth Amendment issues. Because this court is barred from merits review, the undersigned will proceed no further with this claim.[14]

### *The Finding of the Special Circumstance of the Killing of a Witness Violated the Eighth and Fourteenth Amendments (Claim 13)*

The heading of this claim is somewhat inaccurate in that petitioner primarily complains in the text of the petition of a failure to sever the adjudication of a special circumstance from the guilt phase. Even as properly characterized, the claim has no merit.

---

[14] Although petitioner invokes the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments, the issues raised by petitioner clearly only implicate the Fourth Amendment.

40

Petitioner postulates that the failure of the trial court to sever the killing of the

witness special circumstance:

> prejudiced petitioner because it deprived him of the opportunity of presenting a
> defense that he killed his wife for a reason other than  prevention of her testimony
> [in a spousal rape criminal matter]; for if petitioner had presented such a defense
> at the guilt phase, he would have effectively convicted himself of murder.  If the
> special circumstance had been tried separately from guilt, however, Petitioner
> would have been free to remain silent at the guilt trial and then present a
> motivation for the murder different than the one alleged in the special
> circumstance.
>
> There was substantial evidence petitioner could have presented to show that he
> killed his wife not to prevent her testimony, but for a much more powerful reason:
> love.

Amended Petition at 145.

Notwithstanding that this hindsight, theoretical "defense" would have inflamed

any jury against petitioner, i.e., first he raped and beat her, and then a few days later shot her

through the heart to show his "love,"[15] petitioner's claim has no foundation in reality.  As

brought out in the discussion of other claims, petitioner was adamant that he did not kill his wife.

He testified under oath to that effect, and neither petitioner, nor his counsel, have ever withdrawn

such testimony.  Petitioner, through his counsel, nevertheless postulates a theory of constitutional

right deprivation because, supposedly, petitioner would have framed his testimony to take

advantage of a procedural ploy, *regardless of the truth of such framing.*

Petitioner cannot have it both ways.  He cannot try out on a jury "the other guy did

it defense," wait to see if the jury would accept such, and when they did not, imply in later

habeas proceedings that if only the trial judge had severed the special circumstance allegation,

petitioner would have completely changed the critical substance of his given testimony.  No legal

---

[15] Trial counsel worked and succeeded to keep the matter of the spousal rape and beating from the jury.  If, however, petitioner were going to actually testify to a latter day conceived "love" theory, this extra evidence of petitioner's "love" would surely have been permitted to come out on cross-examination.  Petitioner's trial counsel were quite reasonable in not permitting the spousal rape and beating evidence to become part of the case.

1   system should foster such prevarication and manipulation in the name of constitutional rights.

2   Certainly, there are no Supreme Court cases which would justify such, and in this AEDPA

3   context, petitioner cannot prevail.

4          Even getting past the above observations, respondent argues that the state supreme

5   court procedurally barred this very argument concerning severance because the trial court motion

6   to sever the special circumstance did not raise this argument.  People v. Stanley, 10 Cal. 4th at

7   798, 42 Cal. Rptr. 2d at 562.  Respondent is correct.

8          In opposing respondent's motion for summary judgment on this claim, Opposition

9   at 45, petitioner effectively abandons the claim by merely referring to facts set forth in the

10  petition.  Thus, the issue of procedural bar having been put in issue by respondent, petitioner has

11  not met his burden by even challenging the bar.  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir.

12  2003).  The procedural bar is therefore effective.

13         Tucked within this severance claim, petitioner raises an exhausted sub-claim

14  which was not procedurally barred.  Petitioner raises the specter that the jury instructions

15  regarding use of motive for the murder count (motive is not an element) combined with

16  instructions on the special circumstance of killing a witness for purposes of avoiding testimony,

17  where motive is essential to show the requisite intent, confused the jury.  The state supreme court

18  held:

19         Pursuant to CALJIC No. 2.51, the court instructed the jury that "[m]otive is not an
           element of the crime charged and need not be shown."  Pursuant to CALJIC No.
20         8.81.10, the court also instructed the jury that in determining the truth of the
           witness-murder special circumstance, they had to determine whether the victim
21         was killed for the purpose of preventing her testimony.  Defendant argues that
           because motive and purpose are synonymous, the two instructions were
22         inconsistent and may have misled the jury to defendant's prejudice.

23         We rejected a similar contention in People v. Edelbacher, supra, 47 Cal.3d at page
           1027, 254 Cal.Rptr. 586, 766 P.2d 1.  As there stated, "The 'crime charged' was
24         murder and any reasonable juror would have understood the instruction as
           referring to this substantive offense only and not to any special circumstance
25         allegation."  (Ibid.; accord, People v. Noguera (1992) 4 Cal.4th 599, 637, 15
           Cal.Rptr.2d 400, 842 P.2d 1160.)

26

1   People v. Stanley, 10 Cal. 4th at 799, 42 Cal. Rptr. 2d at 563.

2            The undersigned also observes that while motive is not an element of the murder

3   charged against petitioner, it is not irrelevant to the murder charge either.  This principle is

4   established by CALJIC 2.51 which continues: " However, you may consider motive or lack of

5   motive as a circumstance in this case [the murder charge].  Presence of motive may tend to

6   establish the defendant is guilty.  Absence of motive may tend to show the defendant is not

7   guilty."  Thus, even if the jury considered motive for the jury charge, they were perfectly able to

8   do so.  There could not have been confusion, or prejudice from any confusion, when the evidence

9   could logically be considered for both the murder charge and the special circumstance.  Certainly,

10  petitioner has cited no established Supreme Court authority to establish the unreasonableness of

11  the state supreme court's holding.

12           Finally, petitioner included yet one more sub-claim in the amended petition under

13  the general heading of this claim.  He claims that the jury was not instructed in connection with

14  the special circumstance that the desire to prevent the witness from testifying was the

15  *predominant* purpose of the killing.  The state supreme court quickly dispatched this assertion on

16  logic and as a matter of state law.  People v. Stanley, 10 Cal. 4th at 800, 42 Cal. Rptr. 2d at 563

17  (calling the argument "specious").  Not only has petitioner failed to cite a Supreme Court case to

18  establish that a jury must be instructed in accordance with his desires herein, petitioner has cited

19  *no federal case whatsoever*.  The undersigned will not discuss the issue further.

20           To the extent petitioner raises penalty phase arguments in this claim, a decision

21  will be deferred.

22           *The State's Use of Lying-in-Wait Theory to Prove Murder of the First Degree Violated*

23           *Petitioner's Constitutional Rights (Claim 19)*

24           Once again, petitioner opposes the summary judgment claim, and hence

25  respondent's briefing on this issue, by simply referring to the petition which in a footnote refers

26  to one Supreme Court case.  Once again, in the AEDPA world, petitioner cannot prevail.

The state supreme court responded at length to the same claim made on direct review, and to the one Supreme Court case.  Because the undersigned cannot improve on the holding, and because the undersigned agrees with its reasoning, petitioner per force has not established an unreasonable application of Supreme Court authority.  For ease of reference, the undersigned sets forth that section from the opinion of the state supreme court:

> The jury was instructed on the alternative first degree murder theories of murder by premeditation and deliberation and murder by lying in wait.  In connection with lying in wait, the court instructed the jury, in part, "The term, quote, 'lying in wait,' end quote, is defined as waiting and watching for an opportune time to act, together with concealment by ambush or by some other secret design to take the other person by surprise.  [¶]  The lying in wait need not continue for any particular time, provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." (Italics added.)  Defendant argues that either deliberation is an element of first degree murder perpetrated by lying in wait, in which case the jury was wrongly instructed, or, if deliberation is not an element, conviction of first degree murder by lying in wait is a denial of a defendant's constitutional rights.
>
> The court did not err in instructing the jury in the disjunctive that the duration of the lying in wait must show either premeditation or deliberation.  As we held in People v. Ruiz (1988) 44 Cal.3d 589, 614-615, 244 Cal.Rptr. 200, 749 P.2d 854, the instruction's disjunctive phraseology is neither inappropriate nor misleading. (See also People v. Hardy (1992) 2 Cal.4th 86, 162-163, 5 Cal.Rptr.2d 796, 825 P.2d 781.)
>
> Defendant maintains, however, that in classifying nondeliberating murderers the same as those who deliberate their killings, the Legislature has created a "suspect class" that affects a fundamental liberty interest, thus placing on the People the burden to establish a "compelling interest" and demonstrate that the distinctions are necessary to further that purpose.  (People v. Olivas (1976) 17 Cal.3d 236, 251, 131 Cal.Rptr. 55, 551 P.2d 375.)
>
> Defendant's premise the Legislature has created a suspect class is mistaken.  FN8 To prove first degree murder of any kind, the prosecution must first establish a murder within section 187-that is, an unlawful killing with malice aforethought. (People v. Dillon (1983) 34 Cal.3d 441, 465, 194 Cal.Rptr. 390, 668 P.2d 697; People v. Mattison (1971) 4 Cal.3d 177, 182-183, 93 Cal.Rptr. 185, 481 P.2d 193; People v. Hyde (1985) 166 Cal.App.3d 463, 475, 212 Cal.Rptr. 440.) Thereafter, pursuant to section 189, the prosecution must prove the murder was perpetrated by one of the specified statutory means, including lying in wait, or "by any other kind of willful, deliberate, and premeditated killing, ..." (Italics added.) FN9 Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill. (People v. Hardy, supra, 2 Cal.4th at p. 162, 5 Cal.Rptr.2d 796, 825 P.2d 781.)  Consequently, treating the two kinds of murder the same is not a violation of equal protection.

FN8. We note that in equal protection analysis, "suspect classes" are not legislatively created, but, rather, are constitutionally determined.

FN9. At the time relevant to this case, section 189 provided in pertinent part: "All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is a murder of the first degree; and all other kinds of murders are of the second degree."

Citing Enmund v. Florida (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, defendant argues that classifying murder by lying in wait as first degree murder violates the Eighth Amendment proscription against cruel and unusual punishment, because the penalties for first degree murder (25 years to life and, if special circumstances are alleged, exposure to capital punishment) are disproportionate to the culpability of a murderer who does not deliberate on the offense.

In Enmund the high court held that the death penalty, imposed under the state felony-murder rule, was disproportionate punishment for a robber who did not himself kill, attempt to kill, or intend that a killing take place or that lethal force would be employed. ( Id. at p. 797, 102 S.Ct. at 3376-3377.)  More recently, in Tison v. Arizona (1987) 481 U.S. 137, 158 [107 S.Ct. 1676, 1688, 95 L.Ed.2d 127], the court held "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." (Fn. omitted.) In light of these pronouncements, defendant cannot prevail in his argument that his conviction for first degree murder violates the Eighth Amendment.  "Murder committed by lying in wait has been 'anciently regarded ... as a particularly heinous and repugnant crime.' [Citation.]" (People v. Edelbacher (1989) 47 Cal.3d 983, 1023, 254 Cal.Rptr. 586, 766 P.2d 1.)  The moral culpability of the offender who murders by lying in wait justifies fixing the murder in the first degree. (People v. Wolff (1964) 61 Cal.2d 795, 820, 40 Cal.Rptr. 271, 394 P.2d 959; see also People v. Morales (1989) 48 Cal.3d 527, 558, 257 Cal.Rptr. 64, 770 P.2d 244.)

Finally, defendant asserts that if deliberation need not be proved, virtually any premeditated murder can satisfy the requirements of lying in wait and thus be murder in the first degree.  He maintains that once the prosecution has proved premeditation, it has, by the same facts, in effect proved lying in wait.  This contention is meritless.  "Premeditated" simply means " 'considered beforehand.'" (People v. Perez (1992) 2 Cal.4th 1117, 1123, 9 Cal.Rptr.2d 577, 831 P.2d 1159.)  For lying in wait, by contrast, the prosecution must prove the elements of concealment of purpose together with "a substantial period of watching and waiting for an opportune time to act, and ... immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (People v. Morales, supra, 48 Cal.3d at p. 557, 257 Cal.Rptr. 64, 770 P.2d 244 [lying-in-wait special circumstance].)  These circumstances, taken together, present "a factual matrix ... distinct from 'ordinary' premeditated murder...." ( Ibid.)

1   <u>People v. Stanley</u>, 10 Cal. 4th at 793-795, 42 Cal. Rptr. 2d at 559-560.

2           For the above reasons, this claim should be denied.

3           *<u>The "Malice" Instruction Violated the Winship Provision that the State Must</u>*

4           *<u>Prove Every Element of the Crime Beyond a Reasonable Doubt (Claim 20)</u>*

5           Petitioner masks his disagreement with the California Supreme Court's

6 determination of "malice" in state law with the federal requirement to prove all elements of a

7 crime, *as defined by state law*, beyond a reasonable doubt.

8           All agree that the given general malice requirement instruction was proper: "The

9 crime of murder is the unlawful killing of a human being with malice aforethought." See <u>People</u>

10 <u>v. Stanley</u>, 10 Cal. 4th at 796. Petitioner takes issue, however, with the express malice

11 instruction: "Malice may be either express[] or implied. Malice is express[] when there is

12 manifested an intention unlawfully to kill a human being. <u>Id</u>. Petitioner attacks the instruction,

13 citing <u>People v. Conley</u>, 64 Cal. 2d 310, 49 Cal. Rptr. 815 (1966), as improperly setting up an

14 irrebuttable presumption, allegedly at odds with California law, i.e., that if one has manifested a

15 specific intent to kill, one has manifested malice as well. Petitioner cites selected portions of

16 <u>Conley</u> which provide that "[t]he mental state existing when a defendant has a specific intent to

17 kill is not necessarily the mental state known as malice aforethought." <u>Conley</u> at 320.

18           The California Supreme Court held that petitioner erroneously construed

19 California law.

20      <u>Conley</u> is inapposite. There the trial court, in instructing the jury on the elements
of murder, instructed on intention, deliberation and premeditation, but omitted any
21 reference to malice. Defendant's defense was diminished capacity. Observing
that the mental state of specific intent to kill was not necessarily the same as
22 malice aforethought (64 Cal.2d at p. 320, 49 Cal.Rptr. 815, 411 P.2d 911), the
court held the instructional omission removed from the jury the issue of
23 defendant's capacity to harbor malice ( id. at p. 323, 49 Cal.Rptr. 815, 411 P.2d
911). Here, by contrast, the jury was fully instructed on malice.
24
25      Nor did the instruction erroneously equate malice with intent. When these
offenses occurred, "[a]n awareness of the obligation to act within the general body
of laws regulating society ... [was] included in the statutory definition of implied
26 malice in terms of an abandoned and malignant heart and in the definition of

express malice as the deliberate intention unlawfully to take life." (Conley, supra, 64 Cal.2d at p. 322, 49 Cal.Rptr. 815, 411 P.2d 911, italics added; see also People v. Polley (1983) 147 Cal.App.3d 1088, 1092, 195 Cal.Rptr. 496.) FN10[omitted] Although an amplifying instruction may have been required if defendant had relied on a diminished capacity defense (People v. Fusselman (1975) 46 Cal.App.3d 289, 300-301, 120 Cal.Rptr. 282; see, generally, People v. Flannel (1979) 25 Cal.3d 668, 684, 160 Cal.Rptr. 84, 603 P.2d 1), defendant's defense of alibi was totally inconsistent with diminished capacity.  In the circumstances, the court's instructions were sufficient. (See People v. Sedeno (1974) 10 Cal.3d 703, 716-717, 112 Cal.Rptr. 1, 518 P.2d 913; cf. People v. James (1987) 196 Cal.App.3d 272, 289-291, 241 Cal.Rptr. 691.)

People v. Stanley, 10 Cal. 4th at 796-797, 42 Cal. Rptr. 2d at 561.

Petitioner cannot argue that the California Supreme Court misinterpreted its own law in federal habeas [16] in order for petitioner to "set up" a federal anti-presumption argument. Moreover, in another context the state supreme court has clearly held that when diminished capacity is unavailable, "that once the trier of fact finds a deliberate intention unlawfully to kill, no other mental state need be shown to establish malice aforethought."  People v. Saille, 54 Cal. 3d 1103, 1113, 2 Cal. Rptr. 2d 364, 370 (1991) (exhaustively reviewing Conley and other earlier cases and finding them superseded by the change in law abolishing diminished capacity.)  For purposes of the present case, whether one did not present a diminished capacity defense, or it was otherwise unavailable as a matter of law, the result is the same – a specific, deliberate intent to kill will suffice to establish  malice.[17]  Petitioner cannot argue that the jury was not instructed on premeditation and deliberation, and cannot argue that the prosecution evidence did not clearly establish such beyond a reasonable doubt, indeed, beyond any peradventure of a doubt. [18]

_____

[16] See Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 480 (1991) ("it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); Wainwright v. Goode, 464 U.S. 78, 84, 104 S.Ct. 378 (1983) (per curiam) ("the views of the State's highest court with respect to state law are binding on the federal courts").

[17] Moreover, as discussed in the following section, even if petitioner were correct under the old California law, and the state supreme court was wrong in Stanley, a presumptuous assumption, petitioner could not benefit from the old law on retrial.

[18] Petitioner would have an impossible task, in any event, in establishing harmful error, and conversely, the State would have a minuscule task, under the facts of the case, in establishing

1    Petitioner's predicate having failed, so does his conclusion.

2    *Ineffective Assistance of Counsel (Guilt Phase) ( Claims 23, 24[19] and 26[20])*

3    Claim 23 describes a litany of facts and assertions concerning the alleged aspects

4    of petitioner Stanley's mental/emotional health which should have been further investigated and

5    developed by defense counsel.  Petitioner apparently believes that the mental health issues

6    investigated by counsel and presented by Dr. Axelrad were "wrong."

7    Claim 24 lists the conclusion about how the ineffectiveness affected the phases of

8    the trial.  Claim 24 alleges that the guilt phase was affected by ineffective assistance in regards to

9    not quickly and continuously asking the court to find petitioner incompetent, but that contention

10   has already been shown to lack merit.  Claim 24 also asserts that an effect of the ineffective

11   assistance included the facts that waivers of constitutional rights (unspecified) at the guilt phase

12   (and at other times) were not knowingly and intelligently made.  It is difficult to understand how

13   this assertion, on its face an unfiltered-through-ineffective-assistance "straight" claim applicable

14   to petitioner's state of mind, relates to ineffective assistance.  However, even if it does, the

15   standard to be able to waive one's rights, and competency to stand trial are the same.  Godinez v.

16   Moran, 509 U.S. 389, 397, 113 S. Ct. 2680, 2685 (1993).  Because there was no ineffective

17   assistance of counsel with respect to incompetency at the guilt phase (includes pre-trial), the

18   same result would obtain for waivers of constitutional rights during the guilt phase.

19   \\\\\\

20

21   the harmlessness of the error.  See California v. Roy, 519 U.S. 2, 5, 117 S. Ct. 337, 338 (1996)

22   (whether the omission of an element from jury instructions is harmful is determined by whether the omission had a substantial and injurious effect on the verdict).

23   [19] The ineffective assistance claims for the most part implicate the penalty phase and those issues will be deferred.

24

25   [20] This claim alleges ineffective assistance of appellate counsel; however, no specific assertions are made against appellate counsel.  Because no valid issue in any event could be raised against appellate counsel vis-a-vis the guilt phase, and none have been made, the

26   undersigned views Claim 26 as only a repetition of the previous claims.

1   The alleged effect of ineffective assistance of counsel on the penalty phase is

2   deferred.

3   That leaves only the guilt phase, and the singular, somewhat coyly phrased,

4   contention aside from a lack of competency that; "[petitioner] [was] not guilty of the offenses for

5   which he was convicted."  Amended Petition at 182, para 585(a).  Normally, adjudication of such

6   a contention after lengthy habeas proceedings, including an evidentiary hearing would require an

7   exhaustive review of the evidence and its legal implications for the trial which was held.  This is

8   not the normal case.

9   Ineffective assistance related to under-investigated or developed mental health

10  defenses could only have had three possible (realistic) effects which would make a convicted

11  defendant "not guilty of the offenses for which he was convicted":

12  1.  The defendant was not guilty by reason of insanity;

13  2.  The defendant did not *actually* form the intent required for murder offenses thereby rendering

14  the defendant guilty of only involuntary manslaughter;

15  3.  The defendant possessed a diminished capacity (available at the time of petitioner's trial)

16  thereby reducing the severity of the crime.

17  Again, petitioner does not account for the prejudice requirement for a finding of

18  ineffective assistance of counsel.  All three possibilities have not a scintilla of evidence in

19  support in terms of whether there was any likelihood that petitioner possessed any of the

20  referenced mind states; indeed, petitioner produced *not one opinion* at evidentiary hearing

21  regarding whether petitioner may actually have been insane at the time he murdered his second

22  wife, or whether he failed to actually form the intent required, or whether he suffered from

23  diminished capacity.  Moreover, even if an opinion had been rendered, that in light of the habeas

24  experts' investigation, use of new facts etc. which  "should" have been supplied by trial counsel,

25  petitioner in fact possessed a diminished capacity at the time of the crimes, such a doctrine is

26  unavailable presently as a matter of law and hence would be unavailable on retrial.

49

1    Nor is the above simply a mistake on the part of habeas counsel.  Present counsel

2    for petitioner are simply too competent to have overlooked this critical prejudice requirement.

3    The only reasonable inference to be drawn is that counsel knew full well that their experts would

4    not give a positive opinion, positive to petitioner, on any of the three possibilities.  And

5    respondent's counsel was too competent not to recognize the obvious omission, and the logical

6    determination of doing nothing to "correct" it.  Therefore, the "prejudice" record before the

7    undersigned is zero.

8    A defense of insanity was not pursued at trial.  In his declaration on state habeas,

9    produced in a folder with other exhibits relied upon by Dr. Woods, petitioner's present, retained

10    mental health expert (Woods), discussed at length the further investigation into petitioner's

11    mental health deficiencies he would have liked investigated, and in what areas he disagreed with

12    trial and habeas expert Dr. Axelrad.  He then opined: "Therefore, it is reasonable that, given the

13    circumstances of the crime, and NGI defense could have been aggressively investigated and

14    developed."  Respondent's Exhibit 1-C.  Of course, anything can be investigated and developed.

15    But what of its ultimate merit? – a critical component of ineffective assistance of counsel.  Dr.

16    Woods spoke not a word on this at evidentiary hearing [as opposed to lengthy opinions on

17    sentencing phase competency].  And, the undersigned confirmed his memory on this finding with

18    a page by page review of the transcript.

19    Dr. Woods did not utter a word, period, in terms of opining that petitioner had not

20    actually formed the intent required for murder.  He uttered no opinion whatsoever on diminished

21    capacity in terms of a conclusion that petitioner qualified for such.  In fact, he related on cross-

22    examination: "So I have not come to the conclusion that he is not legally responsible, but I have

23    come to the conclusion that it was reasonable for his defense team to have considered it."  RT

24    (Evid. Hearing) 87.  Not coming to a conclusion does not establish prejudice.

25    Similarly, Dr. Axelrad who determined at the trial level, along with counsel, that

26    an NGI would not be pursued, was not asked a question on direct regarding the likelihood, if any,

50

that Stanley was NGI at the time he committed the murder at issue.  The closest thing to a

commencement of a discussion on the subject occurred on cross-examination, and which

referenced trial counsel's alleged "dropping of the ball" with respect to finalizing

neuropsychological testing:

> [Dr. Axelrad]
>
> If Dr. Morrison had been able to give me information in his – Dr. Hutchinson in his report that this gentleman has a severe brain problem that would significantly be impaired further by the use of alcohol to where he could not remember what took place during the homicide involving his wife Cindy, I think I probably could have had some more leverage to be able to testify to a jury at the NGRI – if there was going to be an NGRI defense that this is the basis for this man's problems with his memory which was – which of course was compounded by the use of alcohol.
>
> Q. Would the same apply to the diminished capacity defense as well as the –
>
> A. Yeah.  I – well, the same applies to diminished capacity.  I must tell you that I would have more kind (sic) of confidence in the NGRI aspects of the case as opposed to the diminished capacity defense because we couldn't get any information from him about his behavior during the time the offense was committed.
>
> Q.  And, Doctor, that's based on having more information than Dr. Hutchinson eventually relayed to you.
>
> A. Well, the information he relayed to me would have been useful, but obviously if he had been able to give me a complete report, it would have been much more helpful particularly if there's going to be an NGRI defense.
>
> ***
>
> Q. Okay. So – but just that information alone [preliminary information which had been relayed to him by the testers] would not have been sufficient for you to give a medical certainty opinion regarding diminished capacity or not guilty by reason of insanity, just what he – the portion he has given to you.
>
> Q.  Without a report, I would have had some difficulty in coming up and testifying at that level of the trial, yes.

RT (Evid.Hearing) 121-122.

The above relates *nothing* about any new information developed in habeas from

which Dr. Axelrad could now venture an opinion to a reasonable medical probability concerning

whether petitioner was insane or suffered from diminished capacity.  No attempt whatsoever was

1    made by petitioner to elicit such an opinion.  The mere fact that *maybe* if some more information

2    had been available, and *assuming* the information was favorable,  "I probably could have had

3    some more leverage," is glaring in its insufficiency.  Habeas procedures gave counsel the

4    opportunity to develop the missing information, and no such information was developed – at

5    least with respect to having *any* expert utilize such information in order to speak to NGI and

6    diminished capacity.  No attempt, apparently could be successfully made.  Clearly, Dr. Axelrad

7    had not now determined that the information would have resulted in a viable insanity or

8    diminished capacity defense; his testimony only relates to "more leverage."  This type of opinion

9    in no way constitutes evidence necessary to undermine confidence in the guilty verdict.  To

10   vacate a guilty verdict on this type of decades later musing, would make the trial process an utter

11   futility.  There is not a case existing where a reasoned application of Supreme Court authority

12   would permit a granting of an ineffective assistance of counsel claim on such a non-opinion.

13          With respect to diminished capacity, another impediment precludes the granting

14   of an ineffective assistance claim.  Even if the court could find both unreasonable actions on the

15   part of counsel and prejudice thereby, no retrial would be permitted in order to place diminished

16   capacity before a trier of fact.  Where during the pendency of habeas proceedings, the law is

17   changed such that a defense which was once available becomes unavailable, petitioner is not

18   entitled to benefit from the "old" defense.  Hunt v. Vasquez, 899 F.2d 878, 880-881 (9th Cir.

19   1990) (petitioner not entitled to application of superseded state law in subsequent state

20   proceedings).  In between petitioner's conviction and the present time, California abolished the

21   defense of diminished capacity.  Cal. Penal Code 25(a); see People v. Anderson, 28 Cal. 4th 767,

22   122 Cal. Rptr. 2d 587 (2002).  Thus, no retrial could be ordered where the defense of diminished

23   capacity could be tried.

24          Therefore, insofar as Claim 23, 24 and 26 relate to the guilt phase, said claims

25   should be denied.

26   \\\\\

*Conclusion*

The court has already found that the matter of competency, *at the time it was adjudicated after the guilt phase*, was improperly decided because of juror misconduct.  The court herein finds that all guilt phase issues (includes pre-trial), and including competency to stand trial *at the guilt phase*, should be decided in favor of respondent.

As previously recommended and adopted by the district court, and for the reasons previously set forth in those findings and adopting order as well as in these Findings, partial judgment pursuant to Fed. R. Civ. P. 54(b) should be entered as to claims 1(a), 1(b), 4, 5, 13, 19, 20, 22, 23, 24, 26 as those claims in whole or in part relate to the guilt phase (includes pre-trial) in favor of **RESPONDENT**; as such there are no guilt phase (includes pre-trial) claims remaining to be adjudicated.  Partial judgment should be awarded to **PETITIONER** on the juror Mitts bias/misconduct claim – 21(a).  Adjudication of the remainder of claims in the Amended Petition should be stayed pending a determination of the competency phase proceedings in state court.  A claim-by-claim identification of decided and deferred claims have previously been set forth.

Respondent should be ordered to commence proceedings on the issue of whether to hold a retrospective competency hearing within thirty days after judgment is entered.

DATED: 8/28/07

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

stan1500.final